# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR DORAL BANK, ) ) ) | **COMPLAINT** |
| ) | |
| Plaintiff, ) | **CASE NO.:** |
| ) | |
| v. ) | **MDL No. 2262** |
| ) | |
| BANK OF AMERICA, N.A.; BARCLAYS BANK ) PLC; BRITISH BANKERS' ASSOCIATION; BBA ) ENTERPRISES LTD.; BBA TRENT LTD. (F.K.A. ) BBA LIBOR LTD.); CITIBANK, N.A.; ) COÖPERATIEVE RABOBANK UA (F.K.A. ) COÖPERATIEVE CENTRALE RAIFFEISEN- ) BOERENLEENBANK, B.A.); CREDIT SUISSE ) AG; CREDIT SUISSE INTERNATIONAL (F.K.A. ) CREDIT SUISSE FIRST BOSTON ) INTERNATIONAL); DEUTSCHE BANK AG; ) HSBC BANK PLC; JPMORGAN CHASE BANK, ) N.A.; BANK OF SCOTLAND PLC; LLOYDS ) BANKING GROUP PLC; LLOYDS BANK PLC ) (F.K.A. LLOYDS TSB BANK PLC); SOCIÉTÉ ) GÉNÉRALE; THE NORINCHUKIN BANK; ) ROYAL BANK OF CANADA; THE ROYAL ) BANK OF SCOTLAND PLC; THE BANK OF ) TOKYO-MITSUBISHI UFJ LTD.; UBS AG; and ) PORTIGON AG (F.K.A. WESTLB), ) ) | **ECF CASE** <br><br> **JURY TRIAL DEMANDED** |
| Defendants. ) | |

# TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ................................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 2

PARTIES ............................................................................................................................ 6

    Plaintiff ........................................................................................................................ 6

    Defendants ................................................................................................................... 6

        Bank of America .................................................................................................. 6

        Barclays................................................................................................................ 7

        BBA ..................................................................................................................... 12

        Citibank ................................................................................................................ 13

        Rabobank ............................................................................................................. 14

        Credit Suisse ........................................................................................................ 16

        Deutsche Bank ..................................................................................................... 17

        HSBC ................................................................................................................... 19

        JP Morgan ........................................................................................................... 20

        Lloyds/Banks of Scotland ................................................................................... 20

        Société Générale .................................................................................................. 23

        Norinchukin ......................................................................................................... 24

        Royal Bank of Canada ......................................................................................... 24

        Royal Bank of Scotland ....................................................................................... 25

        The Bank of Tokyo-Mitsubishi UFJ Ltd. ........................................................... 27

        UBS ...................................................................................................................... 28

        Portigon/WestLB ................................................................................................. 29

BACKGROUND ...............................................................................................................30

    A.    Interest Rate Fundamentals ............................................................... 31

    B.    The Role of Indices and Benchmarks in Financial Markets ................................ 32

    C.    The Role of Interest-Rate Benchmarks in Lending ............................................. 37

    D.    The Role of Interest-Rate Benchmarks in Derivatives ........................................ 37

    E.    Development of bbaLIBOR™ .......................................................................... 42

    F.    Calculation of bbaLIBOR™ ............................................................................ 43

    G.    bbaLIBOR™ Governance ................................................................................. 49

    H.    Defendants' Knowledge of bbaLIBOR™'s Importance ..................................... 53

FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO bbaLIBOR™ ...................57

    A.    Systematic bbaLIBOR™ Depression ................................................... 57

    B.    Agreement Among Panel Bank Defendants and the BBA/FX & MM Committee to Align USD bbaLIBOR™ Submissions ........................................ 61

    C.    Agreement to Exclude a Potential Competitor in the Market for Interest-Rate Benchmarks ..................................................................... 75

    D.    Conduct to Benefit Individual Trader Positions ................................................. 77

    E.    Harmful Effects of the Unlawful Conduct ......................................................... 78

DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT .............................84

    A.    Barclays Admissions ............................................................................84

    B.    UBS Admissions ................................................................................86

    C.    RBS Admissions .................................................................................88

    D.    Rabobank Admissions .........................................................................88

    E.    Lloyds Admissions .............................................................................89

    F.    Deutsche Bank Admissions ..................................................................92

    G.    Citibank Admissions ...........................................................................94

THE FRAUD AND COLLUSION ALLEGED IN THIS COMPLAINT COULD NOT REASONABLY HAVE BEEN DISCOVERED BEFORE BARCLAYS'S ADMISSIONS OF INTENTIONAL MISREPRESENTATIONS OF MATERIAL FACT ................................. 95

COUNT I:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (CREDIT SUISSE INTERNATIONAL AND CITIBANK, N.A) ......................... 102

COUNT II:  UNJUST ENRICHMENT/RESTITUTION (CREDIT SUISSE INTERNATIONAL AND CITIBANK, N.A) ............................................................... 104

COUNT III:  FRAUD (ALL DEFENDANTS) .................................................... 105

    Fraudulent USD bbaLIBOR™ Submissions  (Panel Bank Defendants) ........................ 106

    Fraudulent Representations Regarding USD bbaLIBOR™  (Panel Bank Defendants and BBA) ................................................................. 107

    The BBA's Fraud ................................................................. 108

    Contracting Defendants' Fraud ................................................................. 110

COUNT IV:  AIDING AND ABETTING FRAUD (ALL DEFENDANTS) ............................ 111

COUNT V:  CIVIL CONSPIRACY TO COMMIT FRAUD (ALL DEFENDANTS) ........... 111

COUNT VI:  NEGLIGENT MISREPRESENTATION (ALL DEFENDANTS) ...................... 112

    Misrepresentations in USD bbaLIBOR™ Submissions  (Panel Bank Defendants) ........ 113

    Misrepresentations Regarding USD bbaLIBOR™  (Panel Bank Defendants and BBA) ................................................................. 114

    The BBA's Misrepresentations ................................................................. 115

    Contracting Defendants' Misrepresentations ................................................................. 117

COUNT VII:  TORTIOUS INTERFERENCE WITH CONTRACT (PANEL BANK DEFENDANTS AND BBA) ................................................................. 118

COUNT VIII:  AIDING AND ABETTING  TORTIOUS INTERFERENCE WITH CONTRACT (PANEL BANK DEFENDANTS AND BBA) ................................................................. 119

COUNT IX:  CIVIL CONSPIRACY TO COMMIT  TORTIOUS INTERFERENCE WITH CONTRACT (PANEL BANK DEFENDANTS AND BBA) ................................................................. 120

COUNT X:  TORTIOUS INTERFERENCE  WITH PROSPECTIVE ECONOMIC ADVANTAGE (PANEL BANK DEFENDANTS AND BBA) ................................................................. 120

COUNT XI:  AIDING AND ABETTING TORTIOUS  INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (PANEL BANK DEFENDANTS AND BBA) ......................................................................................................122

COUNT XII:  CIVIL CONSPIRACY TO COMMIT TORTIOUS  INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (PANEL BANK DEFENDANTS AND BBA) ......................................................................................................123

COUNT XIII:  VIOLATIONS OF SHERMAN ACT SECTION 1 (ALL DEFENDANTS).............................................................................................123

    Agreement.....................................................................................................124

    Restraint of Trade .......................................................................................131

    Antitrust Injury and Damages ....................................................................136

    Rule of Reason.............................................................................................137

    A.    Relevant Market:  USD Short-Term Interest-Rate Benchmarks ....................... 138

        Market Definition.........................................................................138

        Harm to Competition ...................................................................139

        Antitrust Injury............................................................................142

    B.    Relevant Market:  OTC USD Interest-Rate Derivatives................................... 143

        Market Definition.........................................................................143

        Harm to Competition ...................................................................144

        Antitrust Injury............................................................................145

    C.    Relevant Market:  USD Floating-Rate Retail Loans ......................................... 145

        Market Definition.........................................................................145

        Harm to Competition ...................................................................146

        Antitrust Injury............................................................................147

    D.    Relevant Market:  USD Floating-Rate MBS ..................................................... 147

        Market Definition.........................................................................147

        Harm to Competition ...................................................................148

Antitrust Injury.........................................................................................148

COUNT XIV:  VIOLATIONS OF THE DONNELLY ACT (ALL DEFENDANTS)..............148

PRAYER FOR RELIEF ....................................................................................149

JURY DEMAND...........................................................................................149

**NATURE OF THE CASE**

1.      This Complaint arises from the manipulation and depression of bbaLIBOR™, a series of interest-rate benchmarks incorporated in trillions of dollars in interest-rate derivatives and floating-rate loans that played a fundamentally important role in financial systems throughout the world.  According to the Defendant British Bankers' Association ("BBA"), bbaLIBOR™ represented the average interest rate paid in the London interbank-loan market by a panel of banks, which during the relevant time period was comprised of many of the largest and most reputable commercial banks in the world.  During the relevant period, sixteen banks comprised the panel of banks for bbaLIBOR™ for U.S. dollar ("USD") interbank loans, referred to herein as "Panel Bank Defendants."[1]  Each working day that they were on the panel, the Panel Bank Defendants submitted to the BBA the interest rates that purportedly represented the rates at which the Panel Bank Defendants would be offered USD interbank loans in a competitive market.

2.      The Panel Bank Defendants were not only contributors to USD bbaLIBOR™, they also were among the most important members of the Defendant BBA, active participants in the committees that oversaw bbaLIBOR™, and the most important users of the benchmark in downstream financial markets, such as the markets for USD interest-rate derivatives, floating-rate loans, and floating-rate mortgage-backed securities ("MBS").  While some Defendants have admitted wrongful conduct, most of the facts remain known only to Defendants and the enforcement agencies investigating the manipulation of bbaLIBOR™.

---

[1] Most Panel Bank Defendants were on the USD bbaLIBOR™ panel throughout the entire relevant time period. Defendant Société Générale replaced Defendant Bank of Scotland plc on the USD bbaLIBOR™ panel in 2009. Defendant Portigon joined the USD bbaLIBOR™ panel in 2009 after acquiring WestLB AG, which had been on the USD bbaLIBOR™ panel prior to its acquisition.

3.     The Federal Deposit Insurance Corporation ("FDIC") is a corporation organized and existing under the laws of the United States of America.  Under the Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver for failed insured depository institutions, 12 U.S.C. § 1821(c), including Doral Bank ("Doral"), San Juan, Puerto Rico.  The FDIC succeeds to, and is empowered to sue and complain in any court of law to pursue, all claims held by banks for which it is the receiver, 12 U.S.C. §§ 1819, 1821(d)(2)(A)(i), including Doral.

4.     Defendants' wrongful conduct as described in this Complaint caused substantial losses to Doral with regard to its loan portfolio and derivative holdings.  Doral reasonably expected that accurate representations of competitive market forces, and not fraudulent conduct or collusion among the Defendants, would determine USD bbaLIBOR™ and consequently, the value of financial instruments tied to USD bbaLIBOR™.  Doral's losses flowed directly from, among other things, the harms to competition caused by the fraud and collusion alleged in this Complaint.

5.     Plaintiff the FDIC as Receiver for Doral ("FDIC-R") seeks to recover for losses that Doral sustained as a result of Defendants' wrongful conduct.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over the claims set forth in this Complaint under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), as well as 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because all of the claims set forth in this Complaint arise from the same facts and circumstances and form part of the same case or controversy.

7.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 pursuant to 12 U.S.C. § 1819(b)(2)(A), which provides that all suits to which the FDIC is a party, in any capacity, shall be deemed to arise under the laws of the United States.

8.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and N.Y. C.P.L.R. §§ 301 and 302.  Defendants have deliberately and purposefully conducted business in the United States and in New York.  Defendants are either incorporated in or maintain their principal places of business in the United States, or maintain significant ongoing operations in the United States.  All Defendants transacted business and derived substantial revenue from that business within New York.  Most, if not all, Defendants have offices located in New York and/or have engaged in a regular and continuous course of business in New York.  Some Defendants are resident corporations of New York, with their headquarters or primary places of business located within the state.[2]

9.     As explained below, certain Defendants have also entered into contracts with Doral for interest-rate swaps,[3] which incorporate USD bbaLIBOR™ as the interest-rate benchmark and provide that disputes arising under those contracts will be governed by New York law.  One such contract, between Doral and Credit Suisse First Boston International, predecessor-in-interest to Defendant Credit Suisse International, also includes a jurisdiction and forum-selection clause naming courts in New York, including the United States District Court for the Southern District of New York, as the fora in which claims arising out of those contracts shall be brought.  Defendants therefore purposefully availed themselves of the privilege of

---

[2] Defendant Citibank, N.A. is headquartered in New York.  Defendant Deutsche Bank AG maintains a "regional head office" in New York.

[3] An interest rate swap is a contract in which two parties agree to exchange cash flows for a fixed period of time based on a defined principal amount (known as its notional value).  In its simplest form, one counterparty agrees to pay a fixed rate on the notional amount and, in exchange, receives a floating rate on the notional amount.

conducting activities in the United States and New York in connection with the wrongful activities described in this Complaint.

10.     Furthermore, the Defendants purposefully availed themselves of the benefits and privileges of the laws of New York and the United States in multiple ways, including, but not limited to, the following:

   a.   Bank Defendants,[4] individually and/or through their agents, each voluntarily solicited business in New York, for example, by buying and selling financial instruments in New York for the purpose of deriving revenues from New York residents.

   b.   Bank Defendants, individually and/or through their agents, owned property in New York, which, on information and belief, they claim as business expenses on their tax forms.

   c.   Bank Defendants voluntarily incorporated New York choice of law and forum clauses in financial instruments they bought and sold in New York.

   d.   Panel Bank Defendants and the BBA voluntarily published USD bbaLIBOR™ to licensed vendors in New York, including Bloomberg and the Wall Street Journal.

   e.   Panel Bank Defendants and the BBA voluntarily published individual Panel Bank Defendants' USD bbaLIBOR™ submissions to licensed vendors in New York, including Bloomberg and the Wall Street Journal.

---

[4] "Bank Defendants" refers collectively to the Panel Banks Defendants and the parents, subsidiaries, or affiliates of the Panel Bank Defendants, which are named as Defendants to this Complaint.

    f.   Bank Defendants put financial products into the stream of commerce in New York.

    g.   Defendants voluntarily met with the Federal Reserve Bank of New York ("NY Fed") to discuss USD bbaLIBOR™ in an effort to convince the NY Fed that USD bbaLIBOR™ remained a reliable USD interest-rate benchmark.

    h.   Bank Defendants acted as market makers for OTC USD interest-rate derivatives in New York.

    i.   Defendants licensed USD bbaLIBOR™ to vendors in the United States in contracts that provided that Defendants had a right to sue those vendors for breaches of the licensing agreements.

11.    Defendants also expressly aimed the conduct alleged in this Complaint at the United States and New York in many ways, including, but not limited to, the following:

    a.   Bank Defendants sought to project financial strength to investors in New York.

    b.   Defendants, individually and through their agents, hid their collusion and made false statements, in part, to avoid sanction by regulators in New York.

    c.   Defendants sought to exclude potential competitors in the market for USD interest-rate benchmarks that were focused on New York.

12.    Moreover, Defendants acted as co-conspirators with each other and performed acts in furtherance of their unlawful conspiracy within New York, and elsewhere in the United States.

13.    Doral's claims as set forth in this Complaint are related to Defendants' purposeful contacts with the United States.  But for Defendants' voluntary contacts with New York, and the

United States as a whole, Doral would not have suffered the financial injuries for which the

FDIC-R seeks relief in this Complaint.

14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391 and Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22).  All Defendants maintain

offices or agents, transact business, and/or are found within the Southern District of New York.

The interstate commerce giving rise to the claims described in this Complaint was carried out, in

part, within the Southern District of New York.

## PARTIES

### Plaintiff

15.     The Plaintiff is the FDIC-R.  On February 27, 2015, the FDIC was duly appointed

as Receiver for Doral.  The FDIC-R is empowered to pursue claims held by Doral, including the

claims against the Defendants in this action.

### Defendants[5]

*Bank of America*

16.     Bank of America, N.A. ("Bank of America") is a National Association

headquartered in Charlotte, North Carolina, with offices in New York, New York.  Bank of

America was at all relevant times a member of the USD bbaLIBOR™ panel.  Bank of America

is the primary banking subsidiary of Bank of America Corporation.  Bank of America operated

in the United States directly or through its wholly owned and/or controlled subsidiaries,

affiliates, agents, and predecessors.  Bank of America participated in the wrongful conduct

---

[5] Jurisdictional allegations for Defendants are based upon the best available information accessible to Plaintiff
FDIC-R without having had the benefit of discovery.  More specific details concerning the relationship between
parents and subsidiaries and banking affiliates are necessarily within Defendants' control and thus would only be
available to Plaintiff FDIC-R through jurisdictional discovery.

alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*Barclays*

17.     Defendant Barclays Bank plc ("Barclays") is a public limited company of the United Kingdom headquartered in London, England.  Barclays was at all relevant times a member of the USD bbaLIBOR™ panel.

18.     Barclays is registered as a financial holding company with the NY Fed.  Barclays maintains two branch offices and a representative office in New York, New York.  Barclays also maintains branch offices in Miami, Florida and representative offices in Wilmington, Delaware and Washington, D.C.  Barclays holds leases for its New York branch properties for the purpose of soliciting business from the residents of New York and the United States.  In 2016, Barclays's U.S. branches generated $1.67 billion in revenue.  That same year, Barclays employed more than 9,700 employees in New York and the United States.  Through its New York branch, Barclays had access to the NY Fed's discount window throughout the relevant period.  Barclays maintains its representative offices in the United States for the purpose of engaging in activities, such as acting as liaison with clients in the United States, collecting information about the U.S. economy, and providing information to investors.  Barclays's parent company, Barclays plc, is listed on the New York Stock Exchange.

19.     In 2007, Barclays paid $400 million for the naming rights of Barclays Center—a sports arena located in Brooklyn, New York.

20.     Barclays operated its investment bank business through a division known as Barclays Capital.[6]  In 2008, Barclays acquired Lehman Brothers Holdings Inc., the North American investment banking and trading divisions, along with its headquarters in New York, and folded it into the Barclays Capital division.  Through Barclays Capital, Barclays engaged in derivatives transactions and obtained funding via business units known within Barclays, respectively, as the Treasury unit and the Money Market unit.  On information and belief, Barclays operated these business units globally without regard to corporate formalities. Barclays's employees from these business units, including employees located in the United States, reported to the same supervisors within their respective business units.

21.     In 2007, the Barclays Capital division accounted for 31% of the Investment Banking and Investment Management unit of Barclays plc's revenues.  According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Barclays's New York office held more than $4.67 billion in notional value in interest-rate derivatives, nearly all of which were tied to USD bbaLIBOR™.  Barclays Capital earned billions of dollars in revenues from its New York offices through the trading of interest-rate derivatives that incorporated USD bbaLIBOR™ as the interest-rate benchmark.  Barclays also ran a proprietary trading fund that profited from artificially depressed USD bbaLIBOR™ rates.

22.     During the relevant period, Barclays operated the Barclays Capital division in the United States through its direct subsidiary Barclays Capital Inc. ("BCI"), headquartered in New

---

[6] According to Barclays's 2008 Annual Report, Barclays's policy was to concentrate trading activities in the Barclays Capital division, including transactions where Barclays Capital acted as principal with clients or with the market.  Daily market risk reports were produced for the main Barclays Capital business areas covering the different risk categories, including the following:  interest rate, credit spread, commodity, equity, and foreign exchange. Barclays, Barclays Bank PLC Annual Report 2008, at 104 (2008), *available at* https://www.home.barclays/content/dam/barclayspublic/docs/InvestorRelations/AnnualReports/AR2008/2008-barclays-bank-plc-annual-report.pdf.

York.  BCI is a broker-dealer, member of the Financial Regulatory Authority, and registered with the U.S. Securities and Exchange Commission ("SEC") and with the relevant securities agencies in all fifty states, the District of Columbia, and Puerto Rico.  BCI, as part of the Barclays Capital segment, affirmatively sought to, and did, engage in billions of dollars of transactions originating in New York with counterparties located in New York, and elsewhere, involving derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark. Barclays controlled BCI such that BCI was not an independent entity but rather part of the Barclays Capital division.  BCI was a shell used by Barclays to engage in financial transactions related to USD bbaLIBOR™.

23.     Barclays "failed to have adequate systems and controls in place" relating to its bbaLIBOR™ submissions.[7]  During the relevant period, Barclays Capital employees in New York helped determine Barclays's USD bbaLIBOR™ submissions.  Barclays Capital suffered from cultural deficiencies, including a failure to install separation or ethical walls between the trading teams and those contributing USD bbaLIBOR™ submissions.  For example, in 2005, Barclays Capital's then global head of fixed income, Eric Bommensath, told a subordinate, Barclays derivatives trader "to introduce the New York swaps desk" to USD bbaLIBOR™ manipulation and "teach [the New York swaps desk] how to communicate with the cash desk in London and make the New York desk more profitable."[8]  ██████████████████████ ████████████████████████████████████████████████████████████▌

---

[7] Anthony Salz & Russell Collins, Salz Review:  An Independent Review of Barclays' Business Practices ¶ 6.58 (Apr. 2013).

[8] Jeremy Hodges & Stephen Morris, *Ex-Barclays Trader Told SFO His Bosses Knew About Libor Fix*, Bloomberg, Apr. 7, 2016, http://www.bloomberg.com/news/articles/2016-04-07/ex-barclays-traders-quit-rate-rigging-as-crisis-hit-sfo-says.

▌██████████████████████████████████████████████████████████████ ████████████████████████████████████

24.     Barclays participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.  Specifically, Barclays collaborated with its U.S. subsidiaries and affiliates, including BCI (to the extent that BCI can be considered an entity independent of Barclays), to persistently depress (1) Barclays's published USD bbaLIBOR™ contributions and (2) the USD bbaLIBOR™ fix.

25.     At least some members of BCI's Board of Directors and its Executive Officers, including Barclays Capital former Co-President Jerry del Missier, were aware of and actively encouraged USD bbaLIBOR™ manipulation.  In fact, Mr. del Missier has admitted that he instructed subordinates to submit artificially low USD bbaLIBOR™ rates on behalf of Barclays.[10]  In 2007, in an internal email sent to Robert Diamond, Barclays and Barclays plc former Chief Executive Officer, Mr. del Missier wrote that USD bbaLIBOR™ submissions for all of the Panel Banks were "fantasy rates."[11]

26.



---

[10] Jill Treanor, *Former Barclays Executive Insists Bob Diamond Instructed Him To Cut Libor*, The Guardian, July 16, 2012, https://www.theguardian.com/business/2012/jul/16/barclays-del-missier-bob-diamond-libor.

[11] Kit Chellel, *Del Missier Called Libor Rates 'Fantasy' in Diamond E-Mail*, Bloomberg, March 21, 2014, http://www.bloomberg.com/news/articles/2014-03-21/del-missier-called-libor-rates-a-fantasy-in-e-mail-to-diamond.



27.     Barclays derivative traders in New York also openly discussed USD bbaLIBOR™ manipulation via instant messages and "chats" with USD bbaLIBOR™ submitters from at least one other Panel Bank, Coöperatieve Rabobank UA[15] ("Rabobank").  Thus, Barclays employees in New York not only participated in determining Barclays's USD bbaLIBOR™ submissions, those same employees also participated in determining the USD bbaLIBOR™ submissions for other Panel Bank Defendants, including, at least, Rabobank.  Barclays employees in New York were either unaware of, or disregarded, any supposed lines of responsibility for USD bbaLIBOR™ submissions.  Barclays employees used their knowledge of USD bbaLIBOR™ depression to enter into derivatives trades with unsuspecting counterparties and reap illicit profits at the expense of those counterparties, many of whom were located in New York.

28.     Barclays employees in New York not only requested, and obtained, USD bbaLIBOR™ submissions that benefited them financially, they also bought and sold derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark from and to counterparties located in New York and elsewhere in the United States.

---

[15] Formerly known as Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.

*BBA*

29.     The BBA is a trade association based in the United Kingdom.  Throughout the 2000s, the BBA owned bbaLIBOR™.  The BBA was governed by a Board, which officially met four times per year.  The Board was comprised of the BBA Chief Executive and Chief Executives of the Panel Bank Defendants.

30.     Defendant BBA Enterprises Ltd. is a wholly owned subsidiary of the BBA located in London.  In late 2009, the BBA incorporated a new legal subsidiary, BBA LIBOR Ltd. to govern bbaLIBOR™.[16]  According to the BBA, following its incorporation, BBA LIBOR Ltd. took over responsibility for the day-to-day running of the benchmark.[17]  On September 23, 2014, BBA LIBOR Ltd. changed its name to BBA Trent Ltd.

31.     As set forth more fully below, the BBA advertised bbaLIBOR™ and solicited business in the United States, including in the Southern District of New York.  In 2007, the BBA sought and obtained a trademark for bbaLIBOR™ from the U.S. Patent and Trademark Office (Registration No. 3212218).  At all times relevant to the claims asserted herein, the BBA electronically communicated news and information through its Internet websites (www.bba.org, www.bbalibor.org), the Thomson Reuters website (reuters.com), the Wall Street Journal, and through other data vendor websites, including International Data Corp., which maintains an office in New York.[18]  At all times relevant to the claims asserted herein, the BBA, on behalf of

---

[16] David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J., Sept. 11, 2012, http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

[17] U.K. House of Commons Treasury Comm., *Fixing LIBOR:  Some Preliminary Findings*, Second Report of Session 2012-13, Vol. I, at 4 (Aug. 18, 2012) (hereinafter "*Fixing LIBOR*"), *available at* https://publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/481/481.pdf.

[18] *See, e.g.*, *Frequently Asked Questions (FAQs)*, BBA Libor, https://web.archive.org/web/20110303121338/ http://www.bbalibor.com/bbalibor-explained/faqs (last visited Jan. 29, 2018); *Worldwide Offices*, International Data Corp., http://www.idc.com/about/wwoffices.jsp#.UTkzDo6BBMY (last visited Jan. 29, 2018).

the Panel Bank Defendants, also published bbaLIBOR™ data, including the USD bbaLIBOR™ fix and the Panel Bank Defendants' individual USD bbaLIBOR™ submissions (including the names of the Panel Banks), to more than one million computer screens around the world, including in the United States and the Southern District of New York, via a data center in Hauppauge, New York.[19]  In 2009, the BBA launched a Twitter social media news feed to bypass the print media[20] because interest in bbaLIBOR™ had soared "since so many loans are linked to it."[21]  The BBA maintained a Facebook page accessible from the Southern District of New York (https://www.facebook.com/BritishBankers).  The BBA also demanded that any entity that sought to use bbaLIBOR™ for a commercial purpose first obtain a license from the BBA.[22]  The BBA participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*Citibank*

32.     Defendant Citibank, N.A. ("Citibank") is a National Association headquartered in New York, New York.  Citibank is wholly owned by intermediary holding company Citicorp LLC, which is wholly owned by Citigroup Inc.[23]  Citibank operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.  Citibank participated in the wrongful conduct alleged in this Complaint both directly and through

---

[19] *See Frequently Asked Questions (FAQs)*, *supra* note 18.

[20] *See BBA LIBOR*, Capital Markets Bull., June 2009, at 5, attached as Exhibit 1 and incorporated into this Complaint by reference.

[21] Press Release, BBA, BBA LIBOR:  The World's Most Important Number Now Tweets Daily (May 21, 2009), attached as Exhibit 2 and incorporated into this Complaint by reference.

[22] *Licensing*, BBA Libor, http://web.archive.org/web/20111210044943/http://www.bbalibor.com/licencing (last visited Jan. 29, 2018).  The BBA's licensing records do not appear to be publicly available.

[23] Citibank and Citigroup Inc. are referenced collectively in this Complaint as "Citigroup."

its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

33.     Citibank was at all relevant times a member of the USD bbaLIBOR™ panel. Citibank is provisionally registered with the U.S. Commodity Futures Trading Commission ("CFTC") as an interest-rate swaps dealer.  Citibank engaged in financial transactions incorporating bbaLIBOR™ with Doral.

34.     At various times during the relevant period, Citibank determined its USD bbaLIBOR™ contributions, and/or submitted them to the BBA, from New York.  For example, in an internal communication from May 2008, a USD bbaLIBOR™ submitter for Citibank wrote that he got calls from another Citibank USD bbaLIBOR™ submitter "in New York," who stated, "'[y]eah, why are you posting high LIBORs?'"[24]

35.     Citibank collaborated with its U.S. affiliates to persistently depress (1) its published USD bbaLIBOR™ contributions and (2) the ultimate USD bbaLIBOR™ fix.

*Rabobank*

36.     Defendant Rabobank is a financial services provider with its headquarters in Utrecht, the Netherlands, and branches in the United States, including in New York.[25]  The New York branch of Rabobank, which operates in the United States as a legal extension of Rabobank, is licensed by the New York State Department of Financial Services ("NYSDFS") and is regulated by the NY Fed.  Rabobank has employed more than 500 employees in New York and generated substantial revenue from its New York branch.  Rabobank conducts its wholesale

---

[24] *In re Citibank, N.A.*, No. 16-17, at 16-19 (C.F.T.C. May 25, 2016) (hereinafter "Citi CFTC Order"), attached as Exhibit 3 and incorporated into this Complaint by reference.

[25] *See, e.g.*, *Rabobank Group United States of America*, Rabobank Grp., https://www.rabobank.com/en/locate-us/americas/usa.html (last visited Jan. 29, 2018).

activities through its New York branch and certain wholly owned subsidiaries of Utrecht-America Holdings, Inc., including Rabo Securities USA, Inc., a broker-dealer registered with the SEC, and Rabo Capital Services, Inc., headquartered in New York.

37.     In 2000, the BBA selected Rabobank to be a member of the USD bbaLIBOR™ panel even though Rabobank rarely participated in the interbank loan market.

38.     On information and belief, Rabobank operated its derivatives business globally without regard for corporate formalities.  Rabobank employees in New York were aware of USD bbaLIBOR™ manipulation, and bought and sold derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark from and to counterparties located in New York and elsewhere in the United States.  Rabobank held weekly conference calls with its derivatives traders, including traders located in New York, in which USD bbaLIBOR™ manipulation, including persistent depression and agreements to align Rabobank USD bbaLIBOR™ submissions with other Panel Bank submissions, was often openly discussed.[26]  In addition, Rabobank derivative traders in New York openly discussed USD bbaLIBOR™ manipulation via instant messages and "chats" with Rabobank USD bbaLIBOR™ submitters.[27]  During the relevant period, Rabobank employees in New York helped determine Rabobank's USD bbaLIBOR™ submissions.

39.     Rabobank's "book" of USD derivatives transactions was the most important trading vehicle at Rabobank and was the primary consideration for Rabobank's USD bbaLIBOR™ submissions.[28]  On information and belief, a majority of Rabobank's USD

---

[26] Trial Tr. 277:15-278:24, Oct. 19, 2015 (Day 4), *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.).

[27] *Id.* 238:16-239:9, Oct. 19, 2015 (Day 4).

[28] Defense Ex. 608C at 7, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

bbaLIBOR™ derivatives transactions were with counterparties located in the United States and New York.  According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Rabobank's New York office held more than $7.8 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™.  On information and belief, Rabobank employees used their knowledge of USD bbaLIBOR™ depression to enter into derivatives trades with unsuspecting counterparties and reap illicit profits at the expense of those counterparties, many of whom were located in New York.  Rabobank participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*Credit Suisse*

40.     Defendant Credit Suisse AG is a Swiss company headquartered in Zurich, Switzerland.  Credit Suisse AG was at all relevant times a member of the USD bbaLIBOR™ panel.  Defendant Credit Suisse International (f.k.a. Credit Suisse First Boston International) is a bank domiciled in the United Kingdom, with an office in New York.  Credit Suisse International's parent, Credit Suisse Holdings (USA) Inc., is Credit Suisse AG's highest-level U.S. holding company.  Defendant Credit Suisse International engaged in financial transactions incorporating USD bbaLIBOR™ with Doral.  Defendants Credit Suisse AG and Credit Suisse International are referenced collectively in this Complaint as "Credit Suisse."  Credit Suisse operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[29]

---

[29] *See, e.g.*, *United States*, Credit Suisse, https://www.credit-suisse.com/us/en/investment-banking/regional-presence/americas/united-states.html (last visited Jan. 29, 2018).

41.     According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Credit Suisse AG's New York office held more than $27 billion in notional value in interest-rate derivatives for trading, including derivatives that incorporated USD bbaLIBOR™ as the interest-rate benchmark.  On information and belief, Credit Suisse operated the investment bank side of its operations—which was responsible for trading derivatives that incorporated USD bbaLIBOR™—globally without regard to corporate formalities.  In the United States, Credit Suisse operated its investment operations through its wholly owned New York branch.  Credit Suisse employees used their knowledge of USD bbaLIBOR™ depression to enter into derivatives trades with unsuspecting counterparties and reap illicit profits at the expense of those counterparties, many of whom were located in New York.

42.     Credit Suisse participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.  Credit Suisse AG collaborated with its U.S. affiliates, including Credit Suisse International, to persistently depress (1) Credit Suisse AG's published USD bbaLIBOR™ contributions and (2) the USD bbaLIBOR™ fix.

*Deutsche Bank*

43.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany, with numerous offices in the United States, including a regional head office in New York.  Deutsche Bank was at all relevant times a member of the USD bbaLIBOR™ panel.  Deutsche Bank maintained a branch office in New York, which is registered to do business with the NYSDFS and regulated by the U.S. Federal Reserve System.  Deutsche Bank has employed 10,000 people in the United States, including in New York.

44.     On information and belief, Deutsche Bank operated its derivatives trading business in multiple locations around the world, including New York, without regard to corporate formalities, through its Global Finance and Foreign Exchange business unit ("GFFX").[30]  At least thirty members of the GFFX, including derivatives traders based in New York, knew of, and/or participated in, USD bbaLIBOR™ manipulation.[31]  Members of the GFFX unit were responsible for (1) formulating and making Deutsche Bank's USD bbaLIBOR™ submissions and (2) trading a variety of derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark.  Many of these trades were initiated by GFFX members from New York[32] and involved counterparties located in the United States, including New York.  According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Deutsche Bank's New York office held nearly $20 trillion in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™. Deutsche Bank employees used their knowledge of USD bbaLIBOR™ depression to enter into derivatives trades with unsuspecting counterparties and to reap illicit profits at the expense of those counterparties, many of whom were located in New York.

45.     GFFX employees, including those based in New York, participated in weekly "risk calls," during which USD bbaLIBOR™ manipulation was openly discussed.[33]  GFFX

---

[30] *In re Deutsche Bank AG*, Consent Order Under New York Banking Law §§ 44-44a ¶ 11(NYSDFS Apr. 23, 2015) (hereinafter "DB NYSDFS CO"), attached as Exhibit 4 and incorporated into this Complaint by reference.

[31] *United States v. Deutsche Bank AG*, Deferred Prosecution Agreement, Attachment A, Statement of Facts ¶4d (Apr. 23, 2015) (hereinafter "DB SOF"), attached as Exhibit 5 and incorporated into this Complaint by reference.

[32] *Id.* ¶¶ 18-20, 22, 25, 32-35; *In re Deutsche Bank AG*, No. 15-20, at 10-11 (C.F.T.C. Apr. 25, 2015) (hereinafter "DB CFTC Order"), attached as Exhibit 6 and incorporated into this Complaint by reference.

[33] DB CFTC Order, *supra* note 32, at 9.

employees in New York also made requests of Deutsche Bank's USD bbaLIBOR™ submitters to manipulate USD bbaLIBOR™ for Deutsche Bank's profit.[34]

46.     In 2012, Deutsche Bank registered with the CFTC as a swap dealer for the purpose of engaging in financial transactions incorporating USD bbaLIBOR™ in the United States, including New York.  Deutsche Bank operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[35]  Deutsche Bank participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*HSBC*

47.     Defendant HSBC Bank plc ("HSBC") is a public limited company of the United Kingdom headquartered in London, England.  HSBC was at all relevant times, a member of the USD bbaLIBOR™ panel.

48.     During the relevant period, HSBC collaborated with its U.S. subsidiaries and affiliates to (1) persistently depress HSBC's published USD bbaLIBOR™ submissions, (2) persistently depress the USD bbaLIBOR™ fix, and (3) make depressed bbaLIBOR™-based interest payments to unsuspecting counterparties in New York and elsewhere in the United States.  HSBC operated in the United States directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[36]  HSBC participated in the wrongful

---

[34] *Id.*

[35] *See, e.g.*, *Deutsche Bank USA - Contact*, Deutsche Bank, https://www.db.com/usa/content/en/Contact.html (last visited Jan. 29, 2018).

[36] *See, e.g.*, *Country Contacts*, HSBC Holdings plc, http://www.hsbc.com/about-hsbc/structure-and-network/country-contacts#USA (last visited Jan. 29, 2018).

conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*JP Morgan*

49.     Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") is a National Association headquartered in Columbus, Ohio with numerous locations in New York.  JPMorgan is a direct subsidiary of JP Morgan Chase & Co., a U.S. financial holding company incorporated in Delaware and headquartered in New York, New York.  JPMorgan was at all relevant times a member of the USD bbaLIBOR™ panel.  JPMorgan operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.  JPMorgan participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*Lloyds/Banks of Scotland*

50.     Defendant Lloyds Banking Group plc is a public limited company of the United Kingdom headquartered in London, England, with an office in New York, in which, as of September 30, 2014, more than 300 people have been employed full-time.  Lloyds Banking Group plc is traded on the New York Stock Exchange.[37]

51.     Lloyds Banking Group plc was formed in 2009 through the acquisition of HBOS plc ("HBOS"), parent of Defendant Bank of Scotland plc ("Bank of Scotland"), by Lloyds TSB Group plc.

---

[37] *See Investors & Performance: Share Price*, Lloyds Banking Grp., http://www.lloydsbankinggroup.com/investors/share-price-info (last visited Jan. 29, 2018).

52.    Lloyds Securities, a subsidiary of Lloyds Banking Group plc, has been registered to do business as a broker-dealer in the State of New York since February 10, 2011.  Lloyds Securities' main office is located in the Southern District of New York at 1095 Avenue of the Americas, New York, New York 10036.[38]

53.    Defendant Lloyds Bank plc, formerly known as Lloyds TSB Bank plc ("LTSB"), is the current parent of HBOS.[39]  Lloyds Bank plc is licensed by the NYDFS as a New York branch of a foreign bank.

54.    Defendant Bank of Scotland is a direct subsidiary of HBOS and a wholly owned indirect subsidiary of Lloyds Banking Group plc.  During the relevant period, Bank of Scotland shared the New York branch office and at least some corporate officers, including the New York-based Chief Legal Officer for North America, with its parent Lloyds Bank plc.

55.    Defendants Bank of Scotland and Lloyds Bank plc (as LTSB) were members of the USD bbaLIBOR™ panel until February 6, 2009, at which time Lloyds Banking Group plc, following the acquisition, joined the USD bbaLIBOR™ panel.[40]  Bank of Scotland had taken over submissions from the HBOS subsidiary HBOS Treasury Services plc ("HBOS Treasury") in September 2007.[41]

---

[38] *Contact Us*, Lloyds Bank, http://www.lbusa.com/contact-us (last visited Jan. 29, 2018).

[39] *In re Lloyds Banking Group plc*, No. 14-18, at 1 (C.F.T.C. July 28, 2014) (hereinafter "Lloyds CFTC Order"), attached as Exhibit 7 and incorporated into this Complaint by reference.

[40] *Id.* at 2 & n.2.

[41] HBOS was not a member of the USD bbaLIBOR™ panel, and it is not named as a Defendant to this Complaint. However, at times, this Complaint generally refers to HBOS's bbaLIBOR™-related conduct, as committed by and through HBOS Treasury (prior to September 2007) and Defendant Bank of Scotland, in order to more accurately reflect the sources on which the Complaint relies.  For example, subsequent to HBOS's acquisition, Lloyds Banking Group plc and Lloyds Bank plc agreed to a consent order with the CFTC regarding certain acts of manipulation, attempted manipulation, and false reporting in connection with bbaLIBOR™ "by and through Lloyds TSB and HBOS ['through its subsidiaries, HBOS Treasury Services plc until September 2007 and, thereafter, Bank of Scotland plc']."  *Id.*

56.     From at least 2007 through February 6, 2009, employees on the money-markets desks of Bank of Scotland and Lloyds Bank plc (as LTSB) were responsible for (1) contributing USD bbaLIBOR™ submissions and (2) entering into borrowing and lending transactions on behalf of Bank of Scotland and Lloyds Bank plc (as LTSB) at rates tied to USD bbaLIBOR™. During that time, the USD bbaLIBOR™ submitters for both Bank of Scotland and Lloyds Bank plc (as LTSB) contributed USD bbaLIBOR™s that benefited their respective companies' derivatives positions instead of rates that complied with the definition of bbaLIBOR™. Employees of Bank of Scotland and Lloyds Bank plc (as LTSB) initiated USD bbaLIBOR™ derivatives transactions with banks and other financial institutions in the United States.  By entering into these derivative transactions, Bank of Scotland and Lloyds Bank plc (as LTSB) sought to, and did, profit at the expense of their U.S.-based counterparties.  According to the United Kingdom's Financial Conduct Authority ("FCA"), there was a "culture of seeking to take a financial advantage [of GBP and USD bbaLIBOR™] wherever possible" at both Bank of Scotland and Lloyds Bank plc (as LTSB).[42]

57.     Lloyds Banking Group plc admitted through its Deferred Prosecution Agreement with the U.S. Department of Justice ("DOJ") that when USD bbaLIBOR™ submitters contributed rates that took trading positions into account, the bank was engaged in a deceptive course of conduct.[43]  Those USD bbaLIBOR™ submissions were misleading because they were published to investors and counterparties in the United States and elsewhere and because they artificially depressed USD bbaLIBOR™, which was incorporated into derivatives that Lloyds

---

[42] Final Notice from the FCA to Lloyds Bank plc & Bank of Scot. plc ¶ 2.14 (July 24, 2014) (hereinafter "Lloyds Final Notice"), attached as Exhibit 8 and incorporated into this Complaint by reference.

[43] *United States v. Lloyds Banking Group plc,* Deferred Prosecution Agreement, Attachment A, ¶ 45 (July 28, 2014) (hereinafter "Lloyds SOF"), attached as Exhibit 9 and incorporated into this Complaint by reference.

Banking Group plc traded for profit.  Lloyds Banking Group plc further admitted that counterparties to derivatives trades were negatively impacted by the manipulation of USD bbaLIBOR™ by Lloyds employees.[44]

58.     Defendants Lloyds Banking Group plc, Lloyds Bank plc, and Bank of Scotland, and HBOS are referenced collectively in this Complaint as "Lloyds."

59.     During the relevant period, Lloyds employees located in New York helped determine Lloyds's USD bbaLIBOR™ submissions.

60.     Lloyds operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[45]

61.     On information and belief, Lloyds participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*Société Générale*

62.     Defendant Société Générale is a French banking corporation, headquartered in Paris, France, with an office in New York.  Société Générale replaced Bank of Scotland on the USD bbaLIBOR™ panel on February 9, 2009.  Société Générale operated in the United States directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[46]  Société Générale participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.  The DOJ's 2017 indictment in the Eastern District of New York

---

[44] *E.g.*, *id.* ¶¶ 41-42.

[45] *See, e.g.*, *Local to You*, Lloyds Banking Grp., http://www.lloydsbankinggroup.com/tablet-story-map/ (last visited Jan. 29, 2018).

[46] *See, e.g.*, *Our Locations*, Société Générale Grp., http://www.societegenerale.com/en/about-us/our-businesses/our-locations (last visited Jan. 29, 2018).

of Société Générale executives Danielle Sindzingre and Muriel Bescond—for their alleged participation in a scheme to cause Société Générale to submit false and misleading USD bbaLIBOR™ rates to the BBA via Thomson Reuters—alleges that these false and misleading submissions, along with the final averaged bbaLIBOR™ rate, were transmitted to a data center in Hauppauge, New York via Thomson-Reuters for worldwide distribution.[47]  This data caused USD bbaLIBOR™ to be lower than it would have been but for the unlawful conduct, which affected the price of commodities (interest-rate swaps and Eurodollar futures) sold in interstate commerce.

*Norinchukin*

63.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan, with an office in New York.  Norinchukin was at all relevant times a member of the USD bbaLIBOR™ panel.  Norinchukin is one of Japan's largest institutional investors and has a reputation as Japan's largest hedge fund.  Norinchukin operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[48]  Norinchukin participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*Royal Bank of Canada*

64.     Defendant Royal Bank of Canada ("RBC") is the largest financial institution in Canada and is headquartered in Toronto, Canada, with affiliates in New York.  RBC was at all

---

[47] Indictment ¶ 11, *United States v. Sindzingre*, No. 2:17-cr-464 (S.D.N.Y.) (hereinafter "Sindzingre Indictment"), attached as Exhibit 10 and incorporated into this Complaint by reference.

[48] *See, e.g.*, *Global Network*, The Norinchukin Bank, http://www.nochubank.or.jp/en/about/globalnetwork.html (last visited Jan. 29, 2018).

relevant times a member of the USD bbaLIBOR™ panel. RBC operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[49] According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, RBC's New York office held more than $37 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to bbaLIBOR™ and specifically, USD bbaLIBOR™.

65. RBC participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*Royal Bank of Scotland*

66. Defendant The Royal Bank of Scotland plc ("RBS") is a public limited company of the United Kingdom headquartered in Edinburgh, Scotland, with an office in New York, banking divisions in New York, and U.S. headquarters located in Stamford, Connecticut. RBS Securities, Inc. ("RBSI"), f.k.a. Greenwich Capital Markets, Inc., is RBS Group's primary U.S. broker-dealer. RBS was at all relevant times a member of the USD bbaLIBOR™ panel.

67. On information and belief, RBS operated its trading operations globally without regard to corporate formalities. Specifically, RBS controlled RBSI such that RBSI was not an independent entity but rather part of the RBS entity. One of RBS's divisions was Global Banking and Markets ("GBM"), which had employees in multiple legal entities associated with RBS, including RBSI. Through its GBM division, RBS employed money market and derivatives traders throughout the world, including New York and London. RBS's derivatives traders were

---

[49] *See, e.g.*, *RBC Companies*, RBC Bank, http://www.rbcbank.com/about-rbc-bank/rbc-companies/index.html (last visited Oct. 1, 2014).

responsible for trading financial instruments that incorporated USD bbaLIBOR™ as an interest-rate benchmark.  RBS's money market traders were responsible for, among other things, trading cash and ensuring that RBS had sufficient funding with regard to specific currencies.

68.     Through its GBM division, RBS traders were responsible for contributing USD bbaLIBOR™ submissions.  RBS encouraged its derivatives traders, including those located in New York, employed by RBSI, to communicate with USD bbaLIBOR™ submitters, and *vice versa*, for RBS's profit.  █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

69.     On information and belief, RBS's GBM division, through employees located in New York and elsewhere, earned substantial profits by making trades with counterparties located in New York and elsewhere by making use of their knowledge and ability to unlawfully manipulate USD bbaLIBOR™.

70.     According to its Reports of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, RBS's New York office held more than $72 million, and RBS's Chicago office held more than $1.9 billion, in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™.  During the relevant time period, RBS generated 20% of its global revenues from the United States.

---

█████████████████████████████████████████████████████████████████████

71.     RBS operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[51]  In negotiating a plea agreement with the DOJ, RBS acted on behalf of its U.S. subsidiaries, agreed that it was responsible under U.S. law for the acts of its officers, directors, employees, and agents, and promised the cooperation of its subsidiaries, including RBSI.[52]

*The Bank of Tokyo-Mitsubishi UFJ Ltd.*

72.     Defendant The Bank of Tokyo-Mitsubishi UFJ Ltd. ("BTMU") is a Japanese subsidiary of Mitsubishi UFJ Financial Group, Inc. and is headquartered in Tokyo, Japan, with an office in New York.  BTMU was at all relevant times a member of the USD bbaLIBOR™ panel.  BTMU operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[53]  According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, BTMU's New York office held more than $361 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to USD bbaLIBOR™.

73.     BTMU participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

---

[51] *See, e.g.*, *Where We Do Business*, RBS, http://www.rbs.com/about/worldwide-locations.html (last visited Jan. 29, 2018).

[52] *United States v. Royal Bank of Scotland plc,* Deferred Prosecution Agreement, Attachment A ¶ 14 (Feb. 5, 2013) (hereinafter "RBS SOF"), attached as Exhibit 11 and incorporated into this Complaint by reference.

[53] *See, e.g.*, *Global Network—The Americas*, Bank of Tokyo-Mitsubishi UFJ, http://www.bk.mufg.jp/global/ globalnetwork/americas/index.html (last visited Jan. 29, 2018).

*UBS*

74.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland, with offices in New York.  UBS was at all relevant times a member of the USD bbaLIBOR™ panel.  UBS was formed in 1998 through the merger of Swiss Bank Corporation and the Union Bank of Switzerland.  UBS operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[54]  UBS generated substantial revenues from its branch office in New York, including revenues from the transaction of financial instruments that incorporated USD bbaLIBOR™ as the interest-rate benchmark.  UBS controlled its domestic subsidiary, UBS Securities, Inc., such that UBS Securities Inc. was not an independent entity but rather part of the UBS entity.

75.     UBS AG's Group Treasury function, based in Stamford, Connecticut, had ultimate oversight responsibility for USD bbaLIBOR™ submissions.[55] ███████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ ■ The Group Treasury function monitored the financial resources for all of UBS, including the bank's liquidity and funding.[57]  The Asset and Liability Management ("ALM") group was the part of the Investment Bank

---

[54] *See, e.g.*, *UBS Locations*, UBS, https://www.ubs.com/locations.html#united-states/en/nsnf/all/ (last visited Jan. 29, 2018).

[55] Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Division, U.S. Dep't Justice, App. A, Statement of Facts ¶ 129 (Dec. 18, 2012) (hereinafter "UBS SOF"), attached as Exhibit 12 and incorporated into this Complaint by reference.

█ ████████████████████████████████████████████████

[57] UBS SOF, *supra* note 55, ¶ 17.

division, which managed the UBS's liquidity buffer and issuance of new USD commercial paper and certificates of deposit. Group Treasury provided guidance to ALM on funding issues.[58]

76.     UBS participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

*Portigon/WestLB*

77.     WestLB AG was a German joint stock company headquartered in Dusseldorf, Germany.  Defendant Portigon AG is a German company headquartered in Dusseldorf, Germany, with an office in New York.  Portigon AG acquired WestLB AG in 2009.  Prior to 2009, WestLB AG was a member of the USD bbaLIBOR™ panel.  Portigon joined the USD bbaLIBOR™ panel after acquiring WestLB AG.  Defendant Portigon AG and WestLB AG are referenced collectively in this Complaint as "Portigon."  Portigon operated in the United States directly or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors.[59]  According to its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks, in 2011, Portigon's New York office held more than $179 billion in notional value in interest-rate derivatives for trading, nearly all of which were tied to bbaLIBOR™ and specifically, USD bbaLIBOR™.  Portigon participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates in the Southern District of New York and elsewhere in the United States.

---

[58] *Id.*

[59] *See, e.g., Our Locations*, Portigon Fin. Servs., http://www.1fins.com/1cm/cm/content/efs/i/en/ueber-EFS/standorte.html (last visited Jan. 29, 2018).

78.     The unlawful acts charged in this Complaint, as having been done by Defendants, were authorized, ordered, or done by Defendants' officers, directors, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs.

79.     Various other individuals, companies, corporations, partnerships, associations, and other entities, the identities of which are unknown to the FDIC-R and were unknown to Doral, and which cannot, at present, be named as defendants in this action, may have participated as co-conspirators with Defendants in the unlawful conduct alleged in this Complaint, and/or performed substantial acts and made statements in the Southern District of New York in furtherance of the alleged violations.

80.     At all relevant times, Defendants were acting as the agents, employees, co-conspirators, and/or representatives of their respective "affiliates" and of each other, and were acting within the course and scope of their agency, employment, and/or conspiracy with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of their respective affiliates and of each other, in performing the acts alleged in this Complaint.

## **BACKGROUND**

81.     Banks compete in a number of markets.  Among other markets, they compete in the markets for cash in specific currencies.  For example, there is a market for USDs.  Banks compete to obtain USDs principally through customer deposits and short-term wholesale funds. To obtain USDs through those means, banks must agree to pay an interest rate.[60]  Banks compete to obtain short-term wholesale funds from, among other sources, major financial institutions,

---

[60] *See, e.g.*, Bank of Am., 2008 Annual Report, at 56 (2008), *available at* http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf.

including each other.[61]  Banks also compete in the markets for interest-rate derivatives, loans to businesses and consumers ("retail loans"), and the purchase and sale of MBS.

### A.     Interest Rate Fundamentals

82.     Absent collusion, interest rates are set in arms-length negotiations between a lender with cash and a borrower in need of cash.  The interest rate charged by the lender is the price the lender charges to let the borrower use the cash for a period of time.  An interest rate has two basic components:  the "risk-free rate," which represents the return that a lender will expect for losing access to its funds for a period of time (*i.e.*, the time-value of money), and a "risk premium," which compensates the lender for the risk that the borrower will not fully repay the loan on time.  Absent collusion, and all else being equal, lenders will charge a higher risk premium to borrowers with lower relative creditworthiness.  In fact, a financial entity's ability to access short-term wholesale funds at all will depend on its creditworthiness.

83.     In a competitive market, the interest rate that banks pay for short-term wholesale funds is negotiated at arm's length and accounts for the factors described above.  For example, all else being equal, a bank that receives a credit downgrade will have to pay higher interest rates for short-term wholesale funds than it would have to pay absent the downgrade.[62]  Short-term wholesale loans can be secured or unsecured.  Unsecured wholesale loans are backed only by the borrowing bank's creditworthiness.  During the relevant period, Defendants held out

---

[61] *See, e.g.*, Barclays PLC, Annual Report 2009, at 131 (2009), *available at* http://www.barclays.com/content/dam/barclayspublic/docs/InvestorRelations/AnnualReports/AR2009/barclays-plc-annual-report-2009.pdf ("Important factors in assuring liquidity are competitive rates and the maintenance of depositors' confidence.").

[62] *See, e.g.*, *id.* at 130-32.

bbaLIBOR™ as a reliable index that measured competitive interest rates for unsecured interbank loans, which market participants referred to as the bank's "cost of funds."[63]

84.    By the mid-2000s, the London interbank market had been a major source of cash for banks seeking to fund USD loans for more than 30 years.  The London interbank market enabled banks in need of cash to obtain deposits of USDs ("Eurodollar deposits"), either on an overnight basis or for fixed terms (typically, one, two, three, or six months), from banks with excess cash.

85.    A bank's "liquidity" is determined by the amount of cash that it has, or can raise quickly, to pay off its debts.[64]  Banks also compete in the capital markets for longer-term assets.  Longer-term assets, such as residential mortgages, tend to pay higher rates of return[65] but are less "liquid" than cash.  A bank's profitability rests on its ability to attract money through customer deposits and short-term assets and to invest (lend) that money in longer-term assets that pay higher interest rates.

### B.    The Role of Indices and Benchmarks in Financial Markets

86.    An index is a statistical measure, typically of price or quantity, calculated from a representative set of underlying data.[66]  Index providers invest significant amounts of time and

---

[63] *See, e.g.*, Martin Wheatley, *The Wheatley Review of LIBOR:  Final Report* 82 (2012), *available at* https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf (hereinafter "Wheatley Final Report").

[64] An asset is liquid if the market in which it is traded has many buyers and sellers and the asset is bought and sold frequently with low transaction costs.  All else equal, the more liquid an asset is relative to alternative assets, the greater the demand will be for that asset and, consequently, it will be priced higher.  Frederic S. Mishkin, The Economics of Money, Banking, and Financial Markets 90 (3d. ed. 2013).

[65] For example, mortgage lenders sometimes charge a premium over bbaLIBOR™, usually in the form of a set rate on top of bbaLIBOR™.

[66] Commission Staff Working Document, Impact Assessment Accompanying the Document Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts, at 1, SWD (2013) 336 final (Sep. 18, 2013).

money to develop and market financial indices.  The market for financial indices is competitive, with providers differentiating their indices through incremental improvements and innovation.[67] As stated by an association representing the benchmark industry: "A well-functioning benchmark industry is one in which index administrators have an incentive to invest continuously in innovation . . . . Without this incentive, innovation and competition in the industry is likely to decrease."[68]

87.     By providing reliable information to market participants, financial indices promote what economists refer to as "price discovery"—the process by which parties to a transaction come to an agreement on a price for a given product.  In economics, "perfect competition" involves a market in which, among other things, buyers and sellers equally have all relevant information about the market.  All else being equal, when consumers have more information about a product, they will receive higher quality and lower prices than when they are deprived of information or given false information.

88.     If an index is used as a reference price for a financial instrument or a financial contract, it becomes a benchmark.[69]  There are four main types of players in benchmark markets: (1) those that contribute the data ("contributors"); (2) administrators who provide the benchmark

---

[67] *See, e.g.*, BlackRock, *Response to Consultation Document on the Regulation of Indices* 17 (Nov. 29, 2012), *available at* https://www.blackrock.com/corporate/en-ch/literature/whitepaper/regulation-of-benchmarks-and-market-indices-european-commission.pdf (hereinafter "BlackRock Resp.").

[68] Deutsche Börse Group, *White Paper on the Benchmark Industry* 16-17 (Dec. 2013), *available at* https://deutsche-boerse.com/dbg/dispatch/en/binary/gdb_content_pool/imported_files/public_files/10_downloads/11_about_us/Public_Affairs/The_benchmark_industry_1213.pdf (hereinafter "*The Benchmark Industry*"); *see also* BlackRock Resp., *supra* note 67, at 17 ("We note that significant investment and research is involved in creating and calculating indices and it is a competitive market place with providers differentiating through incremental improvements and innovation.").

[69] Proposal for a Regulation of the European Parliament and of the Council on Indices Used as Benchmarks in Financial Instruments and Financial Contracts, at 2, COM (2013) 641 final (Sept. 18, 2013) (hereinafter "EC Proposal"); Wheatley Final Report, *supra* note 63, at 54.

("providers"); (3) institutions that issue products that incorporate the benchmark ("issuers"); and (4) end users.

89.     Absent collusion, the forces of competition choose financial benchmarks.[70]  Thus, providers in a competitive market will only succeed in creating commercially viable benchmarks if they provide accurate and reliable data, establish appropriate governance structures, and provide sufficient transparency around their methodology and data inputs.[71]  If a benchmark does not command the confidence of all participants in the market, parties will cease to use it.  As one index provider recently wrote: "Absent fraud and collusion . . . financial markets, investors, consumers and government agencies will efficiently rout poorly constructed benchmarks and condemn . . . illogical/ill-conceived uses of benchmarks."[72]

---

[70] *See, e.g.*, Argus Media, *Response to Consultation Document on the Regulation of Indices* 15, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/argus_en.pdf (last visited Jan. 29, 2018) (hereinafter "Argus Resp.") ("[T]he choice of benchmarks for financial contract must be largely market driven."); BDEW, *Position Paper on European Commission's Consultation Document on the Regulation of Indices* 2 (Nov. 15, 2012), *available at* http://ec.europa.eu/finance/consultations/2012/benchmarks/docs/contributions/registered-organisations/bdew-en_en.pdf ("[M]arket participants know best, which index is efficient and fits best for their needs."); BlackRock Resp., *supra* note 67, at 15 (competition gives end-users options "and the recourse to change providers if governance and transparency are deemed to be insufficient"); Euribor-EBF, *Response to the European Commission Consultation Document on the Regulation of Indices* 21 (Nov. 28, 2012), *available at* http://www.emmi-benchmarks.eu/assets/files/D2161C-2012-Euribor-EBF%20response%20to%20the%20EC%20Consultation%20on%20the%20Regulation%20of%20Indices_clean.pdf; Federation Bancaire Francaise, *Response to the European Commission Consultation Document for the Regulation of the Production and Use of Indices* 3, *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/fbf_en.pdf  (last visited Jan. 29, 2018) ("[T]he choice of alternative benchmarks should be market-led, with users choosing the best alternatives for their needs."); Finance Watch, *Response to Consultation Document on the Regulation of Indices* 16 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/finance-watch_en.pdf ("A self-regulation principle will state that competition will let the 'best' benchmarks impose themselves.").  Even the BBA has advocated for choice in the market for interest-rate benchmarks.  *See* BBA, LIBOR—Update (Mar. 5, 2012), *available at* http://www.betterregulation.com/doc/2/128582 (quoting Ian Mair, then Chairman of the London Money Market Ass'n, as saying that "[i]t is important that all market participants have a choice of benchmarks").

[71] *See* Markit, *Response to Consultation Document on the Regulation of Indices* 11 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/markit_en.pdf (hereinafter "Markit Resp."); *The Benchmark Industry*, *supra* note 68, at 15 ("Indices are only beneficial if users can trust them fully.").

[72] Russell Indexes, *Response to Consultation Document on the Regulation of Indices* 9 (July 2012) (hereinafter "Russell Resp."); *see also* BlackRock Resp., *supra* note 67, at 3 ("[B]ecause of competition and innovation in the

90.     Because the actual market or economic reality is likely to change over time, benchmark providers in a competitive market regularly reassess key terms of, and inputs to, a financial benchmark to ensure that the benchmark still provides a reliable representation of the actual market or economic reality that the benchmark is intended to measure.[73]  For example, absent collusion, Defendants would have re-evaluated the reliance of bbaLIBOR™ on unsecured interbank loan interest rates as the sole source of input data.  Recent proposals to improve bbaLIBOR™ include provisions to corroborate unsecured interbank loan interest rates with actual transaction data and by referencing other forms of wholesale funding.

91.     In a competitive market, issuers and end users choose financial benchmarks based on how they weigh various quality factors.[74]  First, will the benchmark serve its intended purpose?[75]  If not, issuers and end users will not use it.

92.     Second, is the benchmark anchored in observable transactions or high-quality data?  Absent collusion, issuers and users demand input data that is sufficient to represent the actual market or economic reality that the benchmark is intended to measure.[76]  For interest-rate benchmarks in particular, users want input data that is formed by competitive supply and demand conditions.[77]

---

marketplace, index providers will be incentivised through market forces to ensure their products are of a certain quality and viable indices for the end investor.").

[73] Bd. Int'l Org. Sec. Comm'ns [IOSCO], *Financial Benchmarks Consultation Report*, at 25, IOSCO Doc. CR01/13 (Jan. 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD399.pdf (hereinafter "IOSCO Consultation Report"); EC Proposal, *supra* note 69, at 8.

[74] *See* ICAP, *Response to the European Commission Consultation on the Regulation of Indices* 4 (Nov. 27, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/icap_en.pdf (hereinafter "ICAP Resp.").

[75] EC Proposal, *supra* note 69, at 2.

[76] *Id.* at 15-16; Wheatley Final Report, *supra* note 63, at 55-56.

[77] IOSCO, *Principles for Financial Benchmarks:  Final Report*, at 10, 20, 33, IOSCO Doc. FR07/13 (July 2013), *available at* http://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf (hereinafter "IOSCO Principles"); Market

93.     Third, does the benchmark provide a clearly defined calculation methodology that users can replicate and predict?  Transparency as to what benchmarks measure and their most relevant characteristics is critical because it allows issuers and end users to make correct assessments about whether to choose a particular benchmark.[78]  Market transparency is a "core principle" because "the market demands it."[79]

94.     Fourth, will the benchmark be published by a provider with high professional standards and proven experience and does the benchmark have controls in place to deter manipulation and ensure that rates are properly calculated in accordance with the published methodology?  If not, issuers and end users will avoid the benchmark as insufficiently trustworthy.[80]

95.     Absent collusion, "if benchmarks are found wanting, the market will migrate towards an alternative through choice."[81]  As a result, absent a conspiracy, providers seek to

---

Participants Grp. on Reforming Interest Rate Benchmarks, Final Report 28 (Mar. 2014) ("Rates should be based on prices formed by competitive supply and demand and anchored in observable transactions.").

[78] *See, e.g.*, *The Benchmark Industry*, *supra* note 68, at 5-6 (index should be fully replicable and completely transparent); AFG, Response to the European Commission's Consultation on the Regulation of Indices 3 (Nov. 29, 2012); Amundi, Answer to E.C.'s Consultation Document on the Regulation of Indices 2 (Nov. 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/registered-organisations/amundi_en.pdf; Wheatley Final Report, *supra* note 63, at 55-56.

[79] S&P Dow Jones Indices, *Response to Consultation Document on the Regulation of Indices* ¶ 6 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/s-p-dow-jones-indices_en.pdf ; Markit Resp., *supra* note 71, at 11 ("[C]ommercial benchmark providers will only succeed in creating commercially viable products if they manage to provide accurate and reliable data, establish appropriate governance structures, and provide sufficient transparency around their methodology and data inputs."); *The Benchmark Industry*, *supra* note 68, at 15 ("End customers . . . need transparency about the index methodology to understand what the index is measuring."); Barclays, *Response to the Wheatley Review of Libor:  Initial Discussion Paper* 2 (Sept. 6, 2012) ("It is essential that the market has access to benchmarks that are well-constructed, transparent, and that inspire the confidence of both market participants and regulators.").  Transparency enhances investor protection.  EC Proposal, *supra* note 69, at 9.

[80] *See, e.g.*, Wheatley Final Report, *supra* note 63, at 55-56; Argus Resp., *supra* note 70, at 2 ("Continued commercial success in this competitive marketplace is directly related to the integrity of an organisation's services.").

[81] ICAP Resp., *supra* note 74, at 9.

provide the most reliable and accurate indices "in order to retain a competitive advantage in the marketplace."[82]

### C.    The Role of Interest-Rate Benchmarks in Lending

96.    Lenders can offer loans at fixed or floating rates.  In a fixed-rate loan, the interest rate stays the same through the term of the loan.  As the term increases, however, so does the risk that market-wide interest rates will go up, leaving the lender with an asset paying below market rates.  In a competitive market, the price of a fixed-rate loan reflects these risks.

97.    In a floating-rate loan, the interest rate can change over time as determined by an agreed-upon benchmark.  This allows the lender to transfer the risk of market-wide changes in interest rates to the borrower.  This in turn allows the lender to charge a lower interest rate at the outset of the floating-rate loan.

98.    Lenders in a competitive market should gravitate toward interest-rate benchmarks that reliably represent a bank's actual cost of funds because that enables them to pass those costs on to borrowers and lock in a profit.  For example, a lender may offer a 20-year loan at its cost-of-funds plus a margin.[83]

### D.    The Role of Interest-Rate Benchmarks in Derivatives

99.    A floating-rate loan reduces a lender's risk that interest rates will increase (and increases the risk that rates will decrease), but it transfers that same risk to borrowers.  The market for interest-rate derivatives provides a way for borrowers to transfer interest-rate risk to third parties for a price.  An interest-rate derivative is a derivative where the underlying asset is

---

[82] Index Indus. Ass'n, *Response to Consultation Document—Regulation of Indices* 6 (Nov. 29, 2012), *available at* http://www.indexindustry.org/?page_id=1405.

[83] *See, e.g.*, Wheatley Final Report, *supra* note 63, at 44 ("The use of a benchmark such as LIBOR allows lenders to use it as a barometer of the inter-bank funding market to base the margin to be applied to its customers.").

the right to pay or receive a principal amount of money at a given interest rate.  For example, a borrower may accept a floating-rate loan tied to an interest-rate benchmark and contemporaneously enter into a contract with a third party where the borrower agrees to make fixed-rate payments in exchange for floating interest rates tied to the same benchmark—an interest-rate swap.  Through this "hedging" strategy, the borrower has effectively converted its floating-rate loan into a fixed-rate one.  The ability to hedge is increased if the same interest-rate benchmark is incorporated into the swap and the floating-rate loan because it synchronizes changes in the interest rates.

100.    This synchronization creates a "network effect" in which a product tends towards dominance because its utility increases with the number of people that use it.[84]  For example, a consumer's demand for a telephone network increases with the number of other users on the network whom she can call or from whom she can receive calls.  In industries characterized by network effects, competing networks can "tip" so that if one network overtakes the other, the other becomes insignificant.[85]

101.    The vast majority of interest-rate swaps were traded over-the-counter ("OTC").  In addition, interest-rate swaps are traded on exchanges, such as the Chicago Mercantile Exchange ("CME") and Intercontinental Exchange ("ICE").  Exchange-traded swaps are standardized financial instruments, with pre-defined notional values, repayment dates, benchmarks, and length.

---

[84] *See, e.g., id.* at 46, 76; European Comm'n, Consultation Document on the Regulation of Indices:  A Possible Framework for the Regulation of the Production and Use of Indices Serving as Benchmarks in Financial and Other Contracts, at 19 (Sept. 5, 2012), *available at* http://ec.europa.eu/internal_market/consultations/docs/2012/ benchmarks/consultation-document_en.pdf.

[85] *See* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 393 (4th ed. 2005).

**Figure 1:  Vanilla Interest-Rate Swap**



102.    The advantage of OTC swaps was that they can be adjusted to meet a user's

needs, for example by synchronizing the payment dates and duration within a loan.  OTC swaps

are typically negotiated pursuant to a standardized Master Agreement that was developed by the

International Securities and Derivatives Association ("ISDA").  Many of the Panel Bank

Defendants served on ISDA's Board of Directors and had other prominent roles in that trade

association.[86]  A swap contract is negotiated for an agreed-upon term—10 years, for example—

with pre-defined dates on which the interest rates are calculated and payments made (known as

"payment dates").  On each payment date, the interest payments are "netted" out and the "loser"

pays its counterparty the difference between the fixed- and floating-rate payments.  For example,

if on the first payment date, application of the fixed interest rate to the notional results in a

payment due of $10,000 and application of the predefined benchmark interest rate to the notional

results in a payment due of $9,000, then the fixed-rate payer must pay the difference ($1,000) to

its counterparty.

103.    In the OTC interest-rate swap market, broker-dealers functioned as market

makers.  A small set of dealers dominated the market for OTC USD interest-rate derivatives

during the relevant period.  According to a July 2010 ISDA market survey, the largest 14 broker-

---

[86] *See, e.g.*, 2011 Board of Directors, International Swaps & Derivatives Ass'n, Inc., http://www.
isda.org/wwa/bod.html (on file with Plaintiff).

dealers held 82% of all interest-rate derivatives by notional amount.[87]  Of these 14 largest

dealers, 10 were Panel Bank Defendants: Bank of America, Barclays, Citibank, Credit Suisse,

Deutsche Bank, HSBC, JPMorgan, RBS, Société Générale, and UBS.[88]  Similarly, the top five

bank holding companies in the United States—Bank of America, JP Morgan, Citigroup, Inc., and

HSBC, and Goldman Sachs—accounted for more than 95% of all OTC swaps and derivatives

transactions in the United States in 2009.[89]

104.    As Defendant UBS has acknowledged, in interest-rate swap transactions, "the

benchmark is a price, not an index."[90]  OTC dealers quote prices for interest-rate swaps in two

parts: (1) an interest-rate benchmark and (2) a fixed interest rate.  In the absence of collusion, the

fixed rate is calculated to provide the same value today (net present value or "NPV") of the

expected cash flows from the quoted benchmark over the life of the swap.  The fixed-rate payer

calculates the expected cash flows by applying the published rules of the quoted benchmark to

the predicted market conditions over the length of the swap.  For example, for a three-year swap,

the counterparty would use bbaLIBOR™'s published rules to predict competitive interbank

interest rates over the three-year period and use those predictions to determine the NPV of those

interest-rate payments.[91]

---

[87] David Mengle, *Concentration of OTC Derivatives Among Major Dealers*, ISDA Research Notes, July 2010, *available at* https://www.isda.org/a/8PDDE/concentrationrn-4-10.pdf.

[88] *See id.*

[89] *See* Office of the Comptroller of the Currency, OCC's Quarterly Report on Bank Trading and Derivatives Activities:  First Quarter 2009, *available at* http://www.occ.gov/news-issuances/news-releases/2009/nr-occ-2009-72a.pdf.  In the first quarter of 2009, Panel Bank Defendants JP Morgan, Bank of America, and Citibank collectively earned more than $6 billion in trading revenue from interest-rate derivative positions.  *See id.*

[90] UBS, *Re:  Consultation Document on the Regulation of Indices* 3 (Nov. 29, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/benchmarks/individual-others/ubs_en.pdf.

[91] *See* Wheatley Final Report, *supra* note 63, at 45.

105.    For example, assume that on January 1, 2014, an OTC dealer offers a three-year swap where the floating rate is indexed to 3-month USD bbaLIBOR™ on a notional $10 million with payment dates at the end of each year.  Applying the USD bbaLIBOR™ methodology, a potential counterparty will predict the floating-rate payments on each payment date and then calculate the NPV of those payments.  If the NPV of the quoted fixed rate exceeds the NPV of the quoted benchmark, then the swap would be over-priced.  In other words, the price of the swap is expressly predicated on the USD bbaLIBOR™ published rules and application of those rules to expected market conditions.

106.    Thus, the markets for interest-rate benchmarks, interest-rate derivatives, and floating-rate loans are inextricably intertwined in that: (a) interest-rate benchmarks serve as a component of the prices of interest-rate derivatives and floating-rate loans; (b) interest-rate derivatives and floating-rate loans require a reliable interest-rate benchmark; (c) network effects support adoption of a single standard interest-rate benchmark for interest-rate derivatives and floating-rate loans; and (d) the value of an interest-rate benchmark is fundamentally determined by its suitability as a pricing component in interest-rate derivatives and floating-rate loans. Similarly, holders of floating-rate MBS (whose prices incorporate interest-rate benchmarks) seek to hedge their risks through interest-rate derivatives (whose prices likewise incorporate interest-rate benchmarks), which further reinforce the network-effect nature of the market for interest-rate benchmarks.  The relationship among these product markets is graphically depicted in Figure 2 below.

**Figure 2:  Relationship Between Product Markets**



### E.      Development of bbaLIBOR™

107.    The origin of bbaLIBOR™ can be traced to 1969, when a Greek banker arranged an $80 million syndicated loan to the Shah of Iran.[92]  At the time, lenders in global markets did not have access to a uniform benchmark that would reflect their cost of funds.  Instead, lending syndicates offered loans with interest rates that were renegotiated every three or six months to reflect changing market conditions.

108.    The banker, who worked for the London branch of Manufacturer's Hanover (now part of JP Morgan), devised a formula whereby a group of major reference banks within each syndicate agreed to report their funding costs shortly before a loan rollover date.  The weighted

---

[92] Kirstin Ridley & Huw Jones, *Insight:  A Greek Banker, the Shah and the Birth of Libor*, Reuters (Aug. 7, 2012), http://www.reuters.com/article/2012/08/08/us-banking-libor-change-idUSBRE87702320120808.

average of these rates, rounded to the nearest 1/8th percent plus a spread for profit, became the price of the loan for the next period.  The banker named this rate the London interbank offer rate. Within a few years, this version of "Libor" evolved from a measure used to price individual loans to a much broader benchmark for deals worth hundreds of billions of dollars a year.  As demand for loans surged, demand for interest-rate derivatives followed.

109.    In the mid-1980s, the banks using the informal "Libor" asked the BBA to devise a benchmark to act as a reference point for pricing derivatives and interest-rate swaps, and to make benchmarking more transparent and objective.[93]  The BBA agreed, and working with other parties, such as the Bank of England, renamed the benchmark bbaLIBOR.

**F.    Calculation of bbaLIBOR™**

110.    During the 2000s, the BBA licensed bbaLIBOR™ for 15 maturities (from overnight to 12 months) and for 10 currencies (Australian Dollar, Canadian Dollar, Swiss Franc, Danish Krone, Euro, Pound Sterling ("GBP"), Japanese Yen ("JPY"), New Zealand Dollar, Swedish Krona and USD).  The BBA's licensees included companies located in the United States.[94]

111.    The BBA represented that it chose the banks that would contribute submissions (Panel Banks) based on their scale of market activity, credit rating, and perceived expertise in the currency concerned.[95]  The BBA stated that it intended the selection criteria to show that Panel

---

[93] Michael R. Koblenz et al., *LIBOR:  Everything You Ever Wanted to Know But Were Afraid to Ask*, 6 J. Bus., Entrepreneurship & L. 281, 283 (2013), *available at* http://digitalcommons.pepperdine.edu/cgi/viewcontent. cgi?article=1094&context=jbel.

[94] The BBA has access to this license information.  The FDIC-R does not.

[95] *The Basics*, BBA Libor, https://web.archive.org/web/20130130191334/http://www.bbalibor.com/bbalibor-explained/the-basics (last visited Jan. 29, 2018).  Many, if not all of the Panel Bank Defendants were, during the relevant time period, contributors to other bbaLIBOR™ panels as well as the USD bbaLIBOR™ panel.

Banks would have the best and most accurate knowledge of interbank borrowing costs for each currency.  Only the Panel Banks knew what the rates really were in the opaque interbank loan market.[96]

112.     The BBA's published rules (its methodology) governed the way that Panel Banks were required to determine their submissions, and Panel Banks purported to agree to abide by those rules in order to remain on the bbaLIBOR™ panel of banks.  In 1998, the Foreign Exchange and Money Markets ("FX & MM") Committee of the BBA decided that a universal definition of a prime bank could no longer be given and, in response to user demand, changed the definition to the one that was used through the 2000s and continues to exist today: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"[97]

113.     The published bbaLIBOR™ rules required each Panel Bank to submit rates: (a) without reference to rates contributed by other Panel Banks; (b) determined by the Panel Bank's staff primarily responsible for management of a bank's cash, rather than its derivative trading book; (c) without reference to the pricing of any derivative financial instrument; and (d) that represent the rates it "would be offered funds."[98]  The BBA intended for these rules to

---

[96] The term "opaque" is often used in financial markets as an antonym for "transparent."  Transparent financial markets are those in which much is publicly known about prices and volumes of financial transactions.  *See Transparency and Over-the-counter Derivatives*, ISDA, Research Notes, 2009, *available at* https://www.isda.org/a/cPDDE/isda-research-notes1.pdf.  Transparent financial markets promote price discovery and are therefore considered to be more efficient than opaque markets.  Commercial banks have superior access to information in the financial markets and use that information for profit through their activity in OTC derivative markets.  *See, e.g.,* U.S. C.F.T.C. Chairman Gary Gensler, Remarks at the OTC Derivatives Reform, Consumer Federation of America Financial Services Conference (Dec. 3, 2009), *available at* http://www.cftc.gov/ PressRoom/SpeechesTestimony/opagensler-22.

[97] Until 1998, banks submitted quotes to the BBA answering the question:  "At what rate do you think interbank term deposits will be offered by one prime bank to another prime bank for a reasonable market size today at 11 am?"

[98] UBS SOF, *supra* note 55, ¶ 7; *The Basics*, *supra* note 95; *Setting bbalibor*, BBA Libor, https://web.archive.org/web/20120902014345/http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited Jan. 29, 2018); *Definitions*, BBA Libor,

show that the inputs to bbaLIBOR™ reflected competitive interest rates in the market for unsecured interbank loans.[99]  In its 2010 Annual Report, the BBA identified bbaLIBOR™'s three main strengths as:  (1) its simplicity; (2) its transparency (because it purportedly published all of the information needed to understand bbaLIBOR™ including the instructions given to contributing banks); and (3) it was "market led."[100]

114.     In addition, the BBA claimed that it was independent of the Panel Banks and that it would aggressively monitor compliance with the published rules.  For example, in 2008, the BBA stated that the bbaLIBOR™ process was overseen by an "independent committee" (the FX & MM Committee) of "market participants."[101]  ██████████████████████████

████████████████████████████████████████████████████████████

██████ ██████████████████████████████████████████████

███████████

115.     Every business day, Panel Banks electronically communicated their bbaLIBOR™ submissions by 11:10 a.m. London Time to the BBA's agent, Thomson Reuters, which is

---

https://web.archive.org/web/20130205220303/http://www.bbalibor.com/bbalibor-explained/definitions (last visited Oct. 1, 2014).

[99] Wheatley Final Report, *supra* note 63, at 55.  One of the key characteristics for a credible benchmark rate is that the benchmark should "clearly convey the economic realities of the underlying interest it seeks to measure to its users."  IOSCO Consultation Report, *supra* note 73, at 10.

[100] BBA, 2010 Annual Report, at 25 (2010).

[101] BBA, Understanding the Construction and Operation of BBA LIBOR, at 1 (June 10, 2008) (on file with Plaintiff).



headquartered in New York. The BBA's published rules stated that Panel Banks were not to know the bbaLIBOR™ rates submitted by other Panel Banks during this submission window.[104]

116.    USD bbaLIBOR™ was calculated by eliminating the four highest and four lowest submissions, and then averaging the remaining eight submissions. This average constituted the bbaLIBOR™ "fixing."[105] Thomson Reuters, as an agent for the BBA, electronically communicated the bbaLIBOR™ fixings to derivatives traders, U.S. lenders, and other licensees, including the Wall Street Journal and Bloomberg News, by midday London Time.[106] Figure 3 below presents the BBA's graphic depiction of the bbaLIBOR™ process.[107]

**Figure 3:  bbaLIBOR™ Processes**



---

[104] *The Basics*, *supra* note 95.

[105] In the parlance of commercial banks, a rate submission for bbaLIBOR™ was referred to as a "submission" and the bbaLIBOR™ rate that the BBA published was known as the "fixing."

[106] *See Frequently Asked Questions (FAQs)*, *supra* note 18.

[107] *The Basics*, *supra* note 95.

117.    In the United States, market participants sometimes referred to USD bbaLIBOR™ as "LIBOR01" in reference to the Thomson Reuters page transmitted to licensed vendors in the United States and other U.S. financial institutions containing the USD bbaLIBOR™ fixings for that day, or "BBAM" in reference to the Bloomberg page transmitted to licensed vendors in the United States and other U.S. financial institutions containing the USD bbaLIBOR™ fixings for that day.

118.    The Panel Bank Defendants agreed to, and did, transmit and publish their individual USD bbaLIBOR™ submissions into the United States, including New York, to interest-rate derivatives traders in the United States and New York, and licensed vendors, including the Wall Street Journal and Bloomberg.  In publishing these individual USD bbaLIBOR™ submissions, each Panel Bank Defendant misrepresented its borrowing rates.  But for Panel Bank Defendants' agreement to publish those individual USD bbaLIBOR™ submissions to investors and lenders in the United States, the individual USD bbaLIBOR™ quotes submitted by each Panel Bank Defendant would have been known only to Defendants. Panel Bank Defendants specifically aimed those individual USD bbaLIBOR™ submissions at investors in the United States, including those in New York.  To the extent that Panel Bank Defendants depressed their published USD bbaLIBOR™ quotes to protect their reputation, Panel Bank Defendants did so for the express purpose of misleading investors, lenders, and media in the United States through the voluntary publication of their individual USD bbaLIBOR™ submissions into the United States.  Panel Bank Defendants specifically agreed to publish their individual submissions into the United States and collectively rejected calls to "anonymize" the submission process.

119.     In August 2007, the U.S. Federal Reserve System requested that financial institutions, for example, Citigroup, Inc., visit the Federal Reserve System's Discount Window to borrow short-term money—from the United States—to allay some of the concerns that investors in the United States had about the liquidity of Citigroup and other Bank Defendants.[108]

120.     Panel Bank Defendants and/or their parent companies made use of the Federal Reserve System's Discount Window.  In August 2007, Citigroup, Inc. withdrew $3.375 billion of cash from the Discount Window in exchange for $23 billion worth of assets, including commercial mortgage-backed securities, residential mortgages and commercial loans.[109]  In November 2007, Deutsche Bank borrowed $2.4 billion.  JP Morgan Chase & Co. and Bank of America Corp. each borrowed $500 million in August 2007.  Panel Bank Defendants and/or their parent companies obtained these loans both to provide liquidity and to bolster each bank's reputation in the United States with U.S. investors and regulators.[110]  During 2007, Royal Bank of Scotland Group plc borrowed $84.5 billion and UBS borrowed $77.5 billion from the Federal Reserve System.[111]  Société Générale SA borrowed $17.4 billion from the Federal Reserve System in May 2008 alone.[112]  By seeking access to these funds, these institutions admitted to having "substantial operation[s]" in the United States.

---

[108] Citi CFTC Order, *supra* note 24, at 14.

[109] Gretchen Morgansen, *The Bank Run We Knew So Little About,* N.Y. Times, Apr. 2, 2011, http://www.nytimes.com/2011/04/03/business/03gret.html.

[110] Bradley Keoun and Phil Kuntz, *Wall Street Aristocracy Got $1.2 Trillion in Secret Loans*, Bloomberg, Aug. 21, 2011, http://www.bloomberg.com/news/articles/2011-08-21/wall-street-aristocracy-got-1-2-trillion-in-fed-s-secret-loans.

[111] *The Fed's Secret Liquidity Lifelines*, Bloomberg, http://www.bloomberg.com/data-visualization/federal-reserve-emergency-lending/.

[112] *Id.*

121.    Table 1 below reflects the peak amounts borrowed from the Federal Reserve System by certain Panel Bank Defendants and/or their parent companies between August 2007 and April 2010.

**Table 1:  Peak borrowing amounts August 2007 - April 2010**

| Bank | Year | Peak Amount of Debt (in billions) |
|---|---|---|
| Bank of America Corp. | 2009 | $91.4 |
| BTMU | 2009 | $9.4 |
| Barclays plc | 2008 | $64.9 |
| Citigroup, Inc. | 2009 | $99.5 |
| Credit Suisse Group AG | 2008 | $60.8 |
| Deutsche Bank | 2008 | $66 |
| HSBC | 2009 | $3.7 |
| JP Morgan Chase & Co. | 2008 | $68.6 |
| Lloyds | 2007 | $0.505 |
| Norinchukin | 2009 | $22 |
| Rabobank | 2009 | $9.1 |
| RBC | 2008 | $6.9 |
| Royal Bank of Scotland Group plc | 2008 | $84.5 |
| Société Générale SA | 2008 | $17.4 |
| UBS | 2008 | $77.5 |

### G.    bbaLIBOR™ Governance

122.    Through 2010, the FX & MM Committee had sole responsibility for all aspects of the functioning and development of bbaLIBOR™.[113]  Thirteen "active market practitioners" comprised the FX & MM Committee.[114]  As noted above, the BBA represented that the FX &

---

[113] *See, e.g.*, Landon Thomas Jr., *Trade Group for Bankers Regulates a Key Rate*, N.Y. Times, July 5, 2012, http://www.nytimes.com/2012/07/06/business/global/the-gentlemens-club-that-sets-libor-is-called-into-question.html?pagewanted=all; *Fixing LIBOR*, *supra* note 17, at 5.

[114] *Understanding BBA LIBOR*, BBA, https://web.archive.org/web/20130511195637/http://www.bba.org.uk/media/article/understanding-bba-libor (last visited Jan. 29, 2018).

MM Committee was an "independent body."[115]  The BBA did not disclose the names of the

members of the FX & MM Committee,[116] but the identities of many members have been

disclosed through public trials and admissions to or findings of enforcement agencies.[117]  The

chairs and two deputy chairs of the FX & MM Committee were representatives from Panel

Banks ████████████████████████  ████████████████████

████████  FX & MM Committee members met at least every two months at undisclosed

---

[115] *See, e.g.*, BBA Libor, LIBOR Governance and Scrutiny:  Proposals Agreed by the FX & MM Committee § 1.6 (Nov. 17, 2008) (hereinafter "LIBOR Governance and Scrutiny").

[116] Enrich & Colchester, *supra* note 16.

[117] Executives from the following banks have been revealed as members of the FX & MM Committee:



UBS SOF, *supra* note 55, ¶ 85; Fin. Servs. Auth., Final Notice to UBS AG ¶ 122 (Dec. 19, 2012), attached as Exhibit 13 and incorporated into this Complaint by reference; Fin. Servs. Auth., Final Notice to the Royal Bank of Scotland ¶ 89 (Feb. 6, 2013) (hereinafter "RBS Final Notice"), attached as Exhibit 14 and incorporated into this Complaint by reference.  The specific entities for which the executives purportedly worked and their relationship to their bank's respective U.S. operations are not publicly known.  The identities of other individuals involved in the FX & MM Committee and/or the BBA are not publicly known.

[118] BBA Libor, LIBOR Governance and Scrutiny, *supra* note 115, § 1.11;

locations to discuss bbaLIBOR™.[120]  The FX & MM Committee did not publish official

minutes.[121]

123.   The BBA employed a full-time manager to supervise on a day-to-day basis all

aspects of the calculation of bbaLIBOR™ and the dissemination of bbaLIBOR™ to the

marketplace.  The BBA represented that the manager was responsible for ensuring that all

bbaLIBOR™ processes met the "highest standards."[122]  The bbaLIBOR™ manager acted as an

executive on the FX & MM Committee and was responsible for informing the FX & MM

Committee about issues pertaining to bbaLIBOR™.  The BBA and its agents monitored the

Panel Banks' individual submissions in real-time.  When one Panel Bank submitted rates that

seemed out of line with other submissions, the BBA or its agents would contact the outlier Panel

Bank to "confirm" the submission—for example, "Everyone else is coming in a good bit under

that."[123]

124.   In April 2005, the BBA hired John Ewan, a 29-year-old financial researcher with

a biology degree and no apparent prior experience managing a financial benchmark, to serve as

the bbaLIBOR™ manager.[124]  Mr. Ewan, dubbed by one publication as "Mr. LIBOR," has

claimed that he was hired to put bbaLIBOR™ on a secure commercial footing and that in his

first two years he increased revenue more than tenfold, introduced new products, and obtained

---

[120] Liam Vaughan, *Secret Libor Committee Clings to Anonymity Following Scandal*, Bloomberg (Aug. 21, 2012), http://www.bloomberg.com/news/2012-08-20/secret-libor-committee-clings-to-anonymity-after-rigging-scandal.html.

[121] *Id.*

[122] *See, e.g.*, BBA Libor, LIBOR Governance and Scrutiny, *supra* note 115, § 1.7.

[123] Donald MacKenzie, *What's in a Number?*, London Rev. Books, Sep. 25, 2008, *available at* http://www.lrb.co.uk/v30/n18/donald-mackenzie/whats-in-a-number.

[124] *John Ewan Public Profile*, LinkedIn, https://www.linkedin.com/pub/john-ewan/5/490/627 (last visited Jan. 29, 2018).  Mr. Ewan left the BBA in the summer of 2012.

European Union, United States, and Japanese trademarks for bbaLIBOR™, and successfully negotiated contracts with the derivatives exchanges, major data vendors, and hundreds of other users.[125]

125.    At least by 2007, the BBA required entities that sought to redistribute bbaLIBOR™ or use it for any commercial purpose to first obtain a license from the BBA.[126]  Mr. Ewan claims that he was responsible for developing and maintaining relationships with all "stakeholders" in bbaLIBOR™, including the NY Fed, which involved keeping them apprised of changes to the benchmark and the markets it tracks.[127]  Mr. Ewan also claims to have cultivated "excellent relationships at a senior level" with most major central banks and market participants (principally banks, brokers, trade associations, hedge funds, and exchanges).[128]

126.    On January 1, 2010, more than a year after learning that regulators were investigating bbaLIBOR™, the BBA modified its structure.  It created a new entity, BBA LIBOR, Ltd., to assume responsibility for the day-to-day running of the benchmark.  One report suggested that the BBA created BBA LIBOR, Ltd. to limit the BBA's liability for expected claims relating to bbaLIBOR™.[129]  Despite this change in structure, the processes and procedures followed by Panel Banks and the BBA in calculating and publishing bbaLIBOR™ remained the same.  The FX & MM Committee also continued to oversee bbaLIBOR™.

---

[125] Steve Hawkes, *Mr. Libor Quits*, The Sun, July 21, 2012, http://www.thesun.co.uk/sol/homepage/news/money/4441913/Mr-Libor-quits.html.

[126] *Licensing*, *supra* note 22 ("Please note that without the express permission of the BBA, no company is allowed to display bbalibor on their website or use the data for commercial purposes.").

[127] *John Ewan Public Profile*, *supra* note 124.

[128] *Id.*

[129] Enrich & Colchester, *supra* note 16.

127.    On September 12, 2012, an independent panel recommended that the BBA be stripped of its role in bbaLIBOR™ rate setting.  As Martin Wheatley, former head of the United Kingdom's Financial Services Authority ("FSA")[130] and later, the FCA, explained at the time, "the BBA acts as the lobby organisation for the same submitting banks that they nominally oversee, creating a conflict of interest that precludes strong and credible governance."[131]  In February 2013, the BBA agreed to cede control of bbaLIBOR™ to a new operator.  On January 31, 2014, the BBA handed over responsibility for the administration of bbaLIBOR™ to the ICE Benchmark Administration ("IBA").[132]

## H.    Defendants' Knowledge of bbaLIBOR™'s Importance

128.    Defendants understood the importance of bbaLIBOR™ to the global economy and actively promoted bbaLIBOR™ as a key benchmark rate.  For example, the BBA described the importance of that benchmark as follows:

> BBA LIBOR is by far the most widely referenced interest rate index in the world.  Its importance goes beyond that of interbank lending and touches everyone from large international conglomerates to small borrowers.  It is central in interest rate swaps and the great majority of floating rate securities and loans relate to LIBOR.  Independent research indicates that around $350 trillion of swaps and $10 trillion of loans are indexed to BBA LIBOR.  It is the basis for settlement of interest rate contracts on the world's major futures and options exchanges.  It is written into standard derivative and loan documentation such as the ISDA terms and is also used for an increasing range of retail products.[133]

---

[130] The FSA is now two separate regulatory authorities:  The FCA and the Prudential Regulation Authority.  This Complaint uses "FSA" when referencing action taken by the FSA prior to its division in April 2013.

[131] Wheatley Final Report, *supra* note 63, at 21.

[132] *Disclaimer*, BBA Libor, http://www.bbalibor.com/disclaimer (on file with Plaintiff).

[133] BBA, Understanding the Construction and Operation of BBA LIBOR, *supra* note 101, at 3.

129.    Financial instruments that incorporated USD bbaLIBOR™ were priced based on the express understanding that Defendants would adhere to the benchmark's published methodology.  Market participants, including Doral, reasonably relied on Defendants' representations that bbaLIBOR™ was, and would be, honestly and reliably calculated according to the published rules.  Indeed, the BBA acknowledged in 2008 that bbaLIBOR™ "has always been relied on by the market as a reliable benchmark" of borrowing costs.[134]

130.    USD was by far the most important, and widely used, of the bbaLIBOR™ benchmarks.  The United States provided the biggest market for products that incorporated USD bbaLIBOR™ as the interest-rate benchmark.  ███████████████████████ ███████████████████████████████████████████████████████████ ███████████████████  The Panel Bank Defendants specifically intended to, and did, seek to induce U.S. lenders to incorporate USD bbaLIBOR™ as the interest-rate benchmark in their mortgage and other loan products.  █████████████████████████████████ ███████████████████████████████████████████████████████ ████████████

131.    █████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Defendants knew and intended that lenders in the United States, including Doral, would incorporate USD bbaLIBOR™ as an interest-rate benchmark in loans that Defendant Banks

---

[134] Press Release, BBA, Libor Gets Enhanced Governance and Scrutiny Procedures (Dec. 17, 2008), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-gets-enhanced-governance-and-scrutiny-procedur.

█ ████████████████████████████████████████████████████
█ ████████████████████████
█ ████████████████████

issued in the United States to U.S. borrowers.  Defendants' conduct was thus aimed specifically at the United States.

132.    Defendant Barclays has admitted that individual bbaLIBOR™ submissions conveyed information to market participants about each Panel Bank's costs of borrowing unsecured funds, the liquidity conditions and stress in the money markets, and each Panel Bank's ability to borrow funds in particular markets.[138]  Barclays further admitted that the market information conveyed by bbaLIBOR™ submissions "affect[ed], or tend[ed] to affect the prices" of financial products that incorporated bbaLIBOR™ as the interest-rate benchmark.[139]  Barclays admitted that bbaLIBOR™ was used to price a variety of global financial products, including U.S.-based swaps transactions and futures contracts, as well as home mortgages and commercial loans.[140]

133.    Because a Panel Bank's individual USD bbaLIBOR™ submissions should correspond to the cost of USD borrowing for that Panel Bank, investors in the United States and consumers of USD bbaLIBOR™ in the United States could perceive a Panel Bank's bbaLIBOR™ published submission as an indicator of that Panel Bank's financial health and liquidity.  For example, if a Panel Bank's USD bbaLIBOR™ published submission was relatively high as compared to other Panel Banks' published submission, that submission would have suggested to investors and users of USD bbaLIBOR™ in the United States that the Panel

---

[138] Nonprosecution Agreement Between U.S. Dep't of Justice, Criminal Div. Fraud Section and Barclays Bank plc, App. A, ¶ 35-36 (June 26, 2012) (hereinafter "Barclays SOF"), attached as Exhibit 15 and incorporated into this Complaint by reference; *see also In re Barclays plc*, No. 12-25, 2012 WL 2500330, at 22 (C.F.T.C. June 27, 2012) (hereinafter "Barclays CFTC Order") (CFTC finding the same), attached as Exhibit 16 and incorporated into this Complaint by reference.

[139] Barclays SOF, *supra* note 138, ¶ 33; *see also* Barclays CFTC Order, *supra* note 138, at 22 (CFTC finding the same).

[140] Barclays SOF, *supra* note 138, ¶ 1; *see also* Barclays CFTC Order, *supra* note 138, at 2 (CFTC finding the same).

Bank presented a credit risk and had potential liquidity problems.  Commercial banks with liquidity problems have trouble attracting business and could find themselves prohibited from working with financial institutions.

134.    Because the Panel Banks were purportedly among the world's largest and most financially sound commercial banks, market participants valued bbaLIBOR™ as a floor for the borrowing rate of other, less creditworthy, institutions and individuals.[141]  Though bbaLIBOR™ developed into the industry standard, other reference rates existed throughout the relevant period. For example, brokers, such as Tullet Prebon and Tradition Financial Services, and data providers, such as Bloomberg and Depository Trust & Clearing Corp. ("DTCC"), provided data on various interest-rate benchmarks.

135.    In March 2012, the BBA responded to published reports about an investigation into bbaLIBOR™ by insisting that it and the Panel Banks were "committed to the continuing evolution of Libor so that it adapts to meet the changing market and user requirements and general expectations."[142]  The BBA has quoted Ian Mair, then Chairman of the London Money Market Association, as saying "It is important that all market participants *have a choice* of benchmarks."[143]  Following Barclays's admission of bbaLIBOR™ manipulation, the BBA again stated that it was committed to providing a benchmark that had the support of all users.[144]

---

[141] David Hou & David Skeie, Fed. Reserve Bank of N.Y., LIBOR:  Origins, Economic Crisis, Scandal, and Reform 3 (March 2014), *available at* http://www.ny.frb.org/research/staff_reports/sr667.pdf.

[142] BBA, LIBOR—Update, *supra* note 70.

[143] *Id.* (emphasis added).

[144] Press Release, BBA, British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings on Libor (Aug. 18, 2012), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-statement-regarding-the-treasury-committees-prelim.

136.    In 2014, the BBA transferred control of bbaLIBOR™ to a commercial benchmark provider, the IBA.  IBA announced that it would implement additional controls to deter misconduct and ensure that LIBOR serves its intended purpose.[145]

137.    Following Barclays's disclosure, multiple providers have sought to enter the market for interest-rate benchmarks, such as the DTCC, which offers the General Collateral Finance Repo Index (which has gained the support of numerous market participants).  This restored competition in the market for interest-rate benchmarks has also led to the introduction of new financial products, such as futures and options contracts linked to Repo Rate indices and overnight indexed swap rates.

### FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO BBALIBOR™

### A.    Systematic bbaLIBOR™ Depression

138.    Many of the Panel Bank Defendants' portfolios in at least 2007 and 2008 were weighted such that the Panel Bank Defendants financially benefited from reductions in short-term floating interest rates.  For example, Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to bbaLIBOR™ because bbaLIBOR™ was lower than predicted by competitive market forces.[146]  Similarly, Bank of America reported that it was "liability sensitive to LIBOR" and net interest income would increase substantially if short-term interest rates fell by 100 basis points while long-term rates remained the same.[147]  Bank of America further stated that it held a notional amount of more than $50 billion in receive

---

[145] Iris Dorbian, *Will Banks Pay Up for a New, Improved Libor?*, CFO (Aug. 19, 2014), http://ww2.cfo.com/credit/2014/08/will-banks-pay-new-improved-libor.

[146] Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall St. J., Jan. 10, 2013, http://online.wsj.com/article/SB10001424127887324442304578231721272636626.html.

[147] Bank of Am., 2008 Annual Report, *supra* note 60, at 88-90.

fixed/pay floating interest rate swaps that would mature in 2008 or 2009 with no offsetting pay fixed/receive floating interest-rate swaps.[148]

139.    On Thursday, August 9, 2007, the Panel Bank Defendants submitted overnight USD bbaLIBOR™ rates that were significantly higher than the prior day.  Overnight USD bbaLIBOR™ rose from 5.35% on August 8, 2007, to 5.86% on August 9, 2007, which put USD bbaLIBOR™ at its highest level since 2001.  Because these increases were not coincidental with changes in the rates charged by central banks, the media expressed concern that the increase in USD bbaLIBOR™ indicated that the Panel Bank Defendants were afraid to lend to each other and that major losses for the Panel Bank Defendants and others were on the horizon.

140.    On August 9, 2007, after the bbaLIBOR™ submissions were electronically published for that day, a UBS executive sent an internal email to a UBS senior manager, a manager, and others stating that "it is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets.  Fixing risk and [profit and loss] thereof is secondary priority for now."[149]  UBS employees understood this secret directive to apply to all bbaLIBOR™ currencies, but was particularly applicable to USD bbaLIBOR™.[150] UBS traders in the United States were aware of this directive and used it to their advantage in executing trades with U.S. financial institutions.

141.    In October 2007, Deutsche Bank's Global Head of GFFX directed Deutsche Bank's USD bbaLIBOR™ submitter (Michael Curtler) to "make sure our libors are on the low side for all [currencies]."[151]  Members of Deutsche bank's GFFX unit, including members based

---

[148] *Id.* at 91 Table 42.

[149] UBS SOF, *supra* note 55, ¶ 105.

[150] *Id.* ¶ 108.

[151] DB NYSDFS CO, *supra* note 30, ¶ 57.

in New York, knew of this directive and used it to their advantage in trading financial products tied to USD bbaLIBOR™ with counterparties in the United States, including New York.

142.    By August 16, 2007, all of the Panel Bank Defendants dropped their submissions significantly.  UBS, for example, lowered its USD overnight bbaLIBOR™ submission by 90 basis points.  The initial differences were arguably consistent with the fact that the Panel Bank Defendants had different creditworthiness and presented different risks for unsecured short-term wholesale lenders.[152]  Figure 4 below plots the USD overnight bbaLIBOR™ submissions for the Panel Bank Defendants from August 7, 2007 through August 28, 2007.  As can be seen in Figure 4, bbaLIBOR™ submissions showed significant differences in early August but then showed significant uniformity by the end of the month.  This pattern is consistent with allegations that the Panel Bank Defendants began colluding on USD bbaLIBOR™ in August 2007.

---

[152] *See, e.g.*, Wheatley Final Report, *supra* note 63, at 79 ("[I]t could be argued that, in the current environment inter-bank lending rates are dominated by credit risk and there is a large dispersion in the perceived creditworthiness of banks."); Lloyds Final Notice, *supra* note 42, ¶ 4.49 (admitting the borrowing rates of the Panel Bank Defendants diverged as lenders became more sensitive to credit risk).

**Figure 4:  Overnight USD LIBOR Submissions**



143.    On August 20, 2007, RBS's London-based head of money markets trading and the person responsible for USD bbaLIBOR™ submissions, Paul Walker, reportedly telephoned RBS's head of short-term markets for Asia, Scott Nygaard, in Tokyo, to discuss how banks were using bbaLIBOR™ to profit on its movements rather than submitting rates that honestly reflected their perceived costs of borrowing.  Mr. Walker is quoted as telling Mr. Nygaard: "People are setting to where it suits their book. . . .  LIBOR is what you say it is."[153]  Senior RBS managers reportedly knew that, at least as of August 2007, the Panel Bank Defendants were systematically rigging LIBOR.[154]

144.    ███████████████████████████████████████████

██████████████████████████████████████████████████████████████

---

[153] Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg (Dec. 13, 2012), http://www.bloomberg.com/news/print/2012-12-13/rigged-libor-with-police-nearby-shows-flaw-of-light-touch.html.

[154] *Id.*



### B.    Agreement Among Panel Bank Defendants and the BBA/FX & MM Committee to Align USD bbaLIBOR™ Submissions

146.    The FX & MM Committee agreed that USD bbaLIBOR™ submissions should be within five basis points of the median of all USD bbaLIBOR™ submissions, regardless of the definition of bbaLIBOR™.  The FX & MM Committee agreed to, and did, institute a "flagging system" to identify any USD bbaLIBOR™ submissions outside of this agreed-upon range before publication of those individual submissions to licensed vendors in the United States.[157]

147.    Rabobank's Global Head of Liquidity and Finance and representative on the BBA's bbaLIBOR™ Steering Group informed its USD bbaLIBOR™ submitters that at the request of the BBA, submitters must keep USD bbaLIBOR™ submissions "nice and aligned with where everybody else is in the market."[158]  According to notes taken by the U.S. Federal Bureau of Investigation ("FBI") during an interview with a bbaLIBOR™ submitter from

---

[157] Defense Ex. 608I at 2, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 210-8.

[158] Defense Ex. 608B at 11, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 210-5.

Rabobank, "Rabobank management's sole goal was to ensure Rabobank's submissions were within the range of other panel bank submissions and submitters were 'towing [sic] the line.'"[159]

148.    In the event that a Panel Bank submitted a USD bbaLIBOR™ submission outside of that range, the FX & MM Committee privately and directly contacted that Panel Bank to tell the Panel Bank what other Panel Banks had submitted—even though the bbaLIBOR™ rules stated that Panel Banks should not have any advance knowledge of other USD bbaLIBOR™ submissions.  As agreed upon by the FX & MM Committee members and USD bbaLIBOR™ Panel Banks, the Panel Bank would then re-submit its USD bbaLIBOR™ submission so that the submission was within the range of all other Panel Banks.  When publishing each Panel Bank's individual USD bbaLIBOR™ submissions, the BBA published only the re-submitted rate.  A former bbaLIBOR™ submitter has testified that "all the BBA seemed to care about was that panel banks would submit rates that were close to each other's rates."[160]

149.    Information revealed through enforcement agencies' bbaLIBOR™ investigations confirm the agreement among Panel Bank Defendants to align USD bbaLIBOR™.  For example, in August 2007, senior managers at Barclays instructed their USD bbaLIBOR™ submitters to stay "within the pack" and be nearer to the depressed rates of other Panel Bank Defendants rather than submit USD bbaLIBOR™s that were consistent with the BBA's definition of bbaLIBOR™.[161]  Barclays implemented this directive in response to negative press concerning Barclays's perceived liquidity problems, including one article published by Bloomberg asking,

---

[159] Defense Ex. 608C at 4, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.).

[160] Trial Tr. 551:21-553:14, Oct. 21, 2015 (Day 6), *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.).

[161] Barclays SOF, *supra* note 138, ¶ 37.

"what in the hell [was] happening" at Barclays and its New York-based Barclays Capital division.[162]

150.    Similarly, internal documents from Lloyds, the contents of which surfaced as a result of enforcement agencies' investigations, reveal that an unidentified HBOS senior manager directed USD bbaLIBOR™ submitters to contribute USD bbaLIBOR™s at the rate of the expected USD bbaLIBOR™ fixing so that HBOS did not stand out as an outlier relative to other Panel Banks.  At the time, HBOS was suffering severe funding and liquidity issues and, *ceteris paribus*, would have had to pay higher interest rates than its competitors to obtain interbank loans.  The HBOS directive was confirmed in an internal HBOS email sent to two other senior HBOS senior managers and other HBOS personnel.  The email stated that the submissions of all USD bbaLIBOR™ Panel Banks were published and HBOS could not "afford to be significantly away from the pack."[163]  HBOS's directive to align its USD bbaLIBOR™ submissions with those of the other Panel Banks was known to HBOS employees that traded derivatives that incorporated USD bbaLIBOR™ as an interest-rate benchmark.  The HBOS directive was also disclosed to other Panel Banks.  In a recorded electronic chat, HBOS's USD bbaLIBOR™ submitter wrote to an employee of another financial institution (the identity of this institution has not been disclosed) that "youll [sic] like this ive [sic] been pressured by senior management to bring my rates down into line with everyone else."[164]

151.    The agreement to align USD bbaLIBOR™ submissions concealed the fact that in the opaque interbank loan market, more creditworthy Panel Banks could borrow at interest rates

---

[162] Barclays CFTC Order, *supra* note 138, at 19; *see also* Barclays SOF, *supra* note 138, ¶¶ 36-40.

[163] Lloyds CFTC Order, *supra* note 39, at 14.

[164] *Id.* at 15.

that were lower than other, less creditworthy, Panel Banks. For example, in a transcript of an October 2008 phone call between Rabobank's FX & MM Committee representative and Mr. Ewan, the Rabobank representative said that as a AAA-rated bank, Rabobank's USD bbaLIBOR™ submissions should, contrary to its aligned submissions, be "miles away from someone like UBS is at the moment."[165]

152. Not only did the Panel Bank Defendants align submissions through the agreed-upon "flagging system" for submission outliers, they also contacted each other directly to discuss their respective USD bbaLIBOR™ submissions. For example, one eyewitness told the FBI that an unknown Bank of America employee used to call Rabobank executive Tony Allen to discuss bbaLIBOR™ submissions.[166]

153. According to notes taken by the FBI from an interview with a bbaLIBOR™ submitter from Rabobank, the submitter called the bbaLIBOR™ submission process a "charade" and a "crock of rubbish because [the submitter] wanted LIBOR rates to be a bit more reflective of Rabobank's actual borrowing rates."[167]

154. Thus, the Panel Bank Defendants had to coordinate with each other to align their respective USD bbaLIBOR™ submissions in advance of publication because any non-aligned submissions would draw public scrutiny.

155. During this same time period, in August 2007, the BBA issued a press release titled "Key Facts about LIBOR," in which the BBA falsely stated that bbaLIBOR™ "closely

---

[165] Government Ex. 110B at 3, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 185-3.

[166] Defense Ex. 608K at 3, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 210-9.

[167] Defense Ex. 608C at 18, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

reflects the real rates of interest being used by the world's big financial institutions" and that it "reflects the actual rate at which banks borrow money from each other."[168]

156.    On November 30, 2007, a representative of Barclays and the FSA had a private discussion.  The Barclays representative internally wrote that he did not disclose to the FSA that "'we're not posting where we think we should.'"[169]  On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that s/he was submitting USD bbaLIBOR™ "lower than s/he would have set if given a 'free hand,'" and that the Panel Bank Defendants, including Barclays, were submitting false and dishonest submissions.[170]

157.    On March 5, 2008, the FSA asked Barclays what it was paying for funding in certain currencies.[171]  A Barclays manager stated internally that s/he did not want to disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it was paying a rate equal to bbaLIBOR™.[172]  A Barclays bbaLIBOR™ submitter agreed that if s/he responded with "the honest truth" it might open a "can of worms."[173]  Barclays responded to the FSA that it was paying for one-year USD at bbaLIBOR™ "flat," which was untrue.[174]

158.    On April 11, 2008, a Barclays employee told an employee of the NY Fed that he was aware of Panel Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest,

---

[168] Press Release, BBA, Key Facts About BBA LIBOR (Aug. 10, 2007), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-falls-on-central-bank-intervention; *see also* Barclays SOF, *supra* note 138, ¶ 34.

[169] Barclays SOF, *supra* note 138, ¶ 45.

[170] *Id.*

[171] *Id.* ¶ 46.

[172] *Id.*

[173] *Id.*

[174] *Id.*

lowest rates."[175]  The Barclays employee said that Barclays could not borrow money at the rates submitted by other Panel Bank Defendants and that "if we can't borrow money at that rate . . . [t]hen no one else could really. . . .  I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and . . . I don't know if at some stage LIBORs will correct themselves."[176]

159.    On Wednesday, April 16, 2008, the Wall Street Journal published an article questioning the reliability of bbaLIBOR™ as a USD interest-rate benchmark.[177]  The article quotes Mr. Ewan as saying that the BBA is "closely watching the rates banks contribute" and that "[i]f it is deemed necessary, we will take action to preserve the reputation and standing in the market of our rates."[178]  The article states that bbaLIBOR™ was to be on the agenda of an upcoming BBA board meeting.[179]

160.    Over the next week, the BBA launched what its executives internally described as a "charm offensive,"[180] reaching out to investors in the United States and journalists to dispel concerns about bbaLIBOR™.  The FX & MM Committee agreed to send Mr. Ewan to the United States, including at least New York and Chicago, to visit personally with journalists at the

---

[175] *Unofficial Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the N.Y. Fed*, Apr. 11, 2008, at 7, *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/April_11_2008_ transcript.pdf (hereinafter "*Apr. 11 Barclays and N.Y. Fed Tr.*"), *attachment to* Press Release, Fed. Reserve Bank of N.Y., New York Fed Responds to Congressional Request for Information on Barclays - LIBOR Matter (July 13, 2012), http://www.newyorkfed.org/newsevents/news/markets/2012/Barclays_LIBOR_Matter.html (hereinafter "N.Y. Fed Press Release").

[176] *Id.* at 16.

[177] Carrick Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, Wall St. J., Apr. 16, 2008, http://online.wsj.com/article/SB120831164167818299.html.

[178] *Id.*

[179] *Id.*

[180] Enrich & Colchester, *supra* note 16.

Wall Street Journal, regulators at the NY Fed, and members of the CME to reassure them that each Panel Bank submitted accurate USD bbaLIBOR™ contributions and that USD bbaLIBOR™ was a reliable interest-rate benchmark that behaved differently in times of financial stress than some other market-wide measures of credit risk. The BBA's meeting with the NY Fed was just one of at least ten meetings and phone calls during this time regarding USD bbaLIBOR™.

161.    On April 17, 2008, the BBA publicly announced that it would expel any Panel Bank that made deliberately inaccurate bbaLIBOR™ submissions.[181]  The BBA stated that it would fast-track an "intensive review" of its bbaLIBOR™ process, but that it did not believe that Panel Bank Defendants had submitted false quotes.[182]  USD bbaLIBOR™ rates rose temporarily after the BBA's statement.[183]

162.    USD bbaLIBOR™ rates increased on April 18, 2008 not because of any legitimate fear among the Panel Bank Defendants that the BBA would actually discipline any Panel Bank for submitting false quotes—the members of the FX & MM Committee had already agreed that they would not impose any such discipline.  Instead, the temporary rise in USD bbaLIBOR™ was the result of coordinated action among the Panel Bank Defendants.  ███

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[181] UBS SOF, *supra* note 55, ¶ 114.

[182] Carrick Mollenkamp & Laurence Norman, *British Bankers Group Steps Up Review of Widely Used Libor*, Wall St. J., Apr. 17, 2008, http://online.wsj.com/article/SB120838284713820833.html.

[183] Carrick Mollenkamp, *Libor Surges After Scrutiny Does Too*, Wall St. J., Apr. 18, 2008, http://online.wsj.com/articles/SB120846842484224287.





164.    In May 2008, the Markets Group of the NY Fed stated in an internal report published on its website that "it is difficult to find convincing evidence of actual [bbaLIBOR™] misreporting."[191]

165.    During a six-month period in 2008, Thomson Reuters reportedly alerted Mr. Ewan on a weekly basis that the bbaLIBOR™ process was being distorted.[192]  Mr. Ewan reportedly told Thomson Reuters that he would investigate its concerns.[193]  There is no public evidence that he did.

166.    On May 19, 2008, the FX & MM Committee met to discuss questions raised about bbaLIBOR™.  The meeting was "confidential" and the BBA refused to admit that it took place.[194]  Senior bank executives described this gathering as a "working level pre meeting" to determine what should happen at the BBA's formal meeting scheduled for May 30, 2008.[195]  Panel Bank executives reportedly decided that they would make no substantive changes to the way bbaLIBOR™ was calculated, but would instead embark on a publicity campaign, known as a "charm offensive" directed at U.S. investors to convince them that the Panel Bank Defendants

---

[191] Samuel Cheun & Matt Raskin, MarketSOURCE, Recent Concerns Regarding LIBOR's Credibility 3 (May 20, 2008), *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/MarketSource_Report_May2 02008.pdf.  As the FSA recently noted, the evidence of "dislocation did not in itself . . . carry any implication that 'lowballing' was occurring."  Fin. Services Auth., Internal Audit Report:  A Review of the Extent of Awareness Within the FSA of Inappropriate LIBOR Submissions, Management Response ¶ 1.5 (Mar. 2013), *available at* www.fsa.gov.uk/static/pubs/other/ia-libor-management-response.pdf (hereinafter "FSA Internal Audit").  Indeed, the Wall Street Journal article warned that "no specific evidence has emerged that banks have provided false information about borrowing rates."  Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, *supra* note 177.

[192] Ian Pollock, *Libor:  BBA 'Warned Weekly' Says Former Rate-Compiler*, BBC (July 25, 2012), http://www.bbc.co.uk/news/business-18930191.

[193] *Id.*

[194] Email from Angela Knight to Paul Tucker (May 21, 2008, 4:40 PM), attached as Exhibit 17 and incorporated into this Complaint by reference.  Barclays publicly disclosed the cover email but, apparently, not the attachment, which is said to provide the "blow-by-blow" account of what transpired at the May 19, 2008 meeting.

[195] Email from Paul Tucker (May 28, 2008, 4:36 PM), attached as Exhibit 18 and incorporated into this Complaint by reference.

provided accurate and honest USD bbaLIBOR™ submissions and that the behavior of USD bbaLIBOR™ was due to exceptional market conditions.[196]

167.    On May 29, 2008, the Wall Street Journal published another article questioning USD bbaLIBOR™ submissions made by Citibank, Portigon, HBOS, JPMorgan, and UBS.[197] Numerous Panel Bank Defendants disputed the Wall Street Journal's analysis.  The Head of Global Fixed-Income Strategy at JPMorgan, for example, asserted that the Wall Street Journal's methodology was flawed because it was "based on too high a risk-free rate which produces a large upward bias in the Journal's measure of bank borrowing costs."[198]  A Citigroup spokesman said, "We continue to submit our LIBOR rates at levels that accurately reflect our perception of the market."[199]  WestLB insisted that it provided accurate data.[200]

168.    In late May 2008, a HBOS spokesman said, "We believe our Libor fixings are a genuine and realistic indication of our average cost of funding.  Our postings are on the whole in line with the market."[201]  HBOS's public statement in late May 2008 was an intentional misrepresentation.  Only the other Defendants could have known of this to be misrepresentation. Many published reports at the time also attributed movements in bbaLIBOR™ rates to factors other than the fraud and collusion alleged in this Complaint.[202]

---

[196] *Id.*

[197] Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J., May 29, 2008, http://online.wsj.com/article/SB121200703762027135.html.  The article also stated as follows:  "The Journal's analysis doesn't prove that banks are lying or manipulating Libor.  Analysts offer various reasons why some banks might report Libor rates lower than what other markets indicate."  *Id.*

[198] John Parry et al., *Banks May Be Understating Key Lending Rate:  Report*, Reuters (May 29, 2008), http://www.reuters.com/article/2008/05/29/us-banks-libor-idUSN2930208320080529.

[199] Mollenkamp & Whitehouse, *supra* note 197.

[200] *Id.*

[201] John Parry et al., *supra* note 198.

[202] *See, e.g.*, Int'l Monetary Fund, Global Financial Stability Report:  Financial Stress and Deleveraging 72 (Oct. 2008) (hereinafter "IMF Global Financial Stability Report"), *available at*

169.     These pretextual explanations and/or denials were materially false and intended to conceal the fact that the Panel Bank Defendants were fraudulently and collusively depressing USD bbaLIBOR™.

170.     In another article published on May 29, 2008, the BBA insisted: "We have every confidence in the integrity of the bbaLIBOR-setting process and the accuracy of the figures it produces."[203]  The BBA's statement was false because the BBA knew that the Panel Bank Defendants had been submitting false and dishonest rates, and that the BBA had helped to coordinate the Panel Bank Defendants' unlawful agreements.[204]

171.     After its formal meeting on May 30, 2008, the BBA announced that it would be strengthening the oversight of bbaLIBOR™ and that "it would give more details in due course."[205]  The unidentified attendees at the May 30, 2008 BBA meeting signed confidentiality agreements limiting their ability to disclose what was discussed.[206]  In fact, the Panel Bank Defendants and the BBA intended only to make minor cosmetic changes to the bbaLIBOR™

---

http://www.imf.org/External/Pubs/FT/GFSR/2008/02/pdf/chap2.pdf (concluding in October 2008 that the "U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding"); Gillian Tett & Michael Mackenzie, *Debate Over Libor Breeds a Crisis of Confidence*, Fin. Times, Apr. 22, 2008 ("It seems unlikely that this discrepancy has arisen because banks have deliberately been colluding to keep Libor rates down."); *Update 2-European, U.S. Bankers Work on Libor Problems*, Reuters (May 16, 2008), http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516 ("There's more wind being made about [the Libor] issue than is being merited by the facts . . . Libor will retain its present function for the foreseeable future . . . . Due to capital pressures not seen for decades[,] . . . Libor rates . . . are historically high." (internal quotation marks omitted)).

[203] Gavin Finch & Elliot Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg (May 29, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aMSoLbYpbHWk (on file with Plaintiff).

[204] *Id.*; Mollenkamp & Whitehouse, *supra* note 197 (As with its April 2008 article, the *Wall Street Journal* cautioned that its analysis "doesn't prove that banks are lying or manipulating Libor.").

[205] *International:  Libor Process*, N.Y. Times, http://www.nytimes.com/2008/06/06/news/06iht-6oxan-LIBOR.13532018.html (last visited Jan. 29, 2018).

[206] Email from Angela Knight to Paul Tucker (May 31, 2008, 4:09 PM), attached as Exhibit 19 and incorporated into this Complaint by reference.

process.  The BBA shared its proposed changes with the Bank of England, which internally concluded that the BBA's proposal was "wholly inadequate."[207]

172.    On June 10, 2008, the BBA issued a press statement asserting that Panel Banks "are invariably those with the best credit ratings and in the current diminished credit capacity of the market it is therefore not surprising that some institutions will not be able to access funds at the LIBOR rate."[208]  The BBA's statement represented that the BBA was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.  In fact, the BBA's statement was false and the Panel Bank Defendants and the BBA did not intend to employ a tight scrutiny mechanism but, rather, intended to allow the Panel Bank Defendants to continue to fraudulently and collusively depress USD bbaLIBOR™.

173.    On August 5, 2008, the BBA represented that Panel Banks which had responded to the BBA's request for consultation were "confident" that their submitted rates were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark, with contributors inputting rates that they believe reflect their future funding costs."[209]  The FX & MM Committee stated that, based on its supposed independent review of responses and investigation, it "believes that current submissions are accurate."[210]  By this statement, the Panel Bank Defendants and the BBA further sought to falsely portray the bbaLIBOR™ "dislocations" as the product of market forces rather than fraud and collusion.

---

[207] Transcript of Governor's written comments, Email to Governors—GPS (May 30 2008, 19:06), attached as Exhibit 20 and incorporated into this Complaint by reference.

[208] BBA, Understanding the Construction and Operation of BBA LIBOR, *supra* note 101, at 1.

[209] BBA, Libor Consultation Feedback Statement ¶¶ 3.14, 3.19 (Aug. 5, 2008), attached as Exhibit 21 and incorporated into this Complaint by reference.

[210] *Id.* at ¶ 4.8.

174.    According to the CFTC, internal documents from Lloyds, however, have since revealed that on August 8, 2008, one of HBOS's senior managers internally circulated a presentation that said, among other things, "As a bank we must be extremely careful about the rates we pay in different markets for different types of funds as paying too much risks not only causing a re-pricing of all short-term borrowings but, more importantly in this climate, may give the impression of HBOS being a desperate borrower and so lead to a general withdrawal of wholesale lines."[211]

175.    According to a Wall Street Journal article in September 2012, Angela Knight, former head of the BBA, told regulators in April 2008 that bbaLIBOR™ had become too big to manage, but BBA's member banks "clung to control of Libor."[212]   After November 2008, BBA staffers pitched the idea of selling bbaLIBOR™ or spinning it off into a wholly independent entity.[213]  According to the Wall Street Journal article, the BBA in late 2008 drew up plans to license bbaLIBOR™ to an independent third party that would pay a fee to administer the rate instead of the BBA.  But when BBA staffers pitched the idea to industry executives, they got the impression that the big banks—which paid most of the BBA's bills through their membership fees—wanted bbaLIBOR™ kept in-house so that they could continue to influence it, according to the Wall Street Journal article.[214]  As a result, the idea ultimately was abandoned.

176.    According to that same Wall Street Journal article, Ms. Knight was heard to argue with Mr. Ewan about bbaLIBOR™.[215]  Ms. Knight reportedly wanted to scale back the BBA's

---

[211] Lloyds CFTC Order, *supra* note 39, at 14.

[212] Enrich & Colchester, *supra* note 16.

[213] *Id.*

[214] *Id.*

[215] *Id.*

role and took the position that bbaLIBOR™ had become too big for her organization to manage.[216]  Mr. Ewan, on the other hand, reportedly advocated further expansion, touting the revenue that the BBA generated from bbaLIBOR™.[217]  According to the BBA, bbaLIBOR™ earned more than £1.8 million and £1.7 million in 2011 and 2012, respectively, in licensing fees.[218]

177.    In September 2008, an internal UBS discussion confirmed that the Panel Bank Defendants were continuing to make artificially low bbaLIBOR™ submissions.  In a documented discussion, a UBS employee stated, "LIBORs currently are even more fictitious than usual."[219]  On September 18, 2008, Lloyds announced the terms of an offer to acquire HBOS.  In late September, HBOS's USD bbaLIBOR™ submitter at the Bank of Scotland increased its submissions to more closely align with the published bbaLIBOR™ rules.[220]  On September 26, 2008, the submitter's supervisor told the submitter that HBOS USD bbaLIBOR™ submissions should be lower relative to other panel members.[221]

178.    Throughout this time, HBOS management also directed employees not to make bids for cash in the wholesale funding market above the rate of the daily bbaLIBOR™ rate.  This instruction reinforced the supervisor's prior direction that HBOS should not be an outlier in the bbaLIBOR™ submissions, regardless of the published bbaLIBOR™ rules.

---

[216] *Id.*

[217] *Id.*

[218] BBA, Audited Consolidated Financial Statements Year Ended 31 December 2012, at 13 (2012), *available at* https://www.bba.org.uk/wp-content/uploads/2014/01/BBA_2012_Financials.pdf.

[219] UBS SOF, *supra* note 55, ¶ 101.

[220] Lloyds CFTC Order, *supra* note 39, at 14.

[221] *Id.* at 15.

179.    On October 10, 2008, a Barclays employee privately reported to the NY Fed that its USD bbaLIBOR™ submissions were "unrealistic."[222]  An October 17, 2008 email from a Rabobank bbaLIBOR™ submitter stated, "We are now setting all libors [sic] significantly under the market levels."[223]  On October 24, 2008, another Barclays employee privately reported to the NY Fed that USD bbaLIBOR™ rates were "absolute rubbish,"[224] citing submissions by WestLB and Deutsche Bank as being too low.[225]  The employee told the NY Fed that he was aware of banks that were making bbaLIBOR™ submissions that were below what they actually paid in comparable transactions.[226]  Publicly, however, Barclays and other Panel Bank Defendants continued to falsely represent that bbaLIBOR™ was based on accurate and honest submissions.

### C.    Agreement to Exclude a Potential Competitor in the Market for Interest-Rate Benchmarks

180.    In May 2008, the broker ICAP plc ("ICAP") announced it intended to create an alternative index of interbank lending rates called the New York Funding Rate ("NYFR"). According to ICAP, the NYFR would be determined by an anonymous survey of at least twenty-four banks (potentially including the Panel Bank Defendants).  ICAP would ask participants each morning to estimate the cost of funding for one- and three-month loans to a "representative"

---

[222] *Unofficial Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*, Oct. 10, 2008, at BARC-MAY6-000095, *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/October_10_2008_transcript. pdf, *attachment to* N.Y. Fed Press Release, *supra* note 175.

[223] *United States v. Cooperative Centrale Raiffeisen Boerenleenbank, B.A.*, Deferred Prosecution Agreement, Attachment A, Statement of Facts (Oct. 29, 2013) ¶ 40, *available at* http://www.justice.gov/iso/opa/resources/ 645201310298755805528.pdf (hereinafter "Rabobank SOF"), attached as Exhibit 22 and incorporated into this Complaint by reference.

[224] *Unofficial Transcript of Phone Call Between Barclays Employee and Analyst in the Markets Group of the New York Fed*, Oct. 24, 2008, at 000098, *available at* https://www.newyorkfed.org/medialibrary/media/newsevents/news/markets/2012/libor/October_24_2008_transcript. pdf (hereinafter "*Oct. 24 Barclays and N.Y. Fed Tr.*"), attachment to N.Y. Fed Press Release, supra note 175,

[225] *Id.* at 000100.

[226] *Id.*

bank in New York.  NYFR would be calculated using the quotes of the middle half of that

group.[227]

181.   ██████████████████████████████████

████████████████████████████████████████████████████

█████████████████ ██████████████████████████████

████████████████████████████████████████████████

████████████████ ████████████████████████████████

███████████████████████████████████████████

███ ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████ ████████████████████████████████

████████████████████████ █████████████████████████

████████████████████████████████████████████████

███████████████████ ████  The Panel Bank Defendants, and other members of the BBA, were

among ICAP's most important customers at the time.[233]

---

[227] Gavin Finch & Ben Livesey, *ICAP's Libor Alternative Lacks 'Concrete Timetable*,' Bloomberg (May 14, 2008, 11:48 AM), http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=asgvKFvA0iio (on file with Plaintiff).



[233] ICAP, Annual Report 2008, at 3 (2008), *available at* http://www.icap.com/~/media/Files/I/Icap-Corp/Annual%20Reports/annual-report2008.pdf.  ICAP obtained 42% of its revenue from brokering interest-rate derivative transactions.  *Id.* at 20.  It obtained another 37% of its revenue from brokering transactions in foreign

### D.   Conduct to Benefit Individual Trader Positions

183.   The conspiracy to depress USD bbaLIBOR™ superseded the prior and ongoing efforts of individual traders to manipulate bbaLIBOR™ to benefit their trading positions.[234]  For example, UBS management on several occasions received requests made by individual traders to deviate slightly from the systematic depression to manipulate a particular submission for JPY bbaLIBOR™ on a given day.[235]  On information and belief, those requests were rejected and/or did not prevent USD bbaLIBOR™ depression.  Each time that a Panel Bank submitted an artificially depressed USD bbaLIBOR™ submission for "trader-based" profit, that act injured any party that held a USD bbaLIBOR™-based instrument in addition to the harm caused by persistent depression.

184.   Public disclosures reveal that certain derivatives traders employed by the Panel Bank Defendants routinely asked their bbaLIBOR™ submitters to provide false and dishonest bbaLIBOR™ submissions to the BBA.[236]  The bbaLIBOR™ submitters for these Panel Bank Defendants agreed to accommodate, and did accommodate, the traders' requests for favorable bbaLIBOR™ submissions on hundreds, and perhaps thousands, of occasions.[237]

---

exchange rate derivatives, commodities derivatives, and credit derivatives.  *Id.*  ICAP earned 43% of its revenues from its top 10 customers.  ICAP, Morgan Stanley European Financials Conference (Apr. 2, 2009), *available at* http://www.icap.com/investor-relations/reports-and-presentations/~/media/Files/I/Icap-Corp/reports-and-presentations/year-2009-10/morgan-stanley-2009.pdf.  Defendants possessed enormous market power in all of these markets.

[234] UBS SOF, *supra* note 55, ¶ ¶ 132-133.

[235] *Id.*

[236] Barclays SOF, *supra* note 138, ¶ 11; RBS SOF, *supra* note 52, ¶ 14; UBS SOF, *supra* note 55, ¶ 19.

[237] Barclays SOF, *supra* note 138, ¶ 11; RBS SOF, *supra* note 52, ¶¶ 14-15, 19; UBS SOF, *supra* note 55, ¶ 20.

185.     Over a period of years, a culture of collusion developed that ultimately enabled the systematic bbaLIBOR™ depression discussed above.[238]  Through coordination with Panel Bank Defendants, on information and belief, these traders improved their ability to effectively, fraudulently, and collusively manipulate bbaLIBOR™.[239]  Barclays, Lloyds, Rabobank, RBS, and UBS all have admitted to the DOJ that they submitted false and misleading bbaLIBOR™ submissions to the BBA, and that the bbaLIBOR™ fixings published by and through the BBA were materially false and misleading.[240]

### E.     Harmful Effects of the Unlawful Conduct

186.     By submitting and publishing interbank lending rates that were determined by collusion rather than by competition, the Panel Bank Defendants interfered with the competitive process in the markets for short-term wholesale funding, USD interest-rate benchmarks, USD OTC interest-rate derivatives, floating-rate retail loans, and floating-rate MBS.

187.     Absent collusion, banks compete for cash based on the interest rates that they pay.[241]  As noted above, the interest rate that a borrower is willing to pay, and a lender is willing to accept, is determined in large part by the borrower's credit standing and liquidity.  In a competitive environment, less creditworthy banks are incentivized to become more efficient and shed risk to compete more effectively.[242]  For example, in 2007 and 2008, absent collusion,

---

[238] *See, e.g.*, Editors, *Libor Gives Prosecutors Chance to Change Banking Culture*, Bloomberg (Sept. 24, 2012), http://www.bloomberg.com/news/2012-09-24/libor-gives-prosecutors-chance-to-change-banking-culture.html.

[239] Barclays SOF, *supra* note 138, ¶¶ 23-24.

[240] *Id.* ¶ 33; Lloyds SOF, *supra* note 43, ¶ 45; Rabobank SOF, *supra* note 223, ¶ 97; RBS SOF, *supra* note 52, ¶ 81; UBS SOF, *supra* note 55, ¶ 97.  On information and belief, other Panel Defendant Banks engaged in the same type of conduct that Barclays, Lloyds, Rabobank, RBS, and UBS have admitted occurred.

[241] *See e.g.*, Citigroup, Citi Annual Report 2009, at 262 (2009), *available at* http://www.citigroup.com/citi/fin/data/ar09c_en.pdf (Citigroup "actively competes for access to capital at competitive rates to fund its operations, including competition for deposits and funding in the short- and long-term debt markets.").

[242] Xavier Freixas et al., Fed. Reserve Bank of N.Y. Staff Reports, Bank Liquidity, Interbank Markets, and Monetary Policy (May 2009) (revised Sep. 2009), *available at* http://www.newyorkfed.org/research/staff_reports/sr371.pdf.

Barclays would be expected to have responded to concerns about its credit risk and liquidity by improving its balance sheet and limiting exposure to illiquid assets (*i.e.*, competing "on the merits"), and not by entering into a secret agreement with other Panel Bank Defendants to hide their respective abilities to obtain funds, and the interest rates they had to pay to obtain those funds.

188.    In addition, the Panel Bank Defendants' and the BBA's fraudulent and collusive conduct artificially biased the competitive process for interest-rate derivatives and floating-rate MBS in favor of the Panel Bank Defendants.  As shown above, prices for USD OTC interest-rate derivatives and floating-rate MBS were set based on the expectation that the Panel Bank Defendants and the BBA would determine USD bbaLIBOR™ according to the published rules and governance mechanisms.  By secretly agreeing to depress USD bbaLIBOR™, the Panel Bank Defendants obtained a competitive advantage over their counterparties that artificially inflated the margins that the Panel Bank Defendants would earn in transactions for USD pay-fixed interest-rate swaps and floating-rate MBS.

189.    Prior to the contract settlement date, the price of a three-month Eurodollar futures contract is an indication of the market's prediction of the three-month USD bbaLIBOR™.  As shown in Figure 5 below, from at least 1992, USD bbaLIBOR™ was consistently a few basis points above the Eurodollar Bid Rate published by the Federal Reserve Board of the U.S. Federal Reserve System from 2002-2006.[243]  Eurodollars are time deposits in USD held in commercial banks outside the United States, primarily in London.  Eurodollar futures contracts, based on a

---

[243] *Ask Dr. Econ*, Fed. Reserve Bank of S.F. (July 2006), http://www.frbsf.org/education/activities/drecon/2006/0607.html.

notional $1 million three-month deposit, are traded on the CME.[244]  Prior to the contract

settlement date, the price of a three-month Eurodollar futures contract is an indication of the

market's prediction of the three-month USD bbaLIBOR™ on its settlement date.[245]

190.    In other words, before the Panel Bank Defendants' and the BBA's fraud and

collusion, a Eurodollar futures contract provided an estimate of USD bbaLIBOR™ in the future

for the given maturity.  The Eurodollar Bid Rate represents the interest rate at which a bank

would lend money to another bank, while bbaLIBOR™ is intended to represent the rate at which

a Panel Bank would ask to pay.[246]  As a result, one would expect to see a small bid

(Eurodollar)/ask (bbaLIBOR™) spread as reflected in the relationship that existed from 1992

through 2006.[247]  One academic study has found that from 1992 through 2007, the Eurodollar

Bid Rate reportedly was a better predictor than bbaLIBOR™ rates of the following day's

bbaLIBOR™.[248]

191.    The relationship between the Eurodollar Bid Rate and USD bbaLIBOR™

fundamentally changed in the summer of 2007, with USD bbaLIBOR™ rates falling below the

Eurodollar Bid Rate, sometimes dramatically, through late 2011.  These data confirm that the

Panel Bank Defendants' behavior changed in 2007 with regard to USD bbaLIBOR™

submissions at the same time that UBS, Barclays, RBS, Citibank, and other Panel Bank

Defendants secretly adopted policies to depress USD bbaLIBOR™ and submitted rates within a

---

[244] Barclays SOF, *supra* note 138, ¶ 9.

[245] *Id.*

[246] Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?*, at 3, 11 (July 21, 2010), *available at* https://www.dartmouth.edu/~tyoule/documents/Snider506.pdf.

[247] *Id.* at 11.

[248] *Id.* at 11.

narrow range.  Defendants artificially depressed USD bbaLIBOR™ from at least August 8, 2007

through at least October 1, 2011.  This date range is further supported by, *inter alia*, ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ admissions by

Barclays that it artificially depressed its USD bbaLIBOR™ submissions from "approximately

August 2007 through *at least* January 2009,"[250] statements by the CFTC that UBS artificially

depressed its USD bbaLIBOR™ submissions from August 2007 through "*at least*" the first half

of 2009,[251] and the indictment of Société Générale executives, Ms. Sindzingre and Ms. Bescond,

which alleges that Société Générale submitted artificially low USD bbaLIBOR™ rates from at

least May 2010 until October 2011.[252]

---

█ ██████████████████████████████████████████████████████
████████████████████

[250] Barclays SOF, *supra* note 138, ¶ 36 (emphasis added).

[251] *In re UBS AG*, No. 13-09, at 41-52 (C.F.T.C. Dec. 19, 2012) (emphasis added) (hereinafter "UBS CFTC Order"), attached as Exhibit 23 and incorporated into this Complaint by reference.

[252] Sindzingre Indictment, *supra* note 47, ¶¶ 14,18 (emphasis added).  While the indictment does not allege a conspiracy between Société Générale and the other Panel Bank Defendants, Société Générale allegedly depressed USD bbaLIBOR™ during this time period and its submissions were higher than most other Panel Banks' submissions.  For example, Panel Bank Defendants Citibank, Deutsche Bank, HSBC, JPMorgan, UBS, Bank of America, and Lloyds consistently submitted lower interest rates than Société Générale's artificially low submissions.  There is no reason to believe that Société Générale's financial condition was so uniquely dire that its depressed USD bbaLIBOR™ submissions would still be higher than the "accurate" submissions of other Panel Bank Defendants.  In fact, one measure of credit risk, default insurance prices, tells the opposite story.  Société Générale's default insurance rates (as measured by credit default swap ("CDS") prices) were almost identical to the average CDS rates for all Panel Banks in May.

**Figure 5:  Difference between 3M USD bbaLIBOR™ and 3M Eurodollar Bid Rate**



192.    On a Defendant-by-Defendant basis, the average USD bbaLIBOR™/Eurodollar Bid Rate spread during that time ranged from 25 basis points (BTMU, Barclays, Norinchukin) to 35 basis points (JPMorgan, WestLB).[253]  Notably, there appears to be no meaningful distinction between the Panel Bank Defendants that have admitted submitting artificially depressed USD bbaLIBOR™s and those that have not yet done so.  Barclays's submissions were at the high end of the range at an average 25 basis points spread; UBS and HBOS were in the middle with an average 29 basis points spread.

193.    Similarly, focusing only on the last two weeks of September 2008, the average USD bbaLIBOR™/Eurodollar Bid Rate spread generally ranged from 110 basis points (HBOS) to 153 basis points (JPMorgan).[254]  The outlier was Barclays (87 bp), which has admitted that it

---

[253] The remaining Panel Bank Defendants are as follows:  Bank of America (30 bp), Citibank (32 bp), Credit Suisse (27 bp), Deutsche Bank (31 bp), HBOS (29 bp), HSBC (32 bp), Lloyds (30 bp), Rabobank (32 bp), RBC (26 bp), RBS (26 bp), and UBS (29 bp).

[254] The remaining Panel Bank Defendants are as follows:  BTMU (120 bp), Bank of America (144 bp), Citibank (142 bp), Credit Suisse (122 bp), Deutsche Bank (129 bp), HSBC (141 bp), Lloyds (146), Norinchukin (126 bp), Rabobank (143 bp), RBC and RBS (140 bp), UBS (141 bp), and WestLB (138 bp).

regularly submitted artificially low bbaLIBOR™ rates.  Similarly, the next highest submissions were provided by HBOS, which has also admitted to depressing bbaLIBOR™ through HBOS Treasury and Bank of Scotland.[255]  The fact that these two Panel Bank Defendants were at the high end of bbaLIBOR™ submissions supports the inference that the other Panel Bank Defendants were all submitting artificially depressed rates at the time.

194.    The individual participants in the fraudulent and collusive conduct described in this Complaint would not have engaged in the conduct, which carries the potential for criminal penalties, absent a reasonable belief that the conduct actually influenced the USD bbaLIBOR™ fixings.

195.    By collusively depressing USD bbaLIBOR™, Defendants distorted prices in the markets for financial products that incorporated interest-rate benchmarks (*e.g.*, pay-fixed swaps and MBS), and diminished the quality of financial products that incorporated interest-rate benchmarks.  The unlawful agreements also limited the choice of interest-rate benchmarks available to non-conspirators that negotiated for OTC interest-rate derivatives, floating-rate retail loans, and floating-rate MBS purchasers.  As the European Commission ("EC") wrote: "In order for users of benchmarks to make appropriate choices of, and understand the risks of, benchmarks, they need to know what the benchmark measures and their vulnerabilities."[256]

196.    The Panel Bank Defendants falsely purported to fully compete in all of these financial product markets.  Further, to the extent that the Panel Bank Defendants used false and dishonest USD bbaLIBOR™ submissions to inflate their apparent creditworthiness and their respective reputations, they artificially increased their ability to charge higher underwriting fees

---

[255] Lloyds SOF, *supra* note 43.

[256] EC Proposal, *supra* note 69, at 16.

and obtain higher offering prices for financial products to the detriment of Doral and other consumers.

197.    Doral engaged in financial transactions with Panel Bank Defendants and others involving products that incorporated USD bbaLIBOR™.  Doral reasonably relied on the honesty of the affected benchmark rates in undertaking these transactions and holding bbaLIBOR™-based financial products.  As a direct and proximate result of Defendants' wrongful conduct as described in this Complaint, Doral was injured in its business and property and the FDIC-R has suffered damages in an amount presently undetermined.

## DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT

198.    On March 15, 2011, UBS disclosed in a note to its Annual Report that it had received subpoenas from the CFTC and the DOJ in connection with investigations into bbaLIBOR™.  This note marked the first public acknowledgment by any Defendant of the confidential CFTC investigation, which had begun in late 2008.[257]  The Annual Report stated that the investigations focused on whether there were improper attempts by UBS, either acting on its own behalf or together with others, to manipulate bbaLIBOR™ rates.  Over the next months, the Panel Bank Defendants, regulators, and media reports gradually revealed the scope of the investigation until Barclays admitted its participation in bbaLIBOR™ manipulation in June 2012.

### A.    Barclays Admissions

199.    On June 26, 2012, Barclays entered into a non-prosecution agreement with the Criminal Fraud Division of the DOJ relating to, among other things, USD bbaLIBOR™.  As part of that agreement, Barclays agreed to a Statement of Facts that explains the basis of the

---

[257] FSA Internal Audit, *supra* note 191, ¶ 1.1.

non-prosecution agreement.  Barclays further received conditional leniency from the DOJ's

Antitrust Division for potential Sherman Act violations involving financial instruments that

reference Euribor.  Barclays also entered into a settlement with the CFTC to resolve charges

related to bbaLIBOR™ that it violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity

Exchange Act ("CEA"), 7 U.S.C. §§ 9, 13b, and 13(a)(2).[258]

200.    According to these filings, Barclays through its agents, officers, and employees

repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD

bbaLIBOR™ and other currencies.  More specifically, Barclays admitted that it engaged in a

deceptive course of conduct in an effort to gain an advantage over its counterparties and that

Barclays's USD bbaLIBOR™ submissions were false or misleading.[259]  Barclays admitted that it

lacked specific internal controls and procedures concerning its submission processes for

bbaLIBOR™ and that its inadequate supervision allowed the fraudulent and collusive conduct to

occur.  Barclays further admitted that it knew that the fraudulent and collusive depression of

affected interest-rate derivatives tied to bbaLIBOR™ benefited Barclays at the expense of its

counterparties.[260]

201.    The BBA, which had known of the investigation since late 2008, publicly claimed

to be "shocked" by Barclays's disclosures.[261]  Just a few months earlier, the BBA deleted links

on its website that detailed its involvement with setting bbaLIBOR™, including a statement that

---

[258] Barclays CFTC Order, *supra* note 138.

[259] Barclays SOF, *supra* note 138, ¶ 33.

[260] *Id.* ¶¶ 30-32.

[261] Rachel Cooper, *Barclays Libor Scandal:  As It Happened—June 28, 2012*, The Telegraph, June 28, 2012, http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/9361646/Barclays-Libor-scandal-as-it-happened-June-28-2012.html.

it "calculates and produces bbaLIBOR™ at the request of our members for the good of the market."[262]

202.    The day after Barclays's June 2012 disclosure, its stock price dropped dramatically, reflecting a loss of more than $5 billion in market capitalization.[263]  This sudden drop in stock price was further evidence that market participants, including Doral, were unaware that Barclays had been propping up its creditworthiness through bbaLIBOR™ manipulation.

###    B.    UBS Admissions

203.    On December 18, 2012, UBS entered into a non-prosecution agreement with the Criminal Fraud Division of DOJ related to bbaLIBOR™.  UBS also obtained conditional leniency for potential Sherman Act violations involving financial instruments that reference JPY bbaLIBOR™ and Euroyen TIBOR.

204.    On December 19, 2012, the Swiss Financial Market Supervisory Authority ("FINMA") issued a Summary Report regarding its investigation of UBS.[264]  The Final Notice summarizes UBS's misconduct and notes that UBS's "[s]ubstantial failings in the system and control processes for LIBOR submissions prevented those responsible at UBS from detecting and acting" on the misconduct.[265]

205.    In December 2012, UBS Securities Japan Co. Ltd. ("UBSSJ") agreed to plead guilty to one count of wire fraud (18 U.S.C. § 1343) for secretly manipulating JPY bbaLIBOR™

---

[262] Liam Vaughan & Jesse Westbrook, *Libor Links Deleted as U.K. Bank Group Backs away from Rate*, Bloomberg Businessweek (Mar. 7, 2012), http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate#p2 (on file with Plaintiff).

[263] Cooper, *supra* note 261.

[264] FINMA, FINMA Investigation into the Submission of Interest Rates for the Calculation of Interest Reference Rates such as LIBOR by UBS AG, at 2 (Dec. 19, 2012), attached as Exhibit 24 and incorporated into this Complaint by reference.

[265] *Id.*

and TIBOR.[266] UBSSJ admitted in its plea that false and misleading bbaLIBOR™ submissions were "material" from the perspective of counterparties to financial transactions.[267]

206.    In December 2012, the DOJ charged two former UBS traders—Tom Hayes and Roger Darin (collectively, the "UBS traders")—with wire fraud and conspiracy to commit wire fraud for secretly manipulating bbaLIBOR™ and other benchmark rates.[268]  In addition, the DOJ charged the UBS traders with a violation of Section 1 of the Sherman Act for conspiring with an unidentified employee at a major financial institution and others to fix JPY bbaLIBOR™, a key price component of JPY bbaLIBOR™-based derivative products.[269]

207.    On December 19, 2012, UBS and UBSSJ entered into a settlement with the CFTC to resolve allegations that UBS violated Sections 6(c), 6(d), and 9(a)(2) of the CFTC, 7 U.S.C. §§ 9, 13b, and 13(a)(2) related to bbaLIBOR™.[270]  According to the CFTC's findings, from at least January 2005 through 2011, UBS by and through acts of dozens of employees, officers, and agents located around the world, engaged in systematic misconduct that undermined the integrity of certain global benchmarks, including USD bbaLIBOR™.  The CFTC also found that UBS's false submissions contained market information that affected or tended to affect USD bbaLIBOR™, and USD bbaLIBOR™ was a commodity in interstate commerce.[271]  Further,

---

[266] UBS SOF, *supra* note 55, App. B.

[267] *Id.* at App. B, Ex. 3 ¶¶ 9-10, Ex. 4 ¶ 75.

[268] Compl. 1-2, *United States v. Alexander*, No. 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012), attached as Exhibit 25 and incorporated into this Complaint by reference.

[269] *Id.* at 3.

[270] UBS CFTC Order, *supra* note 251.

[271] *Id.* at 4, 41, 52-53.

UBS continued its "rampant misconduct," including collusive conduct, long after it was on notice (in October 2008) of an investigation into its USD bbaLIBOR™ practices.[272]

### C.    RBS Admissions

208.    On February 5, 2013, RBS executed a Deferred Prosecution Agreement with the Criminal Fraud Section of the DOJ.  Under the terms of that agreement, RBS admitted various facts relating to its involvement in fraudulent and collusive practices relating to bbaLIBOR™ submissions.  The United States filed a two-count criminal information charging RBS with wire fraud and price fixing in connection with RBS's conduct and agreed to defer prosecution of that case pursuant to its agreement with RBS.[273]  In addition, RBS Securities Japan Ltd. pleaded guilty to one count of wire fraud for its participation in fraudulent and collusive practices relating primarily to JPY bbaLIBOR™.[274]

209.    The agreements reached between (a) the United States and Barclays, (b) the United States and UBS, and (c) the United States and RBS all refer to an ongoing investigation into misconduct related to additional, unidentified benchmark rates.  The United States has declined to reveal those benchmark rates.  On information and belief, USD bbaLIBOR™ is among the interest rates under investigation by the United States.

### D.    Rabobank Admissions

210.    On October 29, 2013, Rabobank settled bbaLIBOR™ investigations by the DOJ, CFTC, FCA, and Dutch authorities.  Specifically, the CFTC fined Rabobank $475 million for Rabobank's manipulation USD, GBP, and JPY bbaLIBOR™ and EURIBOR in violation the

---

[272] *Id.* at 5.

[273] RBS SOF, *supra* note 52, ¶¶ 1-2.

[274] *Id.* ¶ 3.

CEA for.[275]  The Criminal Fraud Section of the DOJ entered into a Deferred Prosecution

Agreement with Rabobank, pursuant to which Rabobank resolved charges of wire fraud based on

the manipulation of bbaLIBOR™ and EURIBOR and agreed paid a $235 million fine.  As part

of this Agreement, Rabobank admitted that more than two dozen of its traders, including its

Global Head of Liquidity and Finance, participated in ongoing and pervasive manipulation of

USD and JPY bbaLIBOR™ to favor its day-to-day trading positions.[276]

211.    According to these settlements, Rabobank, through its agents, officers, and

employees repeatedly made false, misleading, or knowingly inaccurate submissions concerning

USD bbaLIBOR™ and other currencies.  For example, Rabobank admitted that by falsely

representing that its bbaLIBOR™ submissions were based on its perceived costs of borrowing

unsecured funds in the relevant interbank market, it engaged in a deceptive course of conduct in

an effort to gain an advantage over its counterparties and that Rabobank's bbaLIBOR™

submissions were false or misleading.[277]

### E.    Lloyds Admissions

212.    On July 28, 2014, the FCA fined Lloyds (Lloyds Bank plc and Bank of Scotland)

for colluding to manipulate USD, GBP, and JPY bbaLIBOR™, as well as the GBP Repo Rate.[278]

Among other things, the FCA found that traders at Lloyds had communicated with other Panel

---

[275] *In re Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.*, No. 14-02 (C.F.T.C. Oct. 29, 2013), attached as Exhibit 26 and incorporated into this Complaint by reference.

[276] *United States v. Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A.,* Deferred Prosecution Agreement, (Oct. 29, 2013), *available at* http://www.justice.gov/iso/opa/resources/976201310298727797926.pdf; Rabobank SOF, *supra* note 223, ¶ 40.

[277] Rabobank SOF, *supra* note 223, ¶ 97.

[278] A "repo" is a repurchase agreement, in which one party sells securities together with an agreement to buy the securities back at a specific later date.  The difference between the sale and repurchase prices effectively represents the interest charged by the original purchaser.  *See* Lloyds Final Notice, *supra* note 42, ¶ 3.2 (Definitions).

Bank Defendants to manipulate GBP and USD bbaLIBOR™ for profit on derivative transactions.

213.    In addition, the FCA found that in September and October 2008, a Bank of Scotland manager instructed Bank of Scotland traders to depress GBP and USD bbaLIBOR™ submissions to stay in line with other Panel Bank Defendants, rather than comply with the published methodology for bbaLIBOR™.[279]  Lloyds did not discover the unlawful conduct until after they had been asked to investigate potential issues in 2010.[280]  In March 2011, Lloyds attested to the FCA that its systems and controls for its bbaLIBOR™ submissions were adequate.[281]  The FCA later found this attestation to be false.[282]

214.    Also on July 28, 2014, Lloyds consented to entry of an Order Making Findings and Imposing Remedial Sanctions with the CFTC and agreed to pay a $105 million fine.[283]  The CFTC found that Lloyds had misrepresented that it was following the published bbaLIBOR™ methodology from at least 2006 through 2010.  The CFTC findings quote an HBOS (Bank of Scotland) USD bbaLIBOR™ submitter as saying the following during an electronic chat with "an employee of another financial institution": "youll [sic] like this ive [sic] been pressured by senior management to bring my rates down into line with everyone else."[284]

---

[279] *Id.* ¶¶ 4.48-.59.

[280] *Id.*  ¶ 4.70.

[281] *Id.* ¶ 5.15.

[282] *Id.*

[283] Lloyds CFTC Order, *supra* note 39, at 23.

[284] *Id.* at 15.

215.     The CFTC also quoted an HBOS manager as complaining that GBP bbaLIBOR™ rates "could potentially create an issue with buyers of our paper."[285]  The CFTC found that HBOS was concerned that lenders might be unwilling to transact business or deal with HBOS or might have demanded higher interest rates had HBOS (though Bank of Scotland) submitted bbaLIBOR™s that complied with the bbaLIBOR™ methodology.[286]  In addition, the CFTC found that an HBOS bbaLIBOR™ supervisor had instructed employees that they normally should not make bids for cash in the market above the relevant bbaLIBOR™ rate.[287]  The CFTC found that at least through the end of 2008, HBOS (through HBOS Treasury and Bank of Scotland) had made USD bbaLIBOR™ submissions that did not reflect the bbaLIBOR™ methodology and therefore conveyed false, misleading, or knowingly inaccurate reports concerning USD bbaLIBOR™.[288]

216.     The CFTC further found that Lloyds violated Section 9(a)(2) of the CEA by giving false market information that affected, or tended to affect, the price of commodities sold in interstate commerce.  The CFTC found that this false information included information concerning the costs of borrowing funds in USD, the liquidity and stress conditions in the money markets, and Lloyds's ability to borrow funds in the particular markets.

217.     In the Consent Order, Lloyds agreed to abide by a set of principles to ensure the integrity and reliability of submissions in the market for benchmark interest rates.[289]

---

[285] *Id.*

[286] *Id.*

[287] *Id.* at 16.

[288] *Id.*

[289] *Id.* at 25.

218.    The same day, Lloyds entered into an agreement with DOJ to pay an $86 million penalty for manipulating bbaLIBOR™ submissions.[290]  "Lloyds's conduct undermined financial markets domestically and abroad," said Deputy Assistant Attorney General Brent Snyder of the DOJ's Antitrust Division.[291]  As one example, the DOJ quoted an exchange on May 19, 2009 between a money markets trader who was a former USD bbaLIBOR™ submitter at a subsidiary of Lloyds, who wrote:  "have 5 yard [billion] 3 month liability rolls today so would be advantageous to have lower 3month libor setting if doesn't conflict with any of your fix's," and a then-current USD bbaLIBOR™ submitter, who responded later that day:  "obviously we got the Libors down for you."[292]

### F.    Deutsche Bank Admissions

219.    On April 23, 2015, enforcement agencies from the United States, New York, and the United Kingdom publicly disclosed plea and deferred prosecution agreements, statements of facts, and a stipulated consent order, in which Deutsche Bank and various of its affiliates admitted to manipulating, or were found to have manipulated, USD bbaLIBOR™ and other interest-rate benchmarks.  Pursuant to these agreements, Deutsche Bank was required to pay the equivalent of approximately $2.5 billion.

---

[290] Press Release, U.S. Dep't Justice, Lloyds Banking Group Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $86 Million Criminal Penalty (July 28, 2014), http://www.justice.gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal.

[291] *Id.*

[292] *Id.*

220.     Deutsche Bank admitted that the purpose of its misconduct was to influence the ultimate rate published by and through the BBA,[293] and that bbaLIBOR™ manipulation affected USD bbaLIBOR™ and harmed contract counterparties in the United States.[294]

221.     The misconduct was "systemic and pervasive" according to the CFTC.[295] Deutsche Bank reaped "tremendous profits" from its GFFX unit's trading strategy.[296]  Deutsche Bank's primary USD bbaLIBOR™ submitter understood and was aware of GFFX trading positions for products indexed to USD bbaLIBOR™ and routinely submitted USD bbaLIBOR™s for the benefit of those trading positions.

222.     Germany's Federal Financial Supervisory Authority ("BaFin") found that Deutsche Bank cultivated a "business culture" that favored "problematic" communications, "especially . . . with regard to the LIBOR."[297]  Deutsche Bank's internal reporting lines were "incomplete and contradictory and the everyday practice deviated from the prescribed structure."[298]  BaFin (1) expressed "major doubts" about the truthfulness of individuals involved in USD bbaLIBOR™ manipulation at Deutsche Bank, (2) found that Deutsche Bank enjoyed "substantially higher earnings" between August 2007 and spring 2010 compared to earlier time periods, (3) concluded that Deutsche Bank failed to properly retain important business records

---

[293] DB SOF, *supra* note 31, ¶¶ 106-08.

[294] *Id.* ¶¶ 109-12.

[295] DB CFTC Order, *supra* note 32, at 2.

[296] *Id.* at 9.

[297] Letter from Frauke Menke, Dep't President Fed. Fin. Supervisory Auth. (BaFin), to Deutsche Bank AG Management Board (Mar. 31, 2015) (convenience translation), attached as Exhibit 27 and incorporated into this Complaint by reference.

[298] *Id.*

and deleted potentially relevant audio files, and (4) found that Deutsche Bank executives knowingly gave false information to regulators.[299]

223.   Enforcement agencies also found that in an effort to conceal its conduct, Deutsche Bank (1) manipulated bbaLIBOR™ in all tenors "so that the manipulation was not conspicuous,"[300] (2) destroyed 482 tapes containing "thousands of hours of potentially responsive audio recordings" sought by authorities,[301] and (3) was "unacceptably slow and ineffective" in its response to inquiries of enforcement agencies, "prolong[ing] the process of formal investigation significantly."[302]

224.   One of the members of the GFFX unit was Michael Curtler, a senior trader and USD bbaLIBOR™ submitter.  In October 2015, Mr. Curtler agreed to plead guilty to criminal wire fraud and conspiracy charges for manipulating USD bbaLIBOR™ in New York and elsewhere for the benefit of Deutsche Bank.[303]  Mr. Curtler was one of Deutsche Bank's USD bbaLIBOR™ submitters who knowingly and intentionally submitted artificially low USD bbaLIBOR™s. ████████████████████████████████████████

████████

G.   **Citibank Admissions**

225.   On May 25, 2016, the CFTC issued an order filing and settling charges against Citibank and certain of its affiliates, collectively referred to as "Citi," relating to abuses of

---

[299] *Id.*

[300] DB SOF, *supra* note 31, ¶¶ 22-23.

[301] Final Notice from the Fin. Conduct Auth. to Deutsche Bank AG ¶ 4.b (Apr. 23, 2015) (hereinafter "DB Final Notice"), attached as Exhibit 28 and incorporated into this Complaint by reference; *United States v. Deutsche Bank AG*, Deferred Prosecution Agreement ¶ 4.b (Apr. 23, 2015), attached as Exhibit 29 and incorporated into this Complaint by reference.

[302] DB Final Notice, *supra* note 301, ¶¶ 2.3, 2.16, 4.118-121, 5.27-5.30.

[303] Allocution Hr'g Tr. 3:20-4:18, *United States v. Curtler*, 15-cr-670 (VSB) (S.D.N.Y.), ECF No. 6.

bbaLIBOR™.  Among other things, Citi was charged with "the false reporting of U.S. Dollar

LIBOR at times to avoid generating negative media attention and to protect its reputation during

the financial crisis from the spring of 2008 through the summer of 2009."  The CFTC found that

at times, Citi's submitters made USD bbaLIBOR™ submissions "based in whole or in part on a

desire to avoid that negative scrutiny, rather than based on the fact that Citi, at times would have

had to pay above LIBOR in the London interbank market, particularly in the longer tenors, when

securing funding for the bank."  Citi was ordered to pay a penalty of $175 million.

### THE FRAUD AND COLLUSION ALLEGED IN THIS COMPLAINT COULD NOT REASONABLY HAVE BEEN DISCOVERED BEFORE BARCLAYS'S ADMISSIONS OF INTENTIONAL MISREPRESENTATIONS OF MATERIAL FACT

226.    Doral could not have discovered the fraud and collusion described in this

Complaint until June 2012, at the earliest, when Barclays admitted that it knowingly and

intentionally submitted false and dishonest bbaLIBOR™ submissions to the BBA.  Prior to that

time, the only information available was that other enforcement agencies had initiated an

investigation into bbaLIBOR™, and that bbaLIBOR™ "dislocations" were unusual and deviated

from patterns predating the financial crisis.

227.    A reasonably diligent investigation would not have disclosed sufficient *facts* to

state a viable fraud claim until, at the earliest, the Barclays admissions.  A reasonable

investigation, prior to Barclays's admissions in June 2012, could have disclosed, at most, the

following:

- **March 2008**:  A report published by the Bank for International Settlements ("BIS"),[304] titled *Interbank Rate Fixings During the Recent Turmoil*, evaluated

---

[304] BIS is the world's oldest international financial organization. Its members include central banks representing countries from around the world that together make up about 95% of world GDP.  It is an independent organization that routinely publishes analyses of monetary and financial stability issues.

the divergence between USD bbaLIBOR™ and the Eurodollar Bid Rate.[305] Based on information available at that time, BIS found the "main causes of the divergence" were "a deterioration in market liquidity, an increase in interest rate volatility and differences in the composition of the contributor panels."[306] The BIS report further undertook a statistical study and concluded that alternative methods of estimating bbaLIBOR™ "***gave no indication that fixings were manipulated***."[307]  The BIS report noted that there were differences between USD bbaLIBOR™ and the Eurodollar Bid Rate that might reasonably explain the divergence due to unprecedented conditions in the financial markets (*e.g.*, the source and methodology).

- **May 16, 2008:**  A Reuters news article in which the Austrian Minister of Finance was quoted as saying, "[t]here's more wind being made about this issue than is being merited by the facts."[308]

- **May 20, 2008**: A study by the NY Fed, part of the same Reserve Bank System that published the Eurodollar Bid Rate, concluded that "it is difficult to find convincing evidence of actual misreporting" beyond anecdotal evidence.[309] The study noted that there were no sources of data to compare USD bbaLIBOR™ submissions to a Panel Bank's actual interbank borrowing rates and that the Eurodollar Bid Rate is set based on a methodology that could respond differently to market stresses.[310]

- **May 29, 2008**: Analysts at Deutsche Bank Securities and JP Morgan Securities issued reports explaining in detail why they believed that questions about USD bbaLIBOR™ were unconvincing.  For example, they concluded that comparisons between USD bbaLIBOR™ and CDS prices were akin to comparing apples and oranges.[311]  The investment firm BlackRock wrote: "The relationship between one year borrowing rates indicated by panel members in the LIBOR submissions and their one year [CDS] spreads is affected by several

---

[305] Jacob Gyntelberg & Philip Wooldridge, *Interbank Rate Fixings During the Recent Turmoil*, BIS Quarterly Review, Mar. 3, 2008.

[306] *Id.* at 59.  That same article stated as follows:  "Benchmark status is gained through competition; it is not conferred.  Therefore, it can also be lost" in a competitive market.  *Id.* at 60.

[307] *Id.* at 70 (emphasis added).

[308] Reuters Staff, *Bankers work on Libor; ICAP Readies New Index*, Reuters, May 16, 2008, http://uk.reuters.com/article/markets-rates/wrapup-1-bankers-work-on-libor-icap-readies-new-index-idUKN1643985220080516.

[309] Cheun & Raskin, *supra* note 191, at 3.

[310] *Id.* at 2-3

[311] BlackRock Resp., *supra* note 67, at 9.

factors, any of which can account for meaningful differences between the two financial series."[312]

- **August 4, 2008**:  A group of independent U.S.-based economists published a study in the Journal of Banking and Finance titled, *LIBOR Manipulation?*[313] The study attempted to confirm the "conjecture" published in several news articles that some Panel Banks may have had intentionally manipulated their individual USD bbaLIBOR™ submissions.[314]  The study was aimed at "extend[ing] the [Wall Street] Journal's analysis by employing a wider array of comparative statistical techniques and more recent methodologies and to gain a greater understanding of the issues underlying such speculations."[315]  The authors of the study performed what they held out to be sophisticated statistical analyses that led them to conclude any "apparent anomalies within the individual quotes" suggest that the "evidence is ***not consistent*** with a material manipulation" of bbaLIBOR™.[316]  The authors found "questionable patterns" for a period of time ***ending*** on August 8, 2007.[317]

  The authors further found that "the ***empirical evidence is not consistent with the hypotheses that the Libor was materially manipulated downward***" (a finding that was subsequently shown to be false by Defendant admissions of manipulation and documents that were known only to Defendants).[318]  The authors specifically considered, and rejected, the supposition that CDS spreads are a useful comparator to infer manipulation of USD bbaLIBOR™ submissions.  In other words, as the United Kingdom's House of Commons Treasury Committee ("U.K. Treasury Committee") concluded years later, statistics at the time "did not show that manipulation of LIBOR was successful."[319]  The authors of the study wrote that the empirical methods of which they were aware were not capable of distinguishing conditions of "explicit collusion from conditions of tacit collusion."[320]

- **August 5, 2008**:  The BBA published its LIBOR Consultation Feedback Statement, which found no intentional misrepresentations in USD bbaLIBOR™ submissions.  The Feedback Statement was based on input from, and carried the

---

[312] *Id.*

[313] Rosa M. Abrantes-Metz et al., *LIBOR Manipulation?*, 36 J. Banking & Fin. 136, 138 (2012).

[314] *Id.*

[315] *Id.* at 136-137.

[316] *Id.* at 140 (emphasis added).

[317] *Id.* at 137.

[318] *Id.* at 149 (emphasis added).

[319] U.K. House of Commons Treasury Comm., *Fixing LIBOR*, *supra* note 17, at 27.

[320] Abrantes-Metz et al., *supra* note 313.

imprimatur of, numerous independent sources and regulators, including the EC, the CME, the International Monetary Fund ("IMF"), and the New York Stock Exchange.[321]

- **October 2008**: The IMF published a 30-page report investigating (1) interbank lending during the "current stress in interbank markets" and (2) whether USD bbaLIBOR™ was "distorted."[322]  The report examined the relationship between USD bbaLIBOR™ and other benchmarks, including the Eurodollar Bid Rate and CDS prices.  The report conducted empirical analyses.  The report concluded that "[a]lthough the integrity of the U.S. dollar LIBOR fixing process has been questioned by some market participants and the financial press, *it appears that USD LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding*."[323]

- **November 2008**:  The BBA published a document entitled, *LIBOR Governance and Scrutiny*, which presented proposed enhancements to the benchmark.  The document represented that the BBA had taken steps to ensure that (1) the proposed methodology for bbaLIBOR™ governance and scrutiny complied with competition and other laws and (2) the bbaLIBOR™ setting process operated to the "highest standards."  The document also represented that all Panel Banks formally reaffirmed their commitment to adhere to the published rules.[324]

- No private lawsuits or criminal or civil actions by enforcement agencies, alleging that the Panel Banks intentionally submitted artificially low USD bbaLIBOR™ submissions, had been filed.  The first such lawsuits were not filed until mid-2011 in response to the first public disclosures of the fact of the CFTC's and DOJ's investigations into bbaLIBOR™ manipulation.

228.    As explained above, the Panel Bank Defendants and the BBA offered facially plausible, pre-textual explanations for "dislocations" and repeatedly denied the existence of any fraudulent or collusive conduct relating to USD bbaLIBOR™ submissions.  In particular, the BBA held itself out as an independent entity that exercised meaningful oversight of bbaLIBOR™ and, on several occasions, falsely represented that the BBA had confirmed that

---

[321] BBA, Libor Consultation Feedback Statement, *supra* note 209.

[322] IMF Global Financial Stability Report, *supra* note 202, at 70.

[323] *Id.* at 72 (emphasis added).

[324] BBA Libor, LIBOR Governance and Scrutiny, *supra* note 115.

USD bbaLIBOR™ submissions were honest and accurate. Doral and the FDIC-R therefore did not know, or have reason to know, that USD bbaLIBOR™ was false, made intentionally and knowingly, with intent to mislead, and/or pursuant to an agreement among the Panel Bank Defendants and the BBA. The claims alleged in this Complaint arise from, among other things, the same wrongful acts and concern the same evidence, memories, and witnesses as the class actions filed in this multidistrict litigation (11-MD-2262 (NRB)).

229.    Doral and the FDIC-R did not have access to information that could have revealed the fraud and collusion. For example, Doral and the FDIC-R did not have access to, among other things, (1) the Panel Bank Defendants' internal communications regarding the fraud and collusion, (2) communications between and among the Panel Bank Defendants regarding USD bbaLIBOR™, (3) communications between the Panel Bank Defendants and enforcement agencies regarding USD bbaLIBOR™ investigations, (4) documents produced in connection with the confidential investigations for enforcement agencies, (5) meetings of the FX & MM Committee, or (6) the BBA's internal communications or communications between the BBA and the Panel Bank Defendants.

230.    Even with the benefit of hindsight, several reliable sources confirmed that during the financial crisis, a reasonable investigation would not have uncovered evidence that the Panel Bank Defendants fraudulently submitted artificially low USD bbaLIBOR™ submissions. The U.K. Treasury Committee asked the Governor of the Bank of England why regulators had not spotted bbaLIBOR™ manipulation earlier. The Governor testified under oath that "we had no evidence of wrongdoing." He further testified that "there were plenty of academic articles that looked in it and said that they could not see in the data any evidence of manipulation," and that "if you go back to the inquiries that the regulators made, it took them three years to work out and

find the evidence of wrongdoing" and there was no reasonable way at the time to distinguish manipulation from a market that was "dysfunctional."

231.    The FSA conducted an internal audit in 2013 regarding the extent of awareness within the FSA of inappropriate bbaLIBOR™ submissions.  It found that bbaLIBOR™ "dislocation" manifested itself in five ways, including widening spreads between bbaLIBOR™ and other rates and that the combination of deteriorating market conditions and structural issues in the bbaLIBOR™ fixing process would have caused dislocation "completely independent of low-balling."[325]

232.    The admissions by Barclays, Lloyds, Rabobank, RBS, and UBS reveal some of the efforts that the Panel Bank Defendants undertook to conceal their fraudulent and collusive conduct.  For example, (1) a UBS trader scolded a manager for internally transmitting in writing a request to manipulate a bbaLIBOR™ submission,[326] (2) a Barclays trader consciously sought to move bbaLIBOR™ submissions in small increments over time to avoid detection,[327] (3) a UBS derivatives desk manager instructed a bbaLIBOR™ submitter to lie when interviewed by UBS attorneys investigating bbaLIBOR™ manipulation,[328] and (4) in 2010, long after learning of the investigation into bbaLIBOR™, RBS traders continued their conduct but sought to avoid communicating in writing because "at the moment the FED [sic] are all over us about libors."[329] In or about 2007, Rabobank set up a separate "cash book" account and told its derivative traders,

---

[325] U.K. House of Commons Treasury Comm., *Fixing LIBOR*, *supra* note 17.

[326] UBS SOF, *supra* note 55, ¶ 38.

[327] Barclays SOF, *supra* note 138, ¶ 44.

[328] UBS SOF, *supra* note 55, ¶ 39.

[329] RBS Final Notice, *supra* note 117, ¶ 52.

including traders located in New York, to log transactions, for which Rabobank paid interest rates higher than USD bbaLIBOR™, into that book to conceal those transactions.[330]

233.    On information and belief, the other Panel Bank Defendants engaged in similar conduct to cover up their fraudulent and collusive activities involving USD bbaLIBOR™.  The evidence of such conduct is solely within the custody and control of the Panel Bank Defendants, the BBA, and/or enforcement agencies.

234.    The former head of the FSA, Adair Turner, told Parliament on February 27, 2013, that there was "no information" of bbaLIBOR™ manipulation and that regulators could not have spotted the fraudulent and collusive conduct even with "intensive supervision."[331]  The Bank of England's Governor confirmed in a June 2012 hearing before the U.K. Treasury Committee that he "had no suspicion until two weeks [prior to the hearing] that anything had been going wrong in the LIBOR market[.]" [332]  The Deputy Governor of the Bank of England, Paul Tucker, testified in 2012 that he did not suspect fraud or collusion in 2008 and that "[w]e would not have dreamt of using LIBOR as part of the pricing structure for Bank of England operations had we had doubts about what is now referred to as low-balling." [333]  He further testified that "[w]e thought the underlying markets were dysfunctional, sporadically illiquid, much less reliable than normal, but we did not have suspicions of dishonesty and we thought, as I said just now, the pattern of LIBOR movements made sense."[334]  The former Deputy Governor of the Financial

---

[330] Defense Ex. 608C at 17, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

[331] Huw Jones, *It Was Impossible To Spot Libor Rigging:  UK Watchdog*, Reuters (Feb. 27, 2013), http://www.reuters.com/article/2013/02/27/us-libor-britain-fsa-idUSBRE91Q0NX20130227.

[332] Uncorrected Tr. of Oral Evidence, U.K. House of Commons Treasury Comm., July 17, 2012.

[333] Minutes of Evidence, U.K. House of Commons Treasury Comm., July 9, 2012, *available at* https://publications.parliament.uk/pa/cm201213/cmselect/cmtreasy/481/120709.htm.

[334] *Id.*

Stability Board testified that he had no suspicions during the conspiracy period of intentional fraud.  Similarly, former Chairman of the Federal Reserve Board Alan Greenspan was quoted as saying the following: "Through all of my experience, what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities.  You were honor bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[335]  The CFTC, which led the effort to expose the unlawful conduct surrounding bbaLIBOR™, required twenty months to obtain actionable evidence of manipulation.[336]

### COUNT I:  BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
### (CREDIT SUISSE INTERNATIONAL AND CITIBANK, N.A)

235.    The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

236.    On March 26, 2004, Doral Bank entered into an ISDA Master Agreement with Credit Suisse First Boston International, predecessor-in-interest to Defendant Credit Suisse International, under which Doral entered into pay-fixed swaps with Credit Suisse International ("Doral-Credit Suisse Master Agreement").[337]

---

[335] Liam Vaughn & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg (Jan. 28, 2013), http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html. William Dudley, the President and Chief Executive Officer of the NY Fed, stated with respect to the bbaLIBOR™ investigation:  "We have learned that false reporting and manipulative behavior was pervasive across firms and over time, took many forms and was often conducted in a nonchalant manner."  William C. Dudley, Pres. & CEO, Fed. Reserve Bank of N.Y., Remarks at the Salomon Center for the Study of Financial Institutions, New York University Stern School of Business, New York City (Oct. 2, 2014), *available at* https://www.bis.org/review/r141003a.htm.

[336] Joe Nocera, *The Little Agency That Could*, N.Y. Times, Nov. 15, 2013, http://www.nytimes.com/2013/11/16/opinion/the-little-agency-that-could.html?_r=0.

[337] Doral-Credit Suisse Master Agreement is attached as Exhibit 30 and incorporated into this Complaint by reference.

237.    On February 21, 2008, Doral Bank entered into an ISDA Master Agreement with Defendant Citibank, N.A., under which Doral entered into pay-fixed swaps with Citibank, N.A. ("Doral-Citibank Master Agreement").[338]  The Master Agreements involving Doral are referenced collectively in this Complaint as the "Doral Master Agreements" and the Defendant Counterparties to the Doral Master Agreements are referenced collectively in this Complaint as "Contracting Defendants."

238.    Within each of the Doral Master Agreements there is an implied covenant of good faith and fair dealing, whereby each Contracting Defendant had a duty to act in good faith and not engage in any conduct that would destroy or injure Doral's rights to the benefits of its contracts.

239.    During the relevant period, Doral entered into pay-fixed swaps governed by the Doral Master Agreements.

240.    Contracting Defendants violated the implied covenant of good faith and fair dealing through their fraudulent and collusive conduct, their failure to disclose fraudulent and collusive conduct, their intentional misrepresentation and manipulations of USD bbaLIBOR™, and their underpayments to Doral tied to the artificially depressed USD bbaLIBOR™.

241.    These actions, which were intended to—and did—impair Doral's rights to the benefits of its contracts, increased Contracting Defendants' revenues related to bbaLIBOR™-based financial products, and lowered interest-rate payments to Doral.

242.    As a result of Contracting Defendants' breach of the implied covenant of good faith and fair dealing, Doral and the FDIC-R has suffered damages under the Doral Master Agreements.

---

[338] Doral-Citibank Master Agreement is attached as Exhibit 31 and incorporated into this Complaint by reference.

## COUNT II:  UNJUST ENRICHMENT/RESTITUTION
## (CREDIT SUISSE INTERNATIONAL AND CITIBANK, N.A)

243.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically, paragraphs 235-242.

244.    The Contracting Defendants entered into contracts with Doral for bbaLIBOR™-based financial products.

245.    The Contracting Defendants engaged in wrongful acts and omissions, as described above, whereby the Contracting Defendants interfered with Doral's protected interests and were unjustly enriched at the expense of and to the detriment of Doral.

246.    As described throughout this Complaint, the Contracting Defendants knowingly acted in an unfair, unconscionable, and oppressive manner towards Doral and acted in conscious disregard for Doral's rights by manipulating bbaLIBOR™ and making numerous misrepresentations and/or omissions regarding bbaLIBOR™'s accuracy.

247.    Through their wrongful conduct, the Contracting Defendants have knowingly received and retained wrongful financial and other benefits at Doral's expense and have received windfall profits.

248.    As a direct and proximate result of the Contracting Defendants' wrongful and inequitable conduct, as set forth above, the Contracting Defendants have been unjustly enriched and Doral has suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.  The Contracting Defendants' retention of funds under these circumstances constitutes unjust enrichment as the Contracting Defendants have no right to the benefits that were obtained through their wrongful conduct.

249.     The financial benefits that the Contracting Defendants derived from their wrongful manipulation of bbaLIBOR™ belong to Doral and the FDIC-R.  Doral and the FDIC-R may have no adequate remedy at law for the Contracting Defendants' misappropriated gains. The Court should compel the Contracting Defendants to disgorge to Doral and the FDIC-R all wrongful or inequitable proceeds that the Contracting Defendants received.

## COUNT III:  FRAUD
### (ALL DEFENDANTS)

250.     The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

251.     Defendants owed a duty to Doral to honestly and accurately report USD bbaLIBOR™ and not to intentionally mislead Doral and others by secretly and collectively manipulating USD bbaLIBOR™ for Defendants' gain and to the detriment of others in the financial markets.  The Panel Bank Defendants' and the BBA's duty arises from representations that they made, individually and/or through the BBA, that bbaLIBOR™ was a reliable indicator of the state of the money markets, that it was a reliable barometer of risk, that it reflected competitive rates in the London interbank lending market, that submissions were made in accord with published rules, and other such public representations.  The Contracting Defendants also have a separate and additional duty that arises from the contractual relationships they entered into with Doral, under which the Contracting Defendants owed a duty of good faith and fair dealing to Doral.  Doral reasonably relied on Defendants' fraudulent misrepresentations and conduct because, among other things, Defendants held USD bbaLIBOR™ out as a trustworthy, reliable benchmark and Defendants' fraud could only have been known to Defendants.

**Fraudulent USD bbaLIBOR™ Submissions**
**(Panel Bank Defendants)**

252.     As described above, beginning in August 2007 and continuing through at least

mid-2011, each Panel Bank Defendant falsely represented on a daily basis the following:

- Its USD bbaLIBOR™ submissions were consistent with the published definition
  of bbaLIBOR™.

- It based its USD bbaLIBOR™ submissions on its honest perception of its cost of
  funds in the London interbank market without reference to rates submitted by
  other Panel Bank Defendants.

- Its USD bbaLIBOR™ submissions represented the actual competitive rates at
  which it honestly believed another bank would offer it funds in the London
  interbank market.

253.     The Panel Bank Defendants made these representations knowing that they were

false, or with reckless disregard for their truth.

254.     These representations were material because they formed the basis for USD

bbaLIBOR™ published by and through the BBA and affected the price of bbaLIBOR™-based

financial products.  In addition, each Panel Bank Defendant's published submission provided

information regarding the Panel Bank's creditworthiness and liquidity.  When a Panel Bank

Defendant with high credit risk and liquidity problems submitted bbaLIBOR™ rates that were

artificially low in relation to other Panel Bank Defendants, that Panel Bank Defendant's

submission was material because it led market participants to believe that the Panel Bank

Defendant presented the same credit standing as the other Panel Bank Defendants.  Had market

participants and purchasers of bbaLIBOR™-based financial products known the true credit risk

and liquidity issues facing those Panel Bank Defendants, some market participants would have

declined to do business with them or would have demanded more favorable terms.

255.     The Panel Bank Defendants recognized the importance of USD bbaLIBOR™ and

falsely and publicly held it out as a trustworthy benchmark.  In doing so, the Panel Bank

Defendants intended for Doral and others to rely on their false representations of material fact. Doral reasonably relied on these false representations of material fact.

256.   As a result of Doral's reasonable reliance on these false representations of material fact, Doral and the FDIC-R have suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

## Fraudulent Representations Regarding USD bbaLIBOR™
### (Panel Bank Defendants and BBA)

257.   As described above, beginning in August 2007 and continuing through at least mid-2011, the Panel Bank Defendants and the BBA falsely represented on a daily basis that USD bbaLIBOR™ rates electronically communicated by, and through, the BBA were based on honest submissions by the Panel Bank Defendants of competitively set London interbank lending rates that were consistent with the published definition of bbaLIBOR™.

258.   The Panel Bank Defendants and the BBA made these misrepresentations knowing that they were false, or with reckless disregard for their truth.  These misrepresentations were material because they (a) formed the basis for pricing bbaLIBOR™-based financial products and (b) helped to sustain bbaLIBOR™ as the dominant benchmark for competitive interbank lending rates.  The Panel Bank Defendants and the BBA recognized the importance of USD bbaLIBOR™ and falsely and publicly held it out as a trustworthy benchmark.  In doing so, the Panel Bank Defendants and the BBA intended for Doral and others to rely on their false representations of material fact.

259.   Doral reasonably relied on these false representations of material fact in deciding whether to enter into transactions indexed to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products.  Doral specifically relied on Defendants' false

representations in calculating the expected future cash flows from financial products with interest rates based on USD bbaLIBOR™.

260.    As a result of Doral's reasonable reliance on these false representations of material fact, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

### The BBA's Fraud

261.    Beginning at least by mid-2008, as described in this Complaint, the BBA falsely represented to Doral and others that it actively and independently monitored the Panel Bank Defendants' USD bbaLIBOR™ submissions to ensure that the submissions were consistent with the published definition of bbaLIBOR™.  From 2007 through at least 2011, the BBA represented that bbaLIBOR™ was a "transparent" benchmark and that bbaLIBOR™ provided a "reliable indicator" of the state of the money markets and risk in the global economy.

262.    In April 2008, the BBA falsely represented that (a) it was closely watching USD bbaLIBOR™ submissions, (b) it would expel any Panel Bank that made deliberately inaccurate bbaLIBOR™ submissions, (c) it would fast-track an "intensive review" of its bbaLIBOR™ process, and (d) it did not believe that Panel Bank Defendants had submitted false rates.

263.    In June 2008, the BBA falsely represented that (a) the Panel Bank Defendants' USD bbaLIBOR™ submissions were honest and accurate and (b) it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

264.    On August 5, 2008, the BBA falsely represented that rates submitted by the Panel Bank Defendants were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark."[339]

265.    The BBA made these misrepresentations knowing that they were false, or with reckless disregard for their truth.  These misrepresentations were material because the BBA held itself out as an independent entity that would exercise strong oversight of bbaLIBOR™ to ensure that bbaLIBOR™ submissions by individual Panel Bank Defendants would be honest and consistent with the published definition of bbaLIBOR™.  Had market participants known that USD bbaLIBOR™ was set by collusion, and not competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

266.    The BBA intended for Doral and others to rely on these false representations of material fact.  Doral reasonably relied on these false representations in deciding whether to enter into transactions tied to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products.

267.    As a result of Doral's reasonable reliance on these false representations of material fact, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from financial instruments held by Doral.

---

[339] BBA, Libor Consultation Feedback Statement, *supra* note 209.

## Contracting Defendants' Fraud

268.    As discussed above, Doral entered into contracts with the Contracting Defendants for bbaLIBOR™-based financial products.  By virtue of these contractual relationships, the Contracting Defendants owed a duty of good faith and fair dealing to Doral.

269.    Contrary to their duty, Contracting Defendants knowingly provided Doral information regarding settling positions based on false submissions used to calculate USD bbaLIBOR™, thereby affirmatively misrepresenting that USD bbaLIBOR™ accurately captured the competitive market forces that influence London interbank lending rates.  Further, the Contracting Defendants failed to disclose the fraud and collusion relating to USD bbaLIBOR™.  The Contracting Defendants made these false representations and material omissions knowing that they were false, or with reckless disregard for their truth.  The Contracting Defendants made these misrepresentations and omissions during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with Doral under the pay-fixed swaps in order to induce Doral to enter into these transactions.  Doral would not have entered into the pay-fixed swaps at the same prices if Doral had known the Contracting Defendants intended to substitute collusion for competition in the setting of USD bbaLIBOR™.

270.    Doral reasonably relied on the Contracting Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD bbaLIBOR™ and, if so, on what terms, and whether to continue holding bbaLIBOR™-based financial products.

271.    As a result of Doral's reasonable reliance on these Defendants' fraudulent misrepresentations and omissions, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

## COUNT IV:  AIDING AND ABETTING FRAUD
### (ALL DEFENDANTS)

272.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 250-71.

273.    As explained above, the Defendants committed acts of fraud through their manipulation of bbaLIBOR™ and their misrepresentations regarding bbaLIBOR™, which Doral reasonably relied upon.

274.    Defendants had actual knowledge of the fraudulent acts of the other Defendants.

275.    Each Defendant aided and abetted the fraud committed by the other Defendants by providing substantial assistance and/or participating in the fraudulent acts committed by the other Defendants, as explained in the paragraphs above.

276.    As a result of Defendants' aiding and abetting, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

## COUNT V:  CIVIL CONSPIRACY TO COMMIT FRAUD
### (ALL DEFENDANTS)

277.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 250-71.

278.    As explained above, Defendants committed acts of fraud through their manipulation of bbaLIBOR™ and their misrepresentations and/or omissions regarding bbaLIBOR™, which Doral reasonably relied upon.

279.    Defendants formed a conspiracy or agreement to commit fraud by manipulating bbaLIBOR™ and submitting false USD bbaLIBOR™ rates that were inconsistent with the public definition of bbaLIBOR™, below their actual borrowing costs, and within a narrow range

among the Panel Bank Defendants, as well as by engaging in a course of material misrepresentations and/or omissions to conceal the fraudulent acts.

280.    As explained throughout this Complaint, Defendants conspired together to commit fraud by manipulating bbaLIBOR™ through false and fraudulent bbaLIBOR™ submissions, as well as engaging in a course of material misrepresentations and/or omissions to conceal the fraudulent acts.

281.    Defendants intentionally and knowingly committed acts in furtherance of this conspiracy, as explained above, by manipulating bbaLIBOR™ and making false and fraudulent bbaLIBOR™ submissions, as well as making repeated misrepresentations and omissions regarding bbaLIBOR™'s accuracy.

282.    As a result of Defendants' conduct, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

## COUNT VI:  NEGLIGENT MISREPRESENTATION
### (ALL DEFENDANTS)

283.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

284.    As discussed above, Doral entered into contracts with the Contracting Defendants for bbaLIBOR™-based financial products.  By virtue of these contractual relationships, Doral had a special relationship with the Contracting Defendants and the Contracting Defendants owed a duty of good faith and fair dealing to Doral.  As a result of this special relationship, the Contracting Defendants had a duty to impart correct information to Doral.

285.    The Panel Bank Defendants and the BBA also owed a duty to Doral to honestly and accurately report USD bbaLIBOR™ and not to intentionally mislead Doral and others by secretly and collectively manipulating USD bbaLIBOR™ for their gain and to the detriment of others in the financial markets.  Defendants' duty arises from representations that they made, individually and/or through the BBA, that bbaLIBOR™ was "a reliable indicator of the state of the money markets," that it was a "reliable barometer of risk," that it reflected competitive rates in the London interbank lending market, and other public representations regarding the nature and reliability of bbaLIBOR™.

### Misrepresentations in USD bbaLIBOR™ Submissions
### (Panel Bank Defendants)

286.    As described above, beginning in August 2007 and continuing through at least mid-2011, each Panel Bank Defendant falsely represented on a daily basis the following:

- Its USD bbaLIBOR™ submissions were consistent with the published definition of bbaLIBOR™;

- It based its USD bbaLIBOR™ submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Panel Bank Defendants; and

- Its USD bbaLIBOR™ submissions represented the actual competitive rates at which it honestly believed another bank would offer it funds in the London interbank market.

287.    The Panel Bank Defendants made these representations, at a minimum, negligently and without reasonable justification.

288.    These representations were material because they formed the basis for USD bbaLIBOR™ published by and through the BBA and affected the price of bbaLIBOR™-based financial products.  In addition, an individual bank's published submission provided information regarding its creditworthiness and liquidity.  When a Panel Bank Defendant with high credit risk and liquidity problems submitted bbaLIBOR™ rates that were artificially low in relation to other

Panel Bank Defendants, that Panel Bank Defendant's submission was material because it led market participants to believe that the Panel Bank Defendant presented the same credit standing as the other Panel Bank Defendants.  Had market participants and purchasers of bbaLIBOR™-based financial products known the true credit risk and liquidity issues facing those Panel Bank Defendants, they would have declined to do business with them.

289.    The Panel Bank Defendants intended for Doral and others to rely on these false representations of material fact.  Doral reasonably relied on these false representations of material fact in deciding whether to do business with a particular Panel Bank Defendant.

290.    As a result of Doral's reasonable reliance on these false representations of material fact, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

### Misrepresentations Regarding USD bbaLIBOR™
### (Panel Bank Defendants and BBA)

291.    As described above, beginning in August 2007 and continuing through at least mid-2011, the Panel Bank Defendants and the BBA falsely represented on a daily basis that USD bbaLIBOR™ rates electronically communicated by, and through, the BBA were based on honest submissions by the Panel Bank Defendants of competitively set London interbank lending rates that were consistent with the published definition of bbaLIBOR™.

292.    The Panel Bank Defendants and the BBA made these misrepresentations, at a minimum, negligently and without reasonable care.  These misrepresentations were material because they (a) formed the basis for pricing bbaLIBOR™-based financial products and (b) helped to sustain bbaLIBOR™ as the dominant benchmark for competitive interbank lending

rates. The Panel Bank Defendants and the BBA intended for Doral and others to rely on these false representations of material fact.

293. Doral reasonably relied on these false representations of material fact in deciding whether to enter into transactions indexed to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products. Doral specifically relied on Defendants' false representations in calculating the expected future cash flows from USD bbaLIBOR™ and consequently, the prices Doral was willing to pay for pay-fixed swaps.

294. As a result of Doral's reasonable reliance on these false misrepresentations of material fact, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

### The BBA's Misrepresentations

295. Beginning in mid-2008, as described in this Complaint, the BBA falsely represented to Doral and others that it actively and independently monitored the Panel Bank Defendants' USD bbaLIBOR™ submissions to ensure that they were consistent with the published definition of bbaLIBOR™. From 2007 through at least mid- 2011, the BBA represented that bbaLIBOR™ was a "transparent" benchmark and that bbaLIBOR™ provided a "reliable indicator" of the state of the money markets and risk in the global economy.

296. In April 2008, the BBA falsely represented that (a) it was closely watching USD bbaLIBOR™ submissions, (b) it would expel any Panel Bank that made deliberately inaccurate bbaLIBOR™ submissions, (c) it would fast-track an "intensive review" of its bbaLIBOR™ process, and (d) it did not believe that Panel Bank Defendant had submitted false rates.

297. In June 2008, the BBA falsely represented that (a) the Panel Bank Defendants' USD bbaLIBOR™ submissions were honest and accurate, and (b) it was incorporating a tight

scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.

298.    On August 5, 2008, the BBA falsely represented that rates submitted by Panel Banks were "truly reflective of their perceived borrowing costs" and that bbaLIBOR™ was a "fundamentally robust and accurate benchmark."[340]

299.    The BBA made these misrepresentations, at a minimum, negligently and without reasonable care.  These misrepresentations were material because the BBA held itself out as an independent entity that would exercise strong oversight of bbaLIBOR™ to ensure that bbaLIBOR™ submissions by individual Panel Bank Defendants would be honest and consistent with the published definition of bbaLIBOR™.  Had market participants known that USD bbaLIBOR™ was set by collusion, and not competitive market forces, market participants would have turned to other, more accurate, benchmarks to incorporate into their financial contracts.

300.    The BBA intended for Doral and others to rely on these false representations of material fact.  Doral reasonably relied on these false representations in deciding whether to enter into transactions tied to USD bbaLIBOR™ and whether to continue holding bbaLIBOR™-based financial products.

301.    As a result of Doral's reasonable reliance on these false representations, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

---

[340] BBA, Libor Consultation Feedback Statement, *supra* note 209.

## Contracting Defendants' Misrepresentations

302.    As discussed above, Doral entered into contracts with the Contracting Defendants for bbaLIBOR™-based financial products.  By virtue of these contractual relationships, the Contracting Defendants owed a duty of good faith and fair dealing to Doral.

303.    Contrary to their duty, the Contracting Defendants affirmatively misrepresented their credit risk and liquidity through fraudulent and collusive USD bbaLIBOR™ submissions. In addition, the Contracting Defendants affirmatively misrepresented that USD bbaLIBOR™ accurately captured the competitive market forces that influence London interbank lending rates. Further, the Contracting Defendants failed to disclose the fraud and collusion relating to USD bbaLIBOR™.  The Contracting Defendants made these false representations and material omissions, at a minimum, negligently and without reasonable care.  The Contracting Defendants made these misrepresentations and omissions during negotiations for each pay-fixed swap and each time that payments were made and/or exchanged with Doral under the pay-fixed swaps in order to induce Doral to enter into these transactions.  Doral would not have entered into the pay-fixed swaps at the same prices if Doral had known the Contracting Defendants intended to substitute collusion for competition with respect to USD bbaLIBOR™.

304.    Doral reasonably relied on the Contracting Defendants' misrepresentations and nondisclosures in deciding whether to enter into financial transactions incorporating USD bbaLIBOR™ and, if so, on what terms, and whether to continue holding bbaLIBOR™-based financial products.

305.    As a result of Doral's reasonable reliance on these Defendants' fraudulent misrepresentations and omissions, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from Defendants and others from bbaLIBOR™-based financial products.

<u>**COUNT VII:  TORTIOUS INTERFERENCE WITH CONTRACT**</u>
**(PANEL BANK DEFENDANTS AND BBA)**

306.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

307.    Doral entered into pay-fixed swaps and other financial contracts tied to USD bbaLIBOR™ with the Contracting Defendants and counterparties other than Defendants.

308.    Each Panel Bank Defendant and the BBA knew that USD bbaLIBOR™ was incorporated into ISDA Master Agreements and other financial instruments.

309.    The Panel Bank Defendants and the BBA intentionally and fraudulently held USD bbaLIBOR™ out to the world, including Doral, as a trustworthy and reliable benchmark.

310.    Each Panel Bank Defendant and the BBA knew, or should have known, that Doral had entered into financial instruments with one or more of the other Panel Bank Defendants, as well as counterparties other than Defendants, that incorporated USD bbaLIBOR™.  In fact, as detailed above, certain Panel Bank Defendants were counterparties to similar contracts with Doral.

311.    The Panel Bank Defendants and the BBA intentionally and improperly interfered with these contracts and agreements, as described above, including by their collusive manipulation of USD bbaLIBOR™ and fraudulent misrepresentations and/or omissions about bbaLIBOR™'s accuracy.  The Panel Bank Defendants' and BBA's tortious acts caused those contracts to be breached and Doral to receive reduced payments from those contracts and/or a decrease in value.

312.    As a result of the Panel Bank Defendants' and the BBA's intentional interference with Doral's contracts and agreements, Doral and the FDIC-R suffered damages in the form of,

among other things, receiving lower interest-rate payments from the Contracting Defendants and others.

### COUNT VIII:  AIDING AND ABETTING
### TORTIOUS INTERFERENCE WITH CONTRACT
### (PANEL BANK DEFENDANTS AND BBA)

313.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 306-12.

314.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with Doral's contracts and agreements with the Contracting Defendants and counterparties other than the Contracting Defendants.

315.    The Panel Bank Defendants and the BBA had actual knowledge of the acts of tortious interference of each other.

316.    Each Panel Bank Defendant and the BBA aided and abetted the tortious interference committed by the other Panel Bank Defendants and the BBA by providing substantial assistance and/or participating in the tortious acts committed by the other Panel Bank Defendants and the BBA, including through their collusive manipulation of USD bbaLIBOR™ and fraudulent misrepresentations and/or omissions about bbaLIBOR™'s accuracy.  The Panel Bank Defendants' and the BBA's acts of aiding and abetting caused those contracts to be breached and Doral to receive reduced payments from those contracts and/or a decrease in value.

317.    As a result of the Panel Bank Defendants' and the BBA's aiding and abetting, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting Defendants and others from bbaLIBOR™-based financial products.

## COUNT IX:  CIVIL CONSPIRACY TO COMMIT
## TORTIOUS INTERFERENCE WITH CONTRACT
### (PANEL BANK DEFENDANTS AND BBA)

318.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 306-12.

319.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with Doral's contracts with the Contracting Defendants and counterparties other than Defendants.

320.    As explained throughout this Complaint, the Panel Bank Defendants and the BBA conspired together to tortiously interfere with Doral's contracts by manipulating bbaLIBOR™ through false and fraudulent bbaLIBOR™ submissions, as well as engaging in a course of material misrepresentations and/or omissions to conceal their tortious acts.

321.    The Panel Bank Defendants and the BBA intentionally and knowingly committed acts in furtherance of this conspiracy, as explained above, by manipulating bbaLIBOR™ and making false and fraudulent bbaLIBOR™ submissions, as well as by making repeated misrepresentations and omissions regarding bbaLIBOR™'s accuracy.

322.    As a result of the Panel Bank Defendants' and the BBA's conduct, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting Defendants and others from bbaLIBOR™-based financial products.

## COUNT X:  TORTIOUS INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (PANEL BANK DEFENDANTS AND BBA)

323.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint.

324.    Doral had valid business expectancies in that Doral was engaged in interest-rate swap contracts and other bbaLIBOR™-based financial instruments with certain Defendants and counterparties other than Defendants.  Doral's contractual relationships at that time expressly incorporated USD bbaLIBOR™ and provided that Doral would receive payments based on the level of USD bbaLIBOR™.

325.    The Panel Bank Defendants and the BBA knew that USD bbaLIBOR™ was incorporated into ISDA Master Agreements and other financial instruments.

326.    The Panel Bank Defendants and the BBA knew of Doral's contractual relationships and business expectancies and understood that USD bbaLIBOR™, as the "world's most important number," was incorporated into many contracts similar to the ones to which Doral was party.  In fact, certain Defendants were counterparties to similar contracts with Doral. The Panel Bank Defendants and the BBA further knew, or should have known, that Doral expected payments from these contracts based on the level of USD bbaLIBOR™.

327.    The Panel Bank Defendants and the BBA intentionally interfered with Doral's business expectancies by means of improper, fraudulent, wrongful methods, as described throughout this Complaint, and caused Doral to receive reduced payments from these contracts and/or a decrease in value over what Doral would have realized, absent the Panel Bank Defendants' and the BBA's conduct.

328.    As a result of the Panel Bank Defendants' and the BBA's intentional interference with Doral's business expectancies, Doral and the FDIC-R suffered damages in the form of, among other things, lower interest-rate payments from the Contracting Defendants and others, and paying artificially high prices for financial products tied to USD bbaLIBOR™.

## COUNT XI:  AIDING AND ABETTING TORTIOUS
## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (PANEL BANK DEFENDANTS AND BBA)

329.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 323-28.

330.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with Doral's valid business expectancies with certain Defendants and counterparties other than the Defendants.

331.    The Panel Bank Defendants and the BBA had actual knowledge of the acts of tortious interference of the other Panel Bank Defendants and the BBA.

332.    Each Panel Bank Defendant and the BBA, through improper and fraudulent means, aided and abetted the tortious interference committed by the other Panel Bank Defendants and the BBA by providing substantial assistance and/or participating in the tortious acts committed by the other Panel Bank Defendants and the BBA, including through their collusive manipulation of USD bbaLIBOR™ and fraudulent misrepresentations and/or omissions about bbaLIBOR™'s accuracy.  The Panel Bank Defendants' and the BBA's acts of aiding and abetting caused Doral to receive reduced payments from their contracts and/or a decrease in value over what Doral would have realized, absent the Panel Bank Defendants' and the BBA's conduct.

333.    As a result of the Panel Bank Defendants' and the BBA's aiding and abetting, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting Defendants and others from bbaLIBOR™-based financial products.

## COUNT XII:  CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (PANEL BANK DEFENDANTS AND BBA)

334.    The FDIC-R incorporates by reference the preceding paragraphs in this Complaint, including specifically paragraphs 323-28.

335.    As explained above, the Panel Bank Defendants and the BBA tortiously interfered with Doral's valid business expectancies with certain Defendants and counterparties other than Defendants.

336.    As explained throughout this Complaint, the Panel Bank Defendants and the BBA conspired together to tortiously interfere with Doral's valid business expectancies by manipulating bbaLIBOR™ through false and fraudulent bbaLIBOR™ submissions, as well as by engaging in a course of material misrepresentations and/or omissions to conceal their tortious acts.

337.    The Panel Bank Defendants and the BBA intentionally and knowingly committed acts in furtherance of this conspiracy, as explained above, by manipulating bbaLIBOR™ and making false and fraudulent bbaLIBOR™ submissions, as well as by making repeated misrepresentations and omissions regarding bbaLIBOR™'s accuracy.

338.    As a result of the Panel Bank Defendants' and the BBA's conduct, Doral and the FDIC-R suffered damages in the form of, among other things, higher prices for bbaLIBOR™-based financial products and lower interest-rate payments from the Contracting Defendants and others from bbaLIBOR™-based financial products.

## COUNT XIII:  VIOLATIONS OF SHERMAN ACT SECTION 1
### (ALL DEFENDANTS)

339.    The FDIC-R incorporates by reference the preceding paragraphs of this Complaint.

## Agreement

340.    From in or about August 2007 and lasting through at least mid-2011, the

Defendants participated in a combination, conspiracy, and/or agreement that involved multiple

horizontal and vertical levels.  In this case, the Complaint alleges a set of agreements among the

Defendants that restricted competition in various markets.  As shown above, the unlawful

agreements consisted of the following:

- The Panel Bank Defendants agreed to (a) disregard the bbaLIBOR™ published rules to coordinate the interest rates that they submitted to the BBA for calculation, (b) keep those coordinated submissions below the rates at which they would be offered funds in the London interbank lending market for USD, and (c) keep those coordinated submissions within a narrow range.

- The Defendants agreed to falsely hold USD bbaLIBOR™ out as a reliable interest-rate benchmark calculated according to its published methodology and conceal the fact that the Panel Bank Defendants had agreed to disregard the published methodology for USD bbaLIBOR™.

- The Defendants agreed to conceal the extent to which conditions in the London interbank loan market had deteriorated.

- The Panel Bank Defendants and the BBA agreed to publicly, and falsely, maintain that USD bbaLIBOR™ would be protected by a strict governance protocol, that it would be overseen by an "independent" committee of active market participants, and that the BBA would ensure compliance with bbaLIBOR™'s published rules.

341.    The Defendants had a conscious commitment to common objectives, namely

insulating bbaLIBOR™ from the forces of competition so that the Defendants could collectively

control the product standard in the market for USD interest-rate benchmarks.  Through control of

bbaLIBOR™, the Bank Defendants could manipulate it for their personal gain and

systematically depress it to unfairly profit from USD bbaLIBOR™-based financial transactions.

Certain Bank Defendants also had a common interest in manipulating bbaLIBOR™ to protect

their respective credit ratings.

342.     As set forth above, the Defendants had strong motives to conspire.  Because of the way that USD bbaLIBOR™ was calculated based upon the Panel Bank Defendants' bbaLIBOR™ submissions, a single Panel Bank acting unilaterally had little ability to affect bbaLIBOR™.  By cooperating, the Panel Bank Defendants' collusion gave them the power to affect the USD bbaLIBOR™ fixing published by and through the BBA.  In addition, the unlawful scheme required collective action to avoid detection.  If any Panel Bank Defendant deviated from the unlawful agreements on a sustained basis or disclosed that Defendants had agreed to disregard the bbaLIBOR™ rules, the scheme would have been exposed and bbaLIBOR™'s integrity and reliability would have been fundamentally undermined.  Disclosure of the unlawful agreements would also have exposed bbaLIBOR™ to the forces of competition from other interest-rate indices, imperiling bbaLIBOR™'s position as the market standard for interest-rate benchmarks, and triggering government investigations and lawsuits.  In fact, these are precisely the consequences that followed Barclays's disclosure of systematic depression in 2012.

343.     There is abundant evidence that the conduct of the Defendants was the product of agreement and not independent action.  To date, four Panel Bank Defendants (UBS, Barclays, Lloyds, and Citibank) have already admitted systematically submitting artificially depressed USD bbaLIBOR™ rates to the BBA.  Without the Defendants' conspiracy, the USD bbaLIBOR™ submissions from these four Panel Bank Defendants would have been noticeably lower than the other Panel Bank Defendants.  They were not.  USD bbaLIBOR™ submissions were closely grouped together throughout the conspiracy period, which could not have occurred without explicit coordination.

344.    For example, Figure 6 below plots the submissions for three-month USD bbaLIBOR™ during a two-month period in 2008 for the four Panel Bank Defendants that have admitted to systematic depression (Barclays, UBS, Lloyds, and Citibank) and the submissions of Panel Bank Defendants Bank of America, Credit Suisse, and JP Morgan.  The chart shows that the latter three banks submitted USD bbaLIBOR™ rates that were within *or below* the range of the admittedly depressed rates.  The submissions of other Panel Bank Defendants show the same trend.  This pattern of coordinated submissions cannot be credibly explained in the absence of a conspiracy.

**Figure 6:  Comparison of bbaLIBOR™ submissions**



345.    While very little evidence contained in the internal documents maintained by the

Defendants has been disclosed to date, the evidence that has been revealed confirms the

existence of the unlawful agreements:

- A Rabobank bbaLIBOR™ submitter told federal investigators in 2014 that Rabobank was "low-balling" its USD bbaLIBOR™ submissions at a time when it was attempting to "hoard" cash by borrowing when available for longer terms regardless of cost and even though interest rates were going higher and higher.[341] Rabobank bbaLIBOR™ submitters asked a Rabobank executive whether Rabobank should start submitting bbaLIBOR™s at the much higher rates that were available in the market.  The executive responded that "doing so was a stupid idea and shouldn't be done," specifically related to USD.  In fact, Rabobank was paying much higher rates for longer-term USD borrowings than it reported in its bbaLIBOR™ submissions.

- In an electronic chat between a Bank of Scotland plc USD bbaLIBOR™ submitter and an employee of "another financial institution" (unidentified), the Bank of Scotland plc submitter stated, "youll [sic] like this ive [sic] been pressured by senior management to bring my rates down into line with everyone else."[342]

- In one message dated August 19, 2007, a former trader for RBS, Tan Chi Min, wrote in an electronic discussion with traders at other banks, including Deutsche Bank's Mark Wong: "It's just amazing how Libor fixing can make you that much money or lose if opposite.  It's a cartel now in London."[343]

- In October 2007, a Barclays employee noted internally that an unidentified Panel Bank had submitted a bbaLIBOR™ rate that was lower than the rate it actually paid.[344]

- On November 29, 2007, a Barclays manager contacted a representative of BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that all of the Panel Bank Defendants were doing this.[345]  The Barclays manager specifically identified certain other Panel Bank Defendants that

---

[341] Defense Ex. 608C at 17, *United States v. Conti*, 1:14-cr-00272 (JSR) (S.D.N.Y.), ECF No. 202-1.

[342] Lloyds CFTC Order, *supra* note 39, at 15.

[343] Andrea Tan, Gavin Finch & Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg (Sept. 26, 2012), http://www.bloomberg.com/news/2012-09-25/rbs-instant-messages-show-libor-rates-skewed-for-traders.html.

[344] Email to Jason Miu (Oct. 3, 2007, 07:34), attached as Exhibit 32 and incorporated into this Complaint by reference.

[345] Barclays SOF, *supra* note 138, ¶ 43.

were submitting bbaLIBOR™ rates lower than rates at which those banks could actually get funds.[346]

- On December 4, 2007, a Barclays bbaLIBOR™ submitter sent an internal email stating that the Panel Bank Defendants, including Barclays, were submitting false and dishonest submissions.[347]

- On April 11, 2008, a Barclays employee told an employee of the NY Fed that he was aware of Panel Bank Defendants putting in USD bbaLIBOR™ submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[348]  The Barclays employee noted "if we can't borrow money at that rate, then no one else could really. . . .  I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and I don't know if at some stage LIBORs will correct themselves."[349]

- On October 24, 2008, a Barclays employee privately reported to the NY Fed that USD bbaLIBOR™ rates were "absolute rubbish," citing submissions by WestLB and Deutsche Bank as being too low.[350]  The employee told the NY Fed that he was aware of banks that were making bbaLIBOR™ submissions that were below what they actually paid in comparable transactions.[351]

- In an internal email, a Barclays employee noted that Lloyds's USD bbaLIBOR™ submission was artificially low.[352]

346.    In addition, Panel Bank Defendant RBS has admitted that its employees participated in agreements to submit bbaLIBOR™ submissions that were inconsistent with the published definitions.  Although RBS did not admit systematic depression, the head of its money markets trading and the person responsible for USD bbaLIBOR™ submissions reportedly told a subordinate that Panel Bank Defendants were setting bbaLIBOR™ "to where it suits their book"

---

[346] *Id.* ¶ 43.

[347] *Id.* ¶ 45.

[348] *Apr. 11 Barclays and N.Y. Fed Tr.*, *supra* note 175, at 7.

[349] *Id.* at 16.

[350] *Oct. 24 Barclays and N.Y. Fed Tr.*, *supra* note 224, at 000098, 000100.

[351] *Id.* at 000100.

[352] Email to Pat Leising (Aug. 28, 2007, 11:27), attached as Exhibit 33 and incorporated into this Complaint by reference.

and that "LIBOR is what you say it is."[353]  This communication occurred in August 2007, within days of the admitted directives issued by Barclays and UBS executives.

347.    Because the BBA's instructions prohibited Panel Banks from basing their USD bbaLIBOR™ submissions on submissions by other Panel Banks, the Panel Bank Defendants cannot claim that their conduct was merely the result of conscious parallelism without admitting that they secretly and fraudulently deviated from bbaLIBOR™'s published methodology.  The Panel Bank Defendants' pretextual explanations for their artificially low USD bbaLIBOR™ submissions further confirm the existence of the unlawful agreements.

348.    Moreover, the Panel Bank Defendants acted against their legitimate independent self-interest in several regards.  First, absent agreement with other Panel Bank Defendants, any Panel Bank Defendant that unilaterally chose to deviate from the published bbaLIBOR™ rules would have exposed itself to civil and criminal sanctions that would have undermined the Panel Bank Defendant's reputation in the United States.  According to the bbaLIBOR™ rules, banks that deviated from the rules would be removed from the bbaLIBOR™ panel.[354]  Removal from the bbaLIBOR™ panel would have harmed the bank's perceived integrity, exposed it to investigation by government regulators, and led to civil action by counterparties.  Removal also could have proven catastrophic if the market interpreted the bank's fraud as a desperate attempt to protect its reputation in the United States.

349.    Second, Panel Bank Defendants that were more creditworthy than their supposed rivals on the USD bbaLIBOR™ panel acted against their independent economic self-interest by submitting USD bbaLIBOR™ rates that were not significantly lower than their less creditworthy

---

[353] Vaughan & Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, *supra* note 153.

[354] BBA Libor, LIBOR Governance and Scrutiny, *supra* note 115, § 1.13.

"competitor" banks on the USD bbaLIBOR™ panel and tolerating false submissions that created the appearance that all of the Panel Banks presented the same perceived credit risk.  A bank's creditworthiness is an important part of a bank's ability to obtain wholesale funding at competitive prices. In the absence of collusion, the more creditworthy Bank Defendants would be expected to have used their stronger credit standing as a competitive advantage to obtain lower costs of funds than their rivals and to use those lower costs to compete on price in downstream markets for interest-rate derivatives, floating-rate retail loans, and other financial products.  Similarly, it was in the independent economic self-interest of the more creditworthy Bank Defendants to publicly expose and/or report to the authorities the artificially low bbaLIBOR™ rates submitted by their supposed rivals.

350.    The Panel Bank Defendants had ample opportunity to conspire through, among other things, BBA and FX & MM Committee meetings, numerous interbank communications, electronic chats, and telephone calls.  Even the minimal evidence publicly disclosed to date in connection with government regulatory actions, some of which is set forth above, reveals a sustained pattern of illicit and anticompetitive communications among the Panel Bank Defendants.

351.    The economic evidence also supports the existence of the unlawful agreements in that the USD bbaLIBOR™'s relationship to the Eurodollar Bid Rate fundamentally changed during the alleged conspiracy period.  During the conspiracy, the Panel Bank Defendants and the BBA offered a number of explanations for that change, but the disclosures following Barclays's June 2012 admission of unlawful conduct confirm that the agreements alleged above caused that fundamental change.

**Restraint of Trade**

352.    The purpose and effect of the unlawful agreements was to maintain market dominance for USD interest-rate benchmarks during the conspiracy period and limit competition in the markets for interest-rate benchmarks, interest-rate derivatives, floating-rate loans, floating-rate MBS, and wholesale funding.  The Panel Bank Defendants and the BBA achieved this objective by colluding to create the false impression that USD bbaLIBOR™ was suited for its intended purpose and that the London interbank loan market was a reliable source of data for the Panel Bank Defendants' cost of unsecured funds.  Only the Panel Bank Defendants and the BBA knew whether the Panel Bank Defendants were following the bbaLIBOR™ methodology, the extent to which the opaque London interbank loan market was active, and whether the Panel Bank Defendants were submitting rates consistent with the actual interest rates available in the London interbank loan market. The Panel Bank Defendants' and the BBA's conspiracy harmed competition in numerous markets.

353.    The Panel Bank Defendants and the BBA foreclosed competition by alternative interest-rate benchmarks and shielded bbaLIBOR™'s dominant position as the market standard from the forces of competition.  Taking advantage of their large, if not dominant, market positions (and pursuant to the unlawful agreements), the Bank Defendants continued to incorporate bbaLIBOR™ into USD interest-rate derivatives, floating-rate loans, and floating-rate MBS, even though the Defendants knew that bbaLIBOR™ was not what they held it out to be. This conduct was intended to, and did, insulate bbaLIBOR™ from the forces of competition, and that foreclosure allowed the Defendants to maintain bbaLIBOR™ as the market standard without even attempting to innovate its rules or improve its governance mechanism.  In short, the Defendants maintained USD bbaLIBOR™ as the standard in the market for USD interest-rate benchmarks and the leading reference interest-rate benchmark in markets for USD interest-rate

derivatives, floating-rate loans and floating-rate MBS not by competing on the merits, but by entering into secret agreements to exclude competition.

354.    The unlawful agreements had especially pernicious effects because the market for USD interest-rate benchmarks was characterized by network effects.  These network effects were driven by the widespread use of bbaLIBOR™ throughout the interconnected USD interest-rate derivative, floating-rate loan and floating-rate MBS markets, in which the Bank Defendants were major players.  The Bank Defendants were among the dominant sellers of OTC USD interest-rate derivatives, which gave them additional market power as the most important users of USD interest-rate benchmarks. Thus, the Bank Defendants' agreements as dealers in the OTC interest-rate derivatives market necessarily diminished competition in the related floating-rate loan market and in the upstream market for interest-rate benchmarks.

355.    The Defendants knew, or should have known, that the unlawful agreements would affect the prices and returns on financial products tied to USD bbaLIBOR™.  By agreeing to systematically and secretly depress bbaLIBOR™ into the future, the Defendants harmed the competitive process.

356.    As explained in the Wheatley Report, an interest-rate benchmark serves two important purposes.[355]  First, it functions as the reference interest rate incorporated into financial contracts as a payment (and price) term.  Thus, depression of the benchmark will cause economic loss to companies that hold interest-rate derivatives, loans, or floating-rate MBS.  Second, the benchmark functions as a discount rate used in negotiations to price products that incorporate the benchmark.  As explained above, an interest-rate swap is determined by applying the rules of the interest-rate benchmark to the notional value over the duration of the proposed swap to

---

[355] Wheatley Final Report, *supra* note 63, at 45.

determine the net present value of those payments which, in turn, determines the fixed rate that the counterparty will pay.  Thus, the price of an interest-rate swap is set by the net present value of the interest-rate benchmark.  The net present value calculation is expressly premised on the reliability, predictability, and integrity of the interest-rate benchmark.

357.    By providing a benchmark supposedly tied to competitively determined interbank lending rates, bbaLIBOR™ purported to serve the price-discovery purpose in markets for interest-rate derivatives, floating-rate loans, and floating-rate MBS.  By foreclosing competition in the market for USD interest-rate benchmarks, the Defendants harmed the competitive process by which parties discovered the price of interest-rate derivatives, loans, and floating-rate MBS.[356]  As one District Court observed, "[f]raud and deceit are not legitimate market forces. Fundamentally, markets are information processing systems.  The market price is only as 'real' as the data that inform the process of price discovery.  By the same token, the market price is 'artificial' when the market is misinformed."[357]

358.    By artificially depressing USD bbaLIBOR™, the Panel Bank Defendants caused purchasers of products that incorporated bbaLIBOR™ as an interest-rate benchmark to overpay for those products.  Had purchasers known the true manner in which the Panel Bank Defendants and the BBA calculated, and intended to continue to calculate, USD bbaLIBOR™, purchasers would have chosen not to enter into the transaction at all or requested an alternative interest-rate benchmark.  Had the Defendants not prevented purchasers from making an informed choice to

---

[356] For example, assume a monopolist offers a product for $30 when its internal cost to produce and sell the product is just $10.  Absent competition, buyers will not know that $30 represents a three-fold increase over the seller's costs.  Now, assume instead that there are multiple sellers of the same product, all with similar costs.  Rather than lose a sale, the second seller will offer a price below $30, which should trigger a price reaction from the seller's rivals.  Eventually, through the competitive process, buyers will "discover" that the market price for the product is just above $10.  *See* Robert C. Marshall & Leslie M. Marx, The Economics of Collusion—Cartels and Bidding Rings 83-84 (2012).

[357] *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006).

incorporate bbaLIBOR™ as the benchmark based on the actual rules that the Panel Bank Defendants intended to apply, the true discounted value of the products would have been far less than what purchasers paid.  Similarly, purchasers, including Doral, suffered economic losses on financial products that incorporated USD bbaLIBOR™ as a price term.  As explained above, market participants were not informed of the actual methodology that the Panel Bank Defendants used to submit USD bbaLIBOR™ and therefore the unlawful agreements prevented market participants from being able to make informed decisions whether to keep those financial products and, if so, whether to demand changes to the benchmark methodology.  Through the unlawful agreements, the Bank Defendants artificially increased the profit margins that they earned in certain financial transactions tied to USD bbaLIBOR™ to Doral's economic detriment.

359.    Second, the Defendants also interfered with the ability of non-conspirator banks to fairly compete against the Bank Defendants in the markets for interest-rate derivatives, floating-rate loans, and floating-rate MBS.  Non-conspirator banks were unaware of the alleged fraud and collusion and therefore priced interest-rate derivatives, loans, and floating-rate MBS based on the reasonable expectation that USD bbaLIBOR™ would be determined according to the published rules.  As a result of their conspiracy, the Bank Defendants could slightly undercut prices offered by non-conspirators knowing that even the undercut price would provide a profit due to the Bank Defendants' unlawful agreements.

360.    Third, each artificially depressed bbaLIBOR™ submission by an individual Panel Bank Defendant enhanced that Panel Bank Defendant's reputation in the United States and public perception of its credit risk and liquidity.[358]  In the absence of collusion, banks with superior credit and liquidity profiles would have used their reputation in the United States as a

---

[358] Abrantes-Metz et al., *supra* note 313, at 138.

competitive advantage and banks with lower reputations in the United States would have been forced to compete on the merits by providing better prices, improving efficiency, and shedding risk. Numerous Panel Bank Defendants, in fact, have admitted that individual bbaLIBOR™ submissions contained market information that affected or tended to affect prices of financial contracts and products that incorporated the interest-rate benchmark.[359]

361. Fourth, the Panel Bank Defendants and the BBA stifled innovation and limited demand for alternative (competing) benchmarks. Through their agreement to submit rates that appeared to be fair and honest reflections of interbank lending, the Panel Bank Defendants and the BBA maintained the façade that market forces determined bbaLIBOR™ and that a more reliable benchmark was unnecessary. But for the collusion, the Panel Bank Defendants would have been forced to compete on the merits by showing that bbaLIBOR™ served its intended purpose as a proxy for competition or by incorporating other floating interest-rate benchmarks into financial products they sold. One benchmark provider recently acknowledged that "the existing LIBOR framework [has] failed to keep pace with market needs as they have developed over the past two decades."[360] Another provider recently wrote that enforcement of existing laws prohibiting fraud and price-fixing was the key to avoiding scandals like bbaLIBOR™.[361]

362. Finally, the Defendants interfered with the supply/demand balance for wholesale funding. The Bank Defendants treated bbaLIBOR™ submissions as an upper limit on interest rates they would offer for other unsecured funding products. Lloyds has admitted that its executives instructed employees not to bid for cash at rates that were out of line with their

---

[359] *See, e.g.*, UBS SOF, *supra* note 55, ¶ 97.

[360] Rate Validation Servs., *Regulation of Benchmarks and Indices: RVS Response to the EU Consultation Document*, at 10 (Nov. 15, 2012), *available at* http://ec.europa.eu/internal_market/consultations/2012/ benchmarks/individual-others/rate-valuations-services_en.pdf.

[361] Russell Resp., *supra* note 72, at 12-13.

bbaLIBOR™ submissions.  In a competitive environment, market forces determine interest rates and efficiently allocate money.

363.    The antitrust charges filed against subsidiaries of Panel Bank Defendants UBS and RBS confirm that agreements to manipulate bbaLIBOR™ constitute *per se* restraints of trade that harmed competition in the markets for USD interest-rate benchmarks, interest-rate derivatives, floating-rate loans, and floating-rate MBS in violation of Sherman Act Section 1. *Per se* treatment of the conspiracy is appropriate because the unlawful agreements were specifically related to price and quality.  Where, as here, a plaintiff alleges a *per se* violation of the Sherman Act, no allegations with respect to relevant product market, geographic market, or market power are required.  To the extent allegations may otherwise be necessary, the markets and harm to competition caused by the unlawful agreements are addressed below.

## Antitrust Injury and Damages

364.    During the conspiracy period, Doral purchased and owned interest-rate derivatives, including pay-fixed, receive-floating interest-rate swaps, that incorporated USD bbaLIBOR™ as a price term.  In addition, Doral purchased and held floating-rate MBS that incorporated USD bbaLIBOR™ as the interest-rate benchmark and made loans that were formulated based on or incorporated USD bbaLIBOR™ as a price term.  In the absence of the unlawful agreements, competitive market forces would have created overwhelming incentives for the Panel Bank Defendants and the BBA to calculate and publish USD bbaLIBOR™ in compliance with its published rules and to ensure that the London interbank market used to calculate USD bbaLIBOR™ was sufficient to measure the Panel Bank Defendants' cost of funds.  In addition, the unlawful agreements injected false information into financial markets that depended on interest-rate benchmarks for accurate information regarding the Panel Bank Defendants' costs of funds.

365.     As a result, in some circumstances Doral paid artificially high prices for financial instruments tied to USD bbaLIBOR™.  Conversely, as a result of the collusion and anticompetitive effects, Doral received less in interest-rate payments from these financial instruments tied to USD bbaLIBOR™.  These damages flow directly from the unlawful agreements' interference with competitive market forces.

366.     In the absence of collusion, the Bank Defendants could not have achieved the supracompetitive prices that they were able to charge (and increased profit margins that they were able to earn) in transactions for certain financial instruments tied to USD bbaLIBOR™.

## Rule of Reason

367.     Alternatively, analyzed under either a "quick look" or full rule-of-reason framework, the unlawful agreements unreasonably restrained trade in the markets for USD interest-rate benchmarks, OTC USD interest-rate derivatives, USD floating-rate retail loans, and floating-rate MBS.  The unlawful agreements arose from "competitor collaborations" as that term is used in the U.S. Guidelines for Collaborations Among Competitors[362] because the Bank Defendants were purported competitors in each of the defined

368.     markets as well as in the market for unsecured short-term wholesale funding.  As noted above, absent collusion, each Panel Bank Defendant would have individually competed to submit the lowest USD rates to the BBA consistent with the published bbaLIBOR™ methodology and prevented any other Panel Bank Defendant from submitting artificially low rates to the BBA.

---

[362] U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors, Apr. 2000, *available at* http://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.

369.     Even if the bbaLIBOR™ data gathering process, in fact, was intended to be a cooperative one, that does not mean that the actual submission process was intended to be collaborative and not competitive.  Even for collaborative ventures, agreements are evaluated based on their effects on competition in relevant markets.[363]  The unlawful agreements harmed the competitive processes in several markets and in several ways.

**A.     Relevant Market:  USD Short-Term Interest-Rate Benchmarks**

<u>Market Definition</u>

370.     During the relevant period, there were no reasonable substitutes for USD short-term interest-rate benchmarks.  Interest-rate derivatives and floating-rate loans require an interest-rate benchmark.  The market for USD short-term interest-rate benchmarks was global.

371.     The Defendants had substantial power in the market for short-term interest-rate benchmarks.  bbaLIBOR™ was by far the dominant short-term interest-rate benchmark and the phenomenon of network effects protected the Defendants' market power.  Panel Bank Defendants served on the supposedly independent FX & MM Committee responsible for overseeing and implementing bbaLIBOR™ during the conspiracy period.  The Bank Defendants were in the very small minority of financial institutions that could provide upstream information on the unsecured costs of funds for the largest commercial banks in the world.  The Bank Defendants were also among the dominant sellers of OTC USD interest-rate derivatives, which gave them additional market power as the most important downstream users of USD short-term interest-rate benchmarks.

372.     In addition, Bank Defendants were significant providers of USD floating-rate retail loans and floating-rate MBS, which increased their power in the market for USD short-

---

[363] *Id.* at 3-4, 24-25.

term interest-rate benchmarks.  The phenomenon of network effects further increased the

Defendants' market power because end users will prefer to purchase interest-rate derivatives that

incorporate the same short-term interest-rate benchmark that is incorporated into floating-rate

loans and MBS that they held.

Harm to Competition

373.    The unlawful agreements harmed competition in the market for USD interest-rate

benchmarks by limiting choice, deterring innovation, artificially increasing barriers to entry,

injecting false information in the market, limiting transparency, and increasing prices.

Defendants created the false impression that USD bbaLIBOR™ was suited for its intended

purpose, that users could reliably predict USD bbaLIBOR™ (the price) over the term of interest-

rate derivatives, floating-rate loans, and floating-rate MBS, and that it was carefully monitored

by an "independent" overseer.

374.    One of the reasons that the Defendants entered into the unlawful agreements was

to foreclose competition by alternative benchmarks and thereby insulate themselves from the

forces of competition.  The Bank Defendants benefited from maintaining control of the market

standard interest-rate benchmark, USD bbaLIBOR™, because it allowed them to profit on

transactions involving interest-rate derivatives, floating-rate loans, and floating-rate MBS.  In

addition, the BBA generated revenues through the licensing of USD bbaLIBOR™ and the Bank

Defendants indirectly benefited from those licensing fees as BBA members.

375.    As shown above, had the Defendants publicly disclosed their agreement to

disregard the published USD bbaLIBOR™ methodology and governance mechanisms, market

participants would have sought out, or developed, alternative benchmarks that would better serve

the purpose of USD short-term interest-rate benchmarks, or at the very least negotiated lower

prices that better reflected the additional uncertainty that would have been created by the Panel

Bank Defendants' and the BBA's self-serving rules.  In the absence of the agreement to secretly revise the USD bbaLIBOR™ methodology and governance, the Defendants would have been forced to compete on the merits to protect the status of USD bbaLIBOR™ as the dominant USD short-term interest-rate benchmark.

376.    Real-world insights into the way competition would have encouraged innovation, integrity, and reliability can be gained from market developments following the conspiracy's end.  Soon after Barclays admitted its participation in the bbaLIBOR™ manipulation, the BBA voluntarily sought to reassure users that USD Panel Banks would adhere to the published methodology in the future.[364]  The BBA stated that its top priority was to ensure the provision of a reliable benchmark which had the confidence and support of users.[365]

377.    In addition, the FSA sponsored a wide-ranging report overseen by its then Managing Director, Martin Wheatley, that eventually recommended numerous improvements to "get back to what this reference rate is supposed to do."[366]  The Wheatley Report reforms included stripping the BBA of its administrative role due to unresolvable conflicts of interest, imposing mechanisms to corroborate USD bbaLIBOR™ submissions with actual trade data, expanding the number of Panel Banks, reducing the number of currencies, and delaying publication of individual Panel Bank submissions by three months.

---

[364] Press Release, BBA, Libor Statement—Thursday 28 June (June 28, 2012), *available at* http://www.mondovisione.com/media-and-resources/news/british-bankers-association-libor-statement-thursday-28-june/.

[365] BBA, British Bankers' Association Statement Regarding the Treasury Committee's Preliminary Findings On Libor, *supra* note 144.

[366] Martin Wheatley, Managing Director, FSA, & CEO Designate, FCA at the Wheatley Review of LIBOR, Pushing the Reset Button on LIBOR (Sept. 28, 2012), *available at* http://www.fsa.gov.uk/library/communication/speeches/2012/0928-mw.shtml.

378.    In 2013, IOSCO drafted and published its Principles for Financial Benchmarks that outlined best practices for all indices, including bbaLIBOR™.[367]  Market participants advocated for a broader set of interest-rate benchmarks that could be adapted to a range of applications.  The news service Bloomberg, for example, demanded more alternatives to bbaLIBOR™.[368]  CFTC Chairman Gary Gensler advocated for the abolishment of bbaLIBOR™.[369]

379.    The BBA, in fact, implemented a number of the reforms recommended in the Wheatley Report.  In February 2014, the BBA handed control of USD bbaLIBOR™ over to a private benchmark provider, the ICE.  In response to competitive threats, ICE has since implemented additional screens to prevent manipulation, imposed additional measures to boost LIBOR's reliability, and has vowed to continue to improve LIBOR.

380.    As shown, the unlawful agreements harmed competition in the market for short-term interest-rate benchmarks by deterring innovation, eroding product quality, limiting product choice, injecting false information into the market, limiting transparency, and increasing price.

381.    In addition, the Defendants' agreement to conceal deterioration in the unsecured interbank loan market limited the ability of market participants to determine whether the interbank loan market was a trustworthy source of data.  In the absence of collusion, the

---

[367] IOSCO Principles, *supra* note 77.

[368] Darrell Duffie & Jeremy Stein, *Libor Needs More Competition*, Bloomberg View (July 22, 2014), http://www.bloombergview.com/articles/2014-07-22/libor-needs-more-competition.

[369] Gary Gensler, Chairman, U.S. C.F.T.C., Remarks of Chairman Gary Gensler on Libor Before the Global Financial Markets Association's Future of Global Benchmarks Conference (Feb. 28, 2013), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagensler-133.

Defendants would have had an incentive to apprise users of this issue and clearly identify contingency measures to respond to it.[370]

382.   The unlawful agreements did not provide any pro-competitive benefits.

Antitrust Injury

383.   The reduction of competition in the market for USD interest-rate benchmarks was a direct and material cause of Doral and the FDIC-R's injuries.  The injuries alleged by FDIC-R would not have occurred but for Defendants' antitrust violations.  In a competitive market for interest-rate benchmarks, USD bbaLIBOR™ would have been calculated according to its published rules and not subject to manipulation and systematic depression.  In the absence of the unlawful agreements, the competitive process would have created overwhelming incentives for Defendants to reliably apply the published USD bbaLIBOR™ methodology and Doral would have received the consideration for which it bargained.

384.   In addition, but for the collusion, the Defendants would have disclosed the extent of deterioration in the unsecured interbank loan market and identified methods to improve the reliability of the underlying data.  Virtually all of the recent proposals for improvement of interest-rate benchmarks would broaden the range of data to include actual transactions in unsecured wholesale funding markets.

385.   In its capacity as a lender, Doral was a consumer of USD short-term interest-rate benchmarks, including USD bbaLIBOR™, and therefore suffered direct injury because it was forced to participate in a non-competitive and non-transparent market for interest-rate benchmarks.

---

[370] *See* IOSCO Consultation Report, *supra* note 73, at 20-21 (benchmark providers should clearly disclose changes to the methodology so that users can determine whether it remains a suitable reference); IOSCO Principles, *supra* note 77, at 22-23 (benchmark providers should publish methodology in sufficient detail to allow users to understand how it is derived and its appropriateness as a reference for financial instruments).

386.    In addition, Doral was a consumer of interest-rate derivatives that incorporated bbaLIBOR™ as a payment term for Doral, and received lower payments from derivatives, loans, and floating-rate MBS where payments were determined by or formulated based on USD bbaLIBOR™.

### B.    Relevant Market:  OTC USD Interest-Rate Derivatives

<u>Market Definition</u>

387.    OTC USD interest-rate derivatives include interest-rate swaps and similar instruments used by market participants to hedge exposure to interest rates.[371]  During the conspiracy period, USD bbaLIBOR™ was the dominant interest-rate benchmark used in OTC USD interest-rate derivatives.

388.    The OTC interest-rate derivatives market differed from futures markets in a number of important respects.  Whereas futures and futures options were standardized agreements that traded on organized exchanges, the OTC market was an informal bilateral market consisting of broker-dealers that traded price information and negotiated transactions over electronic communications networks.  Although a great deal of contract standardization existed in the OTC market, dealers active in this market custom-tailored agreements to meet the specific needs of their customers. And unlike futures markets, where futures exchange clearinghouses guarantee contract performance through a system of margin requirements combined with the daily settlement of gains or losses, counterparties to OTC derivative

---

[371] Anatoli Kuprianov, *Chapter 16:  Over-the-Counter Interest Rate Derivatives*, *in* Fed. Reserve Bank of Richmond, Instruments of the Money Market 238, 238-39 (1998), *available at* https://www.richmondfed.org/publications/research/special_reports/instruments_of_the_money_market/pdf/chapter_16.pdf.

agreements must bear some default or credit risk.[372]  The unlawful agreements made the OTC

USD interest-rate derivatives market even more opaque during the conspiracy period.

389.    OTC USD interest-rate derivatives are traded in a global market.  A small set of

dealers—comprised primarily of Bank Defendants—dominated the market for OTC USD

interest-rate derivatives during the conspiracy period.  According to a July 2010 ISDA market

survey, the largest 14 dealers held 82% of interest-rate derivatives by notional amount.[373]  Of

these fourteen dealers, ten were USD bbaLIBOR™ Panel Bank Defendants:  Defendants Bank of

America, Barclays, Citibank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, RBS, Société

Générale, and UBS.[374]  Similarly, the top five U.S. bank holding companies—Bank of America

Corp., Citigroup, Inc., JP Morgan Chase & Co., Morgan Stanley, and Goldman Sachs—

accounted for more than 95% of all OTC swaps and derivatives transactions in the United

States.[375]

390.    There were no reasonable alternatives to OTC USD interest-rate derivatives.

<u>Harm to Competition</u>

391.    Competition in the OTC USD interest-rate derivatives market depends on a

reliable and predictable interest-rate benchmark.  As noted above, OTC dealers quote prices for

interest-rate swaps in two parts: (1) an interest-rate benchmark and (2) a fixed interest rate.  The

fixed rate is calculated to provide the net present value today of the expected cash flows from the

quoted benchmark over the life of the swap.  The potential purchaser of a pay-fixed, receive-

floating derivative calculates the expected cash flows by applying the published rules of the

---

[372] *Id.*

[373] Mengle, *supra* note 87, at 1.

[374] *Id.* at 2.

[375] *Id.* at 1.

quoted benchmark to the predicted market conditions over the length of the swap to determine the price it will pay for that swap.

392.    The unlawful agreements harmed competition in the market for OTC USD interest-rate derivatives by undermining price transparency and excluding alternative benchmarks from being used to price OTC USD interest-rate derivatives.  In a competitive market, bbaLIBOR™ would have been a reliable benchmark or it would have been replaced by an alternative benchmark that better served its intended purposes.

393.    The unlawful agreements did not provide any pro-competitive benefits in this market.

Antitrust Injury

394.    Doral and the FDIC-R's injuries arose from the harm to competition alleged above.  In a competitive environment, Defendants could not have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to its published methodology and therefore would have been consistently higher throughout the conspiracy period.  These injuries flow directly from the substitution of collusion for competition in the market for OTC USD interest-rate derivatives.

**C.     Relevant Market:  USD Floating-Rate Retail Loans**

Market Definition

395.    USD floating-rate retail loans are loans made by banks, including the Bank Defendants, for mortgages and other consumer uses.  Retail loans were of longer duration than the loans available in the wholesale funding markets.  There are markets for USD floating-rate

retail loans worldwide. [376] During the conspiracy period, the Bank Defendants made billions of dollars' worth of USD floating-rate retail loans, which Bank Defendants packaged into MBS for sale to investors.  For example, in 2010, more than half of all mortgages in the United States were originated by three banks:  Wells Fargo, Bank of America, and JP Morgan. [377]  During the conspiracy period, these three banks and Citigroup were consistently among the top five mortgage originators. [378]  They were also, by far, the four largest commercial banks in the United States. [379]  In 2010, these four banks held $3.6 trillion in deposits at the end of the fourth quarter, whereas the next 46 institutions in the top 50 collectively held $2.68 trillion in deposits.

396.    There were no reasonable substitutes for USD floating-rate retail loans. Participants in the market for floating-rate loans seek to transfer risk of higher future interest rates from the lender to the borrower for a price.

## Harm to Competition

397.    The unlawful agreements harmed competition in the market for USD floating-rate retail loans by limiting competition for the key interest-rate benchmark and by injecting false information that obscured the price-discovery process.  The Bank Defendants were among the largest lenders and, as a result of their conspiracy, foreclosed competition for interest-rate benchmarks.  Also as a result of the conspiracy, lenders other than the Bank Defendants were unaware that bbaLIBOR™ no longer served its intended purpose and therefore non-defendant lenders had no incentive to demand alternative interest-rate benchmarks.  The unlawful

---

[376] Wholesale loans are also referred to as "trades," with "buy" corresponding to borrow and "sell" corresponding to lend.

[377] Press Release, Mortgage Daily, 3 Biggest Lenders Close Over Half of U.S. Mortgages (Feb. 15, 2011), http://www.mortgagedaily.com/PressRelease021511.asp.

[378] *Id.*

[379] *See, e.g.*, Aarti Kanjani, *Top 50 U.S. Banks and Thrifts by Assets*, SNL Fin., Mar. 21, 2011, http://www.snl.com/InteractiveX/article.aspx?CDID=A-12500123-14138&KPLT=2.

agreements therefore restricted choice, deterred innovation, artificially increased barriers to entry, limited transparency, and increased prices.

398.    The unlawful agreements did not provide any pro-competitive benefits in this market.

Antitrust Injury

399.    Doral and the FDIC-R's injuries arose from this harm to competition.  In a competitive environment, the Defendants could not have sustained their conspiracy and USD bbaLIBOR™ would have been calculated according to its published methodology.  As a result of the reduction of competition in the market for interest-rate benchmarks, Doral lacked adequate alternatives to USD bbaLIBOR™ and was deceived into believing that USD bbaLIBOR™ sufficiently served its intended purpose.  As a direct result of the competitive harms caused by the Bank Defendants' conduct, payments to Doral on floating-rate loans that incorporated USD bbaLIBOR™ were lower than they would have been in the absence of the conspiracy.

**D.    Relevant Market:  USD Floating-Rate MBS**

Market Definition

400.    The market for USD floating-rate MBS was a global one. During the conspiracy period, the Bank Defendants were among the largest issuers and underwriters of USD floating-rate MBS.  For example, in 2009 Bank of America was the leading underwriter of U.S. mortgaged-backed securities with 17.5 percent of the total market.  Other Bank Defendants in the top 10 included Barclays, Credit Suisse, JP Morgan, Citibank, RBS, and Deutsche Bank.[380]

401.    There were no reasonable substitutes for USD floating-rate MBS.

---

[380] Adam Quinones, *Bank of America Top MBS Underwriter in 2009.  What is an MBS Underwriter?*, Mortgage News Daily, Jan. 4, 2010, http://www.mortgagenewsdaily.com/01042010_bank_of_america_mbs_uw.asp.

## Harm to Competition

402.     The unlawful agreements harmed competition in the market for USD floating-rate

MBS by limiting competition for the key interest-rate benchmark and by injecting false

information that obscured the price-discovery process.  The Bank Defendants were among the

largest issuers and underwriters of USD floating-rate MBS and, as a result of their conspiracy,

were uninterested in promoting competition for interest-rate benchmarks.  As a result of the

conspiracy, purchasers of USD floating-rate MBS paid artificially high prices for products and

received lower quality.  The unlawful agreements also limited choice, deterred innovation,

artificially increased barriers to entry, injected false information into the market, and limited

transparency.

403.     The unlawful agreements did not provide any pro-competitive benefits in this

market.

## Antitrust Injury

404.     The harms to competition in the market for USD floating-rate retail loans were a

material contributing factor to Doral and the FDIC-R's injuries because Doral purchased

significant amounts of USD floating-rate MBS from the Panel Bank Defendants and others.  In a

competitive environment, USD bbaLIBOR™ would have been calculated according to its

published methodology and Doral and the FDIC-R would not have suffered their alleged injuries

because the payments that Doral received from floating-rate MBS were less than they would

have been in the absence of the conspiracy.

## COUNT XIV:  VIOLATIONS OF THE DONNELLY ACT
### (ALL DEFENDANTS)

405.     The FDIC-R incorporates by reference the preceding paragraphs of this

Complaint, including specifically paragraphs 339-404.

406.    As explained in detail above, the Defendants unlawfully interfered with competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in violation of N.Y. Gen. Bus. Law § 340.

407.    As a result of the Defendants' fraudulent and collusive conduct, Doral and the FDIC-R have suffered damages from the artificial depression of bbaLIBOR™ in the form of, among other things, paying artificially high prices for bbaLIBOR™-based financial instruments and receiving artificially low interest payments on bbaLIBOR™-based financial products.  These damages flow directly from the unlawful agreements' interference with competition and the free exercise of any activity in the conduct of any business, trade or commerce.

408.    In the absence of collusion, the Bank Defendants could not have achieved the supracompetitive prices that they were able to charge (and increased profit margins that they were able to earn) in transactions for certain bbaLIBOR™-based financial instruments.

## PRAYER FOR RELIEF

WHEREFORE, FDIC as Receiver for Doral requests the Court to:

a.    Enter judgment for the FDIC-R awarding full damages for all economic, monetary, actual, consequential, and compensatory damages that Doral suffered as a result of Defendants' wrongful and/or inequitable conduct.

b.    Award punitive damages to the extent allowable by law.

c.    Award treble damages for violations of the Sherman Act and/or Donnelly Act.

d.    Award attorneys' fees and costs of suit.

e.    Award pre- and post-judgment interest to the extent allowable by law.

f.    Grant such other further relief as allowed by law.

## JURY DEMAND

The FDIC-R demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure.

Dated:  February 20, 2018                    Respectfully submitted,

                                             ZELLE LLP

                                             By:   */s/ James R. Martin*
                                             _____
                                                   James R. Martin
                                                   Jennifer D. Hackett
                                                   Woody N. Peterson
                                                   Miriam R. Vishio
                                                   Nicholas S. Cheolas
                                                   Allison M. Vissichelli
                                                   1775 Pennsylvania Avenue, NW
                                                   Suite 375
                                                   Washington, DC  20006
                                                   Tel:  202-899-4100
                                                   Fax:  612-336-9100
                                                   Email:   jmartin@zelle.com
                                                            jhackett@zelle.com
                                                            wpeterson@zelle.com
                                                            mvishio@zelle.com
                                                            ncheolas@zelle.com
                                                            avissichelli@zelle.com

                                                   *Attorneys for the FDIC-R*